**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| MICHAEL LASALVIA, GARRISON FUND L.P. and HAL CRAIG on behalf of themselves and all other similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> RUSSELL R. WASENDORF, SR., RUSSELL R. WASENDORF, JR., BRENDA L. CUYPERS,  SUSAN MARY O'MEARA, NEIL ASLIN, VERAJA-SNELLING COMPANY, JEANNIE VERAJA-SNELLING, AND JOHN DOES 1-10, <br><br> Defendants. | Case No. 12-cv-5546 <br><br> Judge Coleman <br><br> Magistrate Judge Denlow |

**AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Michael LaSalvia, Garrison Fund L.P. and Hal Craig ("Plaintiffs"), on behalf of themselves and of all others similarly situated, by their undersigned attorneys, for their Amended Complaint against the above-named defendants ("Defendants"), upon knowledge as to matters relating to themselves and upon information and belief as to all other matters, allege as follows:

**NATURE OF THE ACTION**

1.      On July 9, 2012, the Black Hawk County Iowa Sheriff's Department found Defendant Russell Wasendorf Sr. unresponsive in his automobile after an apparent suicide attempt.  Wasendorf was the Chief Executive Office of Peregrine Financial Group, a Futures Commission Merchant.

2.      With Wasendorf was a suicide note revealing a scheme involving the misappropriation, theft, and commingling of over $200,000,000.00 in Peregrine Financial customer funds.

3.      In the ensuing days, regulators discovered documents evidencing a scheme whereby Wasendorf had apparently misappropriated funds from customer accounts and concealed this misappropriation by forging bank statements and other documents.

4.      Wasendorf was soon arrested, and Peregrine promptly declared bankruptcy and was sued by the Commodity Futures Trading Commission.

5.      Peregrine Financial's customers, including Plaintiffs, are now left without access to any of their funds kept with Peregrine Financial.  This is a class action on behalf of Peregrine customers against the Defendants below seeking to recover the misappropriated and/or commingled customer funds.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C.  §§ 1331 and 1337 and 7 U.S.C. § 1 *et seq.*   Venue is proper under 28 U.S.C. § 1391(a) and (b) and 7 U.S.C. § 25(c), because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## SIGNIFICANT NON-PARTY

7.      Peregrine Financial Group Inc., d/b/a PFGBest, ("PFG"), a brokerage specializing in futures and foreign exchange trading located in Cedar Falls, Iowa, has headquarters in this District at 311 South Monroe Street, Suite 1300 Chicago, IL, as well as in Cedar Falls, Iowa. The company also has offices in California, Florida, Michigan, New York, and Mississauga in Ontario, Canada.

8.     At all relevant times, PFG has been registered as a futures commission merchant ("FCM") with the U.S. Commodity Futures Trading Commission ("CFTC"). PFG has been a registered FCM since 1992 and has been ranked as the second largest non-bank, non-clearing FCM in the United States.

9.     PFG has been a member of the Chicago Mercantile Exchange ("CME") at all relevant times. PFG has been a Forex Dealer Member since September 2010. Forex Dealer Members, as defined by National Futures Association ("NFA"), act as the counterparty, or offer to be the counterparty, to forex transactions, which cover all transactions in foreign currencies on the off-exchange market.

10.     As of July 10, 2012, with over $200 million missing the company's customer segregated accounts, regulators have shut down all operations of the futures broker.  PFG participated in the course of conduct underlying this action and Defendants' violations of the Commodity Exchange Act , 7 U.S.C. § 1 et seq.

11.     PFG is subject to a bankruptcy petition pursuant to Chapter 7 of the U.S. Bankruptcy Code. *See* U.S. Bankruptcy Court for the Northern District of Illinois Dkt. No. 12-27488 (Filed July 10, 2012).

## PARTIES TO THE ACTION

12. a.   Plaintiff  Michael LaSalvia ("LaSalvia") is a natural person residing in Naperville, IL.  LaSalvia maintained a customer account with PFG and believes that his funds have been commingled with PFG's own funds in violation of applicable law.

b.     Plaintiff Garrison Fund L.P. is a trading firm that maintained a customer account with PFG and believes that its funds have been commingled with PFG's own funds in violation of applicable law.

3

      c.     Plaintiff Hal Craig ("Craig") is a natural person residing in Florida. Craig maintained a customer account with PFG and believes that his funds have been commingled with PFG's own funds in violation of applicable law.

**PFG Defendants**

13.     Defendant Russell L. Wasendorf, Sr. ("Wasendorf") was the Chief Executive Officer and Chairman of the Board of PFG at relevant times. Wasendorf Sr. has been registered with the Commission as an Associated Person and a listed principal of PFG since June 15, 1992.

14.     Defendant Russell L. Wasendorf, Jr. ("Wasendorf Jr.") was the President and Chief Operating Officer of PFG at relevant times. He is the son of Wasendorf Sr.

15.     Defendant Brenda L. Cuypers ("Cuypers") was the Chief Financial Officer of PFG at relevant times. She is responsible for account balancing, financial reports and all other financial operations, including monitoring and safeguarding customer segregated funds.

16.     Defendant Susan Mary O'Meara ("O'Meara") was the Chief Compliance Officer of PFG at relevant times. She is responsible for the overall compliance of PFG, its branches and introducing brokers.

17.     Defendant Neil Aslin ("Aslin") was the President of Peregrine Financial Group Inc.

18.     Plaintiffs allege on information and belief that at relevant times an unknown number of persons, referred to as Defendants John Does 1-10, inclusive, were engaged in the commingling of customer funds with PFG's own funds in violation of applicable law as alleged herein.

19.    Plaintiffs are presently unaware of the true names and identities of those Defendants sued herein as John Does 1-10.  Any reference made to such Defendants by specific name or otherwise, individually or plural, is also a reference to the actions of John Does 1-10, inclusive.

20.    Defendants Wasendorf, Wasendorf Jr., Cuypers, O'Meara, and John Does 1-10 are hereinafter sometimes referred to as the "PFG Defendants."

*Accounting/Auditing Defendants*

21.    Defendant Veraja-Snelling Company ("VSC") was PFG's official auditor.

22.    Defendant Jeannie Veraja-Snelling ("Veraja-Snelling") is the sole proprietor of VSC, PFG's auditor.

23.    The acts alleged in this Complaint to have been committed by Defendants were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management of each of the Defendants' affairs.

## STATUTORY BACKGROUND

24.    The Commodity Exchange Act, 7 U.S.C.§§ 1 et seq (2006), as amended ("CEA" or "the Act") passed in 1936, provides federal regulation of all commodities and futures trading activities and requires all futures and commodity options to be traded on organized exchanges.

25.    In 1974, the United States Congress established CFTC a federal regulatory agency with jurisdiction over commodity futures and options trading. The CFTC has responsibility for administering and enforcing the provisions of the CEA and the regulations promulgated thereunder, 17 C.F.R .§§ 1.1 *et seq* (2012).

26.     The same legislation authorized the creation of "registered futures associations," giving the futures industry the opportunity to create a nationwide self-regulatory organization. The CFTC provides government oversight for the entire industry. Each U.S. futures exchange operates as a self-regulatory organization, governing its floor brokers, traders and member firms. Pursuant to that legislative grant of authority, the futures industry created NFA, which regulates every firm or individual who conducts futures trading business with public customers.

27.     With certain exceptions, all persons and organizations that intend to do business as futures professionals must register under the CEA. In addition, all individuals and firms that conduct futures-related business with the public must apply for NFA Membership or Associate status.

28.     The safety of the customer accounts is the cornerstone of the CEA, which ensures the safety of client funds and fosters confidence within the marketplace by mandating that customer funds be segregated and not commingled or used by the firm itself, absent certain stringent restrictions.

29.      The CEA's strict segregation requirement is expressly to eliminate risk of the loss of customer funds even in the event that a commodities firm fails. As a result, commodities account holders rely on the CEA's regulatory scheme and the industry's self-regulation to protect their assets and have not viewed the financial peril of brokerage firms as a risk to the funds in their customers' accounts.

30.     As the futures industry's Self-Regulatory Organization or ("SRO"), the NFA regulates every firm or individual who conducts futures trading business with public customers. NFA performs several regulatory activities pursuant to the authority delegated

to it by the CFTC under Section 17 of CEA including, but not limited to: a) auditing and conducting surveillance of Members to enforce compliance with NFA financial requirements; b) establishing and enforcing rules and standards for investor protection; c) screening to determine fitness to become or remain an NFA Member; and d) multiple registration functions under the CEA.

31.     PFG is a registered FCM, which is defined as individuals, associations, partnerships, corporations, and trusts that solicit or accept orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any exchange and that accept payment from or extend credit to those whose orders are accepted.

32.     FCMs receive money, securities, and other property from their customers to margin, guarantee or secure the customers' futures and options trades. Under the CEA and the Commission's regulations promulgated thereunder, FCMs are required to segregate and separately account for all customer funds.

33.     Customer funds are defined in Regulation 1.3 (gg), 17 C.F.R. §1.3 (gg) (2012) as "all money, securities, and property received by a futures commission merchant or by a clearing organization from, for, or on behalf of customers or options customers."

34.     Specifically, CFTC General Regulations Under the CEA § 1.20 states:

§ 1.20 Customer funds to be segregated and separately accounted for.

(a) All customer funds shall be separately accounted for and segregated as belonging to commodity or option customers. Such customer funds when deposited with any bank, trust company, clearing organization or another futures commission merchant shall be deposited under an account name which clearly identifies them as such and shows that they are segregated as required by the Act and this part. Each registrant shall obtain and retain in its files for the period provided in §1.31 a written acknowledgment from such bank, trust company, clearing organization, or futures commission merchant, that it was informed that the customer funds deposited therein are those of commodity or option customers and are being held in accordance with the provisions of the Act and this part:

*Provided, however,* that an acknowledgment need not be obtained from a clearing organization that has adopted and submitted to the Commission rules that provide for the segregation as customer funds, in accordance with all relevant provisions of the Act and the rules and orders promulgated thereunder, of all funds held on behalf of customers. Under no circumstances shall any portion of customer funds be obligated to a clearing organization, any member of a contract market, a futures commission merchant, or any depository except to purchase, margin, guarantee, secure, transfer, adjust or settle trades, contracts or commodity option transactions of commodity or option customers. No person, including any clearing organization or any depository, that has received customer funds for deposit in a segregated account, as provided in this section, may hold, dispose of, or use any such funds as belonging to any person other than the option or commodity customers of the futures commission merchant which deposited such funds.

* * * .

c) Each futures commission merchant shall treat and deal with the customer funds of a commodity customer or of an option customer as belonging to such commodity or option customer. All customer funds shall be separately accounted for, and shall not be commingled with the money, securities or property of a futures commission merchant or of any other person, or be used to secure or guarantee the trades, contracts or commodity options, or to secure or extend the credit, of any person other than the one for whom the same are held: *Provided, however,* That customer funds treated as belonging to the commodity or option customers of a futures commission merchant may for convenience be commingled and deposited in the same account or accounts with any bank or trust company, with another person registered as a futures commission merchant, or with a clearing organization, and that such share thereof as in the normal course of business is necessary to purchase, margin, guarantee, secure, transfer, adjust, or settle the trades, contracts or commodity options of such commodity or option customers or resulting market positions, with the clearing organization or with any other person registered as a futures commission merchant, may be withdrawn and applied to such purposes, including the payment of premiums to option grantors, commissions, brokerage, interest, taxes, storage and other fees and charges, lawfully accruing in connection with such trades, contracts or commodity options: *Provided, further,* That customer funds may be invested in instruments described in §1.25.

35.     The rules of the Chicago Mercantile Exchange ("CME") similarly prohibit

commingling of customer funds.  CME Rule 973, Customer Accounts with the Clearing

House states:

All customer funds deposited with the Clearing House on behalf of customers protected by CFTC Regulation 1.20 shall be held in accordance with the Commodity Exchange Act and CFTC Regulation 1.20 in an account identified as Customer Segregated. Such customer funds shall be segregated by the Clearing House and treated as belonging to the customers of the clearing member. Pursuant to this rule, a clearing member shall satisfy the segregation acknowledgment letter requirement of CME Rule 971.A.3., the Commodity Exchange Act, and CFTC Regulation 1.20 for customer deposits held at the Clearing House.
All customer funds deposited with the Clearing House on behalf of Cleared OTC Derivatives Customers shall be held in accordance with CME Rules 8F100 through 8F136 in an account identified as a Cleared OTC Derivatives Sequestered Account. Such customer funds shall be sequestered by the Clearing House and treated as belonging to such customers of the clearing member. Pursuant to the rule, a clearing member shall satisfy the sequestered acknowledgement letter requirement of CME Rule 971.A.3 for customer deposits held at the Clearing House.

36.     PFG, per Defendants and/or John Does 1-10, has violated these bedrock principles and regulations and commingled customer funds with its own funds. Wasendorf and PFG have failed to maintain adequate customer funds in segregated accounts.  That shortfall allegedly exceeds and has exceeded $200 million.  PFG and Wasendorf have allegedly used customer funds for purposes other than those intended by its customers, and have misappropriated these funds and submitted false and erroneous information to auditors and regulators regarding the amount of customer segregated funds held by PFG.

## SUBSTANTIVE ALLEGATIONS

### Introduction: Defendant Wasendorf Sr. is Arrested After a Suicide Attempt

37.     On July 9, 2012, Wasendorf unsuccessfully attempted suicide outside PFG offices in Cedar Falls, Iowa. He left a suicide note admitting a long-standing fraud at the company he controlled, PFG.

38.     On July 11, 2012, the CFTC filed a criminal complaint in the United States District Court for the Northern District of Illinois against Wasendorf alleging fraud

by misappropriating customer funds, violation of customer fund segregation laws, and making false statements in financial statements filed with the Commission. (*U.S. v. Wasendorf,* 12-mj-00131, U.S. District Court, Northern District of Iowa (Cedar Rapids)).

39.     The complaint states that Defendant Wasendorf violated 18 U.S.C. § 1001(a)(1)&(3) by "making and using false statements in a matter within the jurisdiction of the Government of the United States." An affidavit in support of the criminal action quotes portions of a signed written statement by Wasendorf in which he admits to misappropriating customer funds over a period of two decades.

40.     Wasendorf admitted using a scheme of false bank statements to embezzle millions of dollars from customer accounts over a long time period and since about 1993. In his note, Mr. Wasendorf wrote, in relevant part:

> I have committed fraud….. Through a scheme of using false bank statements I have been able to embezzle millions of dollars from customer accounts at Peregrine Financial Group, Inc. The forgeries started nearly twenty years ago and have gone undetected until now…
> The bank statements were always delivered directly to me when they arrived in the mail. I made counterfeit statements within a few hours of receiving the actual statements and gave the forgeries to the accounting department."

41.     Indeed, the affidavit details Defendants' conduct and failure to discover/aid and abet Wasendorf Sr.'s fraud during this time:

> On July 9, 2012, Russ Jr. reported to law enforcement that, to determine if Wasendorf's statements in the signed statement were accurate, Russ, Jr. obtained a purported bank statement for PFG's US Bank account ending in 845, titled "Customer Segregated Acct," for the month ending December 31, 2011. Russ Jr. obtained the purported statement from PFG's accounting department. The ending balance on the purported bank statement was $221,770,946.18. Subsequently, Russ, Jr. obtained the bank statement for the same period directly from US Bank personnel. The bank statement obtained from US Bank personnel indicated an ending balance as of December 31, 2011 of $6,337,628.14.

Agent Langdon Affidavit at para. 7

> Also, Defendant Cuypers:
>
> verified she used the purported bank statement from PFG's accounting department indicating a balance of $221,770,946.18 as of December 31, 2011 when she prepared PFG's year-end financial statement. This financial statement, reflecting an inflated amount of customer segregated funds, was sent to PFG's regulators to include the CFTC.

*Id.* at para. 8.

42.     The affidavit also shows that PFG's bank statements for its segregated

accounts were being sent directly to a P.O. Box, specifically the falsified accounts:

> PFG customer segregated account verification records in possession of the NFA (and obtained from the CFTC) include falsified US Bank statements and corresponding account confirmation forms purporting to be for PFG's US Bank account ending in 845 (PFG's customer segregated account). The falsified US Bank statements and corresponding account confirmation forms list US Bank's address as "P.O. Box 706, Cedar Falls, IA 50613-0030." One such US Bank statement is for the period ending February 28, 2010 and reports a total balance of $207,260,962.28 in the account. A corresponding account confirmation form reports the same balance and bears a purported signature of an authorized representative of US Bank. Another such US Bank statement is for the period ending March 31, 2011 and reports a total balance of $218,650,550.98 in the account. A corresponding account confirmation form reports the same balance and bears a purported signature of an authorized representative of US Bank.

*Id.* at para. 11.

43.     In reality, the bank accounts were hundreds of millions less:

> According to the CFTC, the records were sent to the NFA. Law enforcement has obtained copies of actual statements for PFG's US Bank account ending in 845 for the time periods including February 28, 2010, and March 31, 2011. According to the actual statements from US Bank, on February 28, 2010, the account held a total of $9,171,177.08, and on March 31, 2011, the account held a total of $7,181,336.36.

*Id.*

44.     On July 13, 2012, Wasendorf was arrested by federal prosecutors in Iowa and charged with making false statements to the CFTC. Wasendorf is in federal custody pending a bail hearing set for July 27, 2012 in Cedar Rapids Iowa.

***PFG Defendants' Failure to Segregate Funds, Misappropriate Customer Funds and Make False Statements to the CFTC***

45.     On July 10, 2012, the CFTC sought emergency injunctive relief against PFG and Wasendorf for violation of the CEA and the Commission's Regulations by misappropriating over $200 million from a segregated customer account. The regulatory case is *U.S. Commodity Futures Trading Commission v. Peregrine Financial Group Inc.*, 12-cv-05383, U.S. District Court, Northern District of Illinois (Chicago).

46.     The CFTC alleged that from at least February 2010 through the present, "PFG and Wasendorf have used customer funds for purposes other than those intended by PFG's customers, and consequently, have misappropriated these funds. The whereabouts of the funds is currently unknown."

47.     Additionally, between September 2011 and the present, PFG and Wasendorf have filed false reports with the CFTC regarding the amount of customer funds maintained in segregated accounts, a violation of the CEA and Commission Regulations.

48.     At all relevant times, PFG's segregated account at U.S. Bank in Cedar Falls, Iowa, Account No. XXXX1845 ("1845 Account"), and at least since February 2010, did not contain adequate customer funds. This constitutes a violation of Regulation 1.20 (a) 17 C.F.R. §1.20 9a) (2012) which requires in part that all customer funds be separately accounted for and segregated as belonging to commodity or option customers

and deposited under an account name which clearly identifies them as such and shows

that they are segregated as required by the act and the Regulations.

49. Specifically, the CFTC alleges as follows:

a. On or about February 28, 2010, PFG records showed a balance of approximately $207 million in the 1845 Account. PFG had received at least that amount from customers. However, the actual balance in the account was less than $10 million.

b. On or about March 30, 2011, PFG records showed a balance of approximately $218 million in the 1845 Account. PFG had received at least that amount from customers. However, the actual balance in the account was less than $10 million.

c. On or about July 9, 2012, PFG records showed a balance of approximately $225 million in the 1845 Account. PFG had received at least that amount from customers. However, the actual balance in the account was approximately $5 million.

50. In addition, PFG by and through Wasendorf, and Wasendorf individually,

violated Section 4b(a)(1)(A)(C) of the CEA, as amended, 7 U.S.C. §6b(a)(1)(A)(C)

which prohibits misappropriating customer funds for purposes other than those intended

by its customers.

51. Under Regulation 1.10(b), 17 C.F.R. §1.10 (b) (2012), FCMs must file

monthly financial reports with the CFTC, commonly known as a "1-FR" or "financial

report." Pursuant to Regulation 1.32, 17 C.F.R. §1.32 (2012), FCMs must also monitor

and compute their segregation requirements and customer funds on deposit in segregated

accounts on a daily basis and maintain copies of these reports, commonly known as a

"daily segregation computation."

52. By filing false 1-FR statements with the CFTC on and after August 15,

2011, PFG, by and through Wasendorf and Wasendorf individually violated Section 6(c)

(2) of the Act, as amended, 7 U.S.C. §§9,15. Each and every false 1-FR statement that

PFG and Wasendorf filed with the Commission constitutes a separate and distinct violation. [1]

53.    Therefore, as outlined in the Declaration of a CFTC Futures Trading Investigator, Melissa Glasbrenner, the Defendants have allegedly committed the following unlawful acts:

a. From at least February 2010 through the present, Defendants have failed to maintain adequate customer funds in a segregated account;

b. By using customer funds for purposes other than those intended by customers, Defendants misappropriated those funds;

c. The shortfall exceeds $200 million; and

d. Defendants have also filed false reports with the Commission regarding the amount of PFG's customer segregated accounts.

54.    Based on the foregoing, PFG, through Defendants and/or John Does 1-10, has violated Section 13 of the CEA.  Defendants are also liable for such violations pursuant to Section 2(a)(1) of the CEA.  On information and belief, Plaintiffs have been injured by this violation because it has or is likely to prevent Plaintiffs from accessing their funds held in their PFG accounts and, in the event PFG is insolvent, will likely result in monetary harm to Plaintiffs if PFG is unable to repay the sums held in Plaintiffs' PFG accounts.

---

[1]A Futures Trading Investigator with the Division of Enforcement of the FCTC, stated that a review of PFG's September 2011, December 2011, and May 2012 monthly form 1-FRs submitted to NFA and the Commission by Wasendorf indicate the Firm's customer segregated balance ranged from $360 - $520 million." Based on information received from US Bank Management and NFA staff, PFG's customer segregated balance as reported by Wasendorf on the firm's September 2011, December 2011 and May 2012 Form 1-FRs was overstated by at least $200 million."

55.     During the relevant time period and in a letter addressed to customers of PFG, Wasendorf continued to fraudulently state to clients that his company's first priority was to protect clients:

> PFGBEST is not only customer-centric but compliance-focused. We consider it a privilege to conduct business with you and to be an advocate for you. We abide by all regulations mandated by the CFTC and the rules of the NFA to hold customer funds in segregated accounts that are always separate from operational funds. An independent certified audit is conducted annually in additional to periodic regular audits by NFA and information requests from the CFTC and exchange representatives. It is our policy to keep extra funds on deposit in our customer segregation account to protect you."

### *Defendant Wasendorf Jr.'s False Statements to the Public*

56.     Further, as the much-publicized collapse of futures commission merchant MF Global unfolded, Defendant Wasendorf, Jr. stated in a letter to customers: "We abide by all regulations mandated by the CFTC and the rules of NFA to hold customer funds in segregated accounts that are always separate from operational funds. PFGBEST reports daily and monthly to the regulators concerning customer segregated funds….. It is our policy to keep extra funds on deposit in our customer segregation accounts to protect you" The complete text of Wasendorf Jr.'s letter states:

> Dear PFGBEST customers:
>
> In the wake of MF Global Holdings Ltd. filing for Chapter 11 protection yesterday, and continuing investigation into whether and how MF Global failed to keep clients' collateral separate from its own accounts, I would like to reaffirm the absolute dedication of PFGBEST to protect you and your PFGBEST accounts. PFGBEST is not only customer-centric, but compliance-focused. We consider it a privilege to conduct business with you and to be an advocate for you. We abide by all regulations mandated by the CFTC and the rules of NFA to hold customer funds in segregated accounts that are always separate from operational funds. PFGBEST reports daily and monthly to the regulators concerning customer segregated funds. An independent, certified audit is conducted annually in addition to periodic, regular audits by NFA and information requests from the CFTC and exchange representatives.

It is our policy to keep extra funds on deposit in our customer segregation accounts to protect you. PFGBEST has significant excess capital. Currently, PFGBEST holds 169% of the net capital required by the CFTC and NFA. All PFGBEST capital is held in cash or U.S. Treasury bills. PFGBEST does not use subordinated debt as capital.

PFGBEST does not clear customer transactions with MF Global, and it is not a counterparty for PFGBEST. PFGBEST does not clear customer transactions with MF Global, and it is not a counterparty for PFGBEST.

PFGBEST does not do proprietary trading; the only trading done by PFGBEST is in specific instances by emerging CTAs that PFGBEST allocates funds to (always less than $100k) so that they can become "products" that the PFGBEST Managed Futures Division can then offer to customers. The total amount of funds currently allocated is less than $400k. PFGBEST is in communication with regulators and exchanges to assist in any way with solutions for the MF Global customers impacted by recent events.
Thank you.

Russ Wasendorf, Jr.
President and Chief Operating Officer

57.     Defendant Wasendorf Jr. made these blatantly false statements despite the

massive fraud taking place at PFG.

***Audits Never Disclose the Fraud***

58.     From 2008 until the present, Defendant Veraja-Snelling Company audited

PFG.

59.     Defendant Veraja-Snelling Company and its principal, Jeannie Veraja-

Snelling signed off on PFG's financials.

60.     On May 31, 2012, PFG reported to the CFTC that its customer accounts in

segregation totaled $376,523,865.00.

61.     In reality, as detailed above in Agent Langdon's affidavit, this account

was worth hundreds of millions less.

*Receivership and Bankruptcy*

62.     On July 10, 2012 in U.S. District Court appointed a receiver and froze PFG assets "given the magnitude of missing customer funds." *U.S. Commodity Futures Trading Commission v. Peregrine Financial Group Inc.,* 12-cv-5383, U.S. District Court, Northern District of Illinois, Eastern Division.

63.     On July 16, 2012 the Court authorized the Receiver to "take exclusive custody, control, and possession of all funds, property, and other assets in the possession, ownership, or control of Wasendorf, Sr. and any of the Wasendorf Entities, wherever situated, including funds, property and other assets jointly held by Wasendorf, Sr. and one or more individuals and/or entities. "

64.     The Receiver will also take exclusive custody, control, and possession of all customer funds and property and other assets traceable to PFG customers in the possession, ownership, or control of Wasendorf, Sr. or the Wasendorf Entities.

65.     Also on July 10, 2012, PFG filed a petition for relief under Chapter 7 of the Bankruptcy Code, 11 U.S.C. Section 101, *et seq.* [ *In re Peregrine Financial Group Inc*., 12-27488, U.S. Bankruptcy Court, Northern District of Illinois (Chicago).]

66.     By filing for protection under Chapter 7, as opposed to Chapter 11, of the bankruptcy code, the company is demonstrating that it has intentions of an immediate liquidation. Lehman and MF Global, on the other hand, filed for Chapter 11 protection, which gives a company much more time and control to reorganize or wind down its operations.

67.     Also in a futures-brokerage bankruptcy, a trustee is appointed to return segregated customer funds. The trustee collects and liquidates company assets and

distributes the proceeds, subject to court approval.[2] However, in this case, approximately 24,000 customers had accounts with the firm and are missing money. Approximately $200 million is missing from customer segregated accounts.

68.     Customers may be blocked from accessing their funds held in their PFG accounts and, in the event PFG is insolvent, will likely suffer monetary harm if PFG is unable to repay the sums held in Plaintiffs' PFG accounts.

***Previous Regulatory Actions / NFA Fines***

69.     In February 2012, the Business Committee of NFA issued a Complaint against PFG, Wasendorf, Jr., Compliance Officer Susan O'Meara, and Nolan J. Schiff, PFG's director of managed foreign exchange. The Complaint alleged that PFG, Wasendorf, and O'Meara failed to supervise four of PFG's Guaranteed Introducing Brokers (GIBs ).

70.     During 2010 and 2011, NFA stated, the GIBs made trade recommendations that maximized commissions without regard for the best interests of their customers and that all four GIBs made deceptive sales solicitations. (NFA Case No. 12-BCC-001).

71.     PFG agreed to pay a fine of $700,000 to NFA and to retain an independent consultant to review PFG's existing procedures for supervising its GIBs and make specific recommendations for the supervision of trading in broker assisted retail customer accounts.

72.     NFA also stated that PFG, Wasendorf, O'Meara and Schiff failed to diligently supervise activities related to the firm's forex customers' accounts by failing to

---

[2] In the filing, PFG listed assets of more than $500 million and debt exceeding $100 million.

ensure the implementation of effective AML procedures related to some of those accounts. (NFA Case No. 12-BCC-001)

73.     Later this year, on July 9, 2012, NFA took other enforcement actions against PFG and issued a Membership Responsibility Action (MRA) alleging that based on information provided by US Bank that PFG did not have sufficient assets to meet its obligations to its customers or demonstrate the firm was in compliance with its capital requirements.

74.     NFA stated that PFG reported it had about $400 million in the customer-segregated account in early July 2012, of which $225 million was on deposit at U.S. Bank. NFA said it learned that PFG "may have falsified bank records" after finding only approximately $5 million on deposit.

75.     Moreover, the NFA stated that when PFG reported bank balances of more than $200 million in February 2010 and March 2011, in fact it had less than $10 million for each one of these months.

76.     As a result of the NFA enforcement action, PFG is prohibited from accepting or placing trades for any customer accounts except for the liquidation of existing customer positions and are prohibited from distributing, disbursing or transferring any funds, including to existing customers, without the prior approval of NFA.

## CLASS ALLEGATIONS

77.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP").  The Class in this action ("Class") consists of persons, other than Defendants, their employees, affiliates and agents, who held money

or other assets in PFG customer accounts as of any time during the longest period allowed by the applicable statutes of limitations, and in any event at least between January 1, 2010 and July 10, 2012 ("Class Period").

78.     At least thousands of persons are believed to be members of the putative class ("Class"), and those persons or entities are geographically dispersed.  Therefore, joinder is impracticable pursuant to FRCP Rule 23(a)(1).

79.     Common issues of fact or law predominate over individual issues within the meaning of FRCP Rule 23(a)(2).

80.     Common issues of law and fact include but are not limited to:

(i)     whether PFG commingled funds held in customer accounts with its own funds;

(ii)     whether PFG and Defendants violated the CEA;

(iii)     whether a constructive or actual trust should be impressed upon the ill-gotten gains obtained by Defendants as fruits of their misconduct; and

(iv)      the sum of Plaintiffs' and the Class's damages.

81.     Plaintiffs' interests are typical of, and not antagonistic to the interests of, the Class.

82.     Plaintiffs have retained competent counsel experienced with class actions and commodities litigation and intend to vigorously prosecute this action.

83.     Common issues predominate.  A class action is superior to all other methods for the fair and efficient adjudication of this controversy.  Indeed, a class action is the only method by which Plaintiffs and the Class can efficiently seek redress and obtain a uniform adjudication of their claims.

84.     The size of individual damages is small in comparison to the complexity and scope of the Defendants' alleged unlawful conduct.  Plaintiffs do not anticipate any difficulties in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### (Violation of the Commodity Exchange Act
### §§13(a)(1) and 13(a)(5) against all PFG Defendants)

85.     Plaintiffs incorporate and re-allege each of their previous allegations as though fully set forth herein.

86.      Section 13(a)(1) of the CEA makes it unlawful for any "person registered or required to be registered under [the CEA] to embezzle, steal, purloin, or with criminal intent to convert to such person's use or to the use or another, any money securities or property having a value in excess of $100, which was received by such person or any employee or agent thereof to margin, guarantee or secure the trades or contracts of any customer or accruing to such customer as the result of such trades or contracts, or which otherwise was received from any customer, client or pool participant in connection with the business of such person.  PFG was at relevant times registered as an FCM under the CEA  converting customer funds and/or commingling customer funds with PFG's funds.

87.     Section 13(a)(5) of the Commodities Exchange Act  makes it unlawful for any person to willfully violate any other section of the CEA or any regulation promulgated thereunder.  CFTC General Regulations Under the Commodity Exchange Act § 1.20, reproduced at Paragraph 17, *supra*, is a regulation promulgated under the CEA and prohibits any commingling of customer funds with funds of an FCM.

88.     Defendants and/or John Does 1-10, have violated Section 13(a)(1) and/or Section 13(a)(5) of the Commodity Exchange Act by converting customer funds and/or commingling customer funds with PFG's funds.

89.     Plaintiffs and the Class are each entitled to actual damages for the violations of the CEA alleged herein.

## COUNT II

**(Violation of Commodity Exchange Act §4b(a)(2): Fraud by Misrepresentation in Connection with a Futures Contract Against Defendant Wasendorf Sr.)**

90.     Plaintiffs incorporate by reference and reallege the preceding allegations, as though fully set forth herein.

91.     Pursuant to Section 4b(a)(2) of the CEA, 7 U.S.C. § 6b(a)(2), it is unlawful

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, for or on behalf of any other person if such contract for future delivery is or may be used for (A) hedging any transaction in interstate commerce in such commodity or the products or byproducts thereof, or (B) determining the price basis of any transaction in interstate commerce in such commodity, or (C) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof – (i) to cheat or defraud or attempt to cheat or defraud such other person; (ii) willfully to make or cause to be made to such other person any false report or statement thereof, . . .[or]; (iii) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person.

92.     During the relevant Class Period, Wasendorf cheated or defrauded or attempted to cheat or defraud, willfully made or caused to be made false reports about the purported financial condition of PFG in monthly or quarterly reports that were publicly disseminated and filed with the CFTC, and willfully deceived or attempted to deceive Plaintiffs and the Class by making misrepresentations of material facts, and omitting material facts in violation of Sections 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i)-(iii).  Specifically, Wasendorf and PFG held PFG out the public and its customers as a solvent organization that was in compliance with regulatory requirements, including without limitation the requirements concerning segregation and safeguarding of customer funds.

93.     Each misrepresentation or omission of material fact, actual or attempted act to cheat, defraud, or deceive, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Sections 4b(a)(2)(i)-(iii) of the 3.

94.     As a result of the foregoing violations of the CEA, Wasendorf and PFG are liable to Plaintiffs and the Class pursuant to Section 22(a) of the CEA, 7 U.S.C. § 25(a).

95.     Plaintiffs and the Class were damaged by Wasendorf's unlawful conduct, and are each entitled to actual damages for the violations of the CEA alleged herein.

**COUNT III**
**(Violation of the Commodity Exchange Act**
**§ 2(a)(1) Against All PFG Defendants)**

96.     Plaintiffs incorporate and re-allege each of their previous allegations as though fully set forth herein.

97.     Wasendorf, the other Defendants, and/or John Does 1-10, have violated Section 13(a)(1) and/or Section 13(a)(5)  of the Commodity Exchange Act by converting customer funds and/or commingling customer funds with PFG's funds.

98.      Defendants and/or John Does 1-10, was/were acting for and/or as agent(s) of  PFG and Wasendorf Jr., Cuypers and O'Meara.  Under Section 2(a)(1)(B) of the CEA, 7 U.S.C. §2(a)(1)(B), such Defendants are liable for the acts of their agents or another person acting for them.

99.     Plaintiffs and the Class are each entitled to actual damages for the violations of the CEA alleged herein.

## COUNT IV
**(Breach of Fiduciary Duty Against All PFG Defendants)**

100.     Plaintiffs incorporate and re-allege each of their previous allegations as though fully set forth herein.

101.     Defendants, by virtue of their positions with PFG, were responsible for safeguarding the money and property deposited with PFG by Plaintiffs and the putative Class.  Defendants were also required to implement and follow a system of internal controls and procedures designed to ensure that customer money was segregated and safeguarded as required by law and regulation.

102.     As such, Defendants owed Plaintiffs and the Class a fiduciary duty to preserve and protect their assets, to prevent conversion and/or commingling of same, and to maintain a system of internal controls and procedures sufficient to fulfill these duties.

103. Defendants breached the obligations and fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision by, *inter alia,* failing to preserve the safety and security of the money and property of PFG customers, failing to adopt and adhere to a system of internal controls and procedures designed to preserve the safety and security of the money and property of PFG customers, commingling PFG customer assets with PFG's assets and possibly the assets of other persons, and failing to maintain PFG customer money and property in segregated accounts as required by law.

d) failing to maintain the customer assets in separates account that were legally and p distinct from PFG's own accounts.

104. As a direct and proximate result of Defendants' breaches of their fiduciary duty, Plaintiffs and the Class members have been injured in their property and have suffered and continue to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.

## COUNT V
### (Aiding and Abetting Breach of Fiduciary Duty Against Defendants Wasendorf Jr, Cuypers, O'Meara, Aslin, Veraja-Snelling Company, and Veraja Snelling)

105. Plaintiffs incorporate and re-allege each of their previous allegations as though fully set forth herein. This cause of action is asserted against Defendants Wasendorf Jr., Cuypers, O'Meara, Aslin, Veraja-Snelling Company, and Veraja Snelling.

106. Defendant Wasendorf Sr. owed fiduciary duties to Plaintiffs and Class members. These Defendants breached the obligations and fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision as further alleged *supra*.

107.    By virtue of their conduct and omissions herein, Defendants knowingly or recklessly aided and abetted, encouraged, and rendered substantial assistance to these Defendants to accomplish the breaches of fiduciary duty and wrongful acts complained of herein

108.    As a result of the wrongful conduct and omissions of Defendants, Plaintiffs and the Class have suffered and continue to suffer injury to their property and economic and non-economic losses, all in an amount to be determined according to proof at trial.

## COUNT VI
### (Negligence Against All Defendants)

109.    Defendants had a duty of care to Plaintiffs to ensure that Plaintiffs money was securely held.

110.    By failing to supervise and/or prevent Defendant Wasendorf Sr. from commingling and converting money from Plaintiffs' accounts, Defendants breached that duty.

111.    As a direct and proximate cause to these actions and/or inaction, Plaintiffs have lost much or all of their money in PFG accounts.

## COUNT VII
### (Conversion Against PFG Defendants)

112.    Plaintiffs incorporate and reallege each of their previous allegations as though fully set forth herein.

113.    PFG Defendants took unauthorized and wrongful possession of Plaintiffs funds.

114.    Plaintiffs have a right to those funds.

115.     Plaintiffs, by virtue of their accounts at PFG have rights to immediate possession of those funds.

116.     Plaintiffs demand those funds.

## COUNT VIII
### (Accounting Against All Defendants)

117.     Plaintiffs incorporate and reallege each of their previous allegations as though fully set forth herein.

118.     At all relevant times, Defendants owed a fiduciary duty to Plaintiffs by virtue of their positions with PFC, were responsible for safeguarding the money and property deposited with PFC by Plaintiffs and the putative Class.  Defendants were also required to implement and follow a system of internal controls and procedures designed to ensure that customer money was segregated and safeguarded as required by law and regulation.

119.     Defendants breached that duty by, *inter alia*, allowing Wasendorf Sr. to convert Plaintiffs' funds.

120.     Defendants must account for the moneys they have received as a result of the wrongdoing.

121.     An equitable accounting is warranted because Defendants' wrongdoing.

## COUNT IX
### (Constructive Trust)

122.     Plaintiffs incorporate and reallege each of their previous allegations as though fully set forth herein.

123.     Plaintiffs funds were wrongfully commingled and converted by PFG Defendants in breach of their fiduciary duties.

124.    Plaintiffs seek a constructive trust for those funds.

## COUNT X
**(Unjust Enrichment)**

125.    Plaintiffs incorporate and re-allege each of their previous allegations as though fully set forth herein.  This cause of action is asserted against Defendant Wasendorf Sr.

126.    At relevant times, Defendant Wasendorf Sr., by and through PFG and/or one or more other persons, wrongfully caused approximately $215 million in segregated cash (and/or assets) that lawfully belongs to Plaintiffs and/or members of the proposed Class to be transferred to Defendant Wasendorf Sr.

127.    There now exists a substantial controversy between Defendant Wasendorf Sr. on the one hand and Plaintiffs and the proposed Class on the other hand as to the ownership of the $215 million and/or as to any other cash (and/or assets) in the possession of Defendant Wasendorf Sr. and/or any third parties in receipt of any such money or property that lawfully belongs to Plaintiffs and members of the proposed Class, in an amount not yet ascertained and transferred at a time or times not presently known to Plaintiffs.

128.    By reason of the conduct alleged in the Complaint, including the transfer and/or the receipt by Defendant Wasendorf Sr. of other amounts not yet ascertained at some other time relevant to the allegations in this Complaint that lawfully belongs to Plaintiffs and/or members of the proposed Class, Defendant Wasendorf Sr. has received a significant pecuniary benefit at the expense of Plaintiffs and members of the proposed Class.

129.     Defendant Wasendorf Sr. has been unjustly enriched by the receipt of approximately $215 million in cash (and/or assets) and/or other amounts not yet ascertained that lawfully belongs to Plaintiffs and/or members of the proposed Class.

130.     Defendant Wasendorf Sr. and/or one or more of the Defendants to this action or other persons whose identities are presently unknown, delivered to Defendant Wasendorf Sr. cash (and/or assets) that lawfully belongs to Plaintiffs and/or members of the proposed Class,  and consequently, Defendant Wasendorf Sr. holds such assets in trust for the benefit of the Plaintiffs and members of the Class and has a lawful or equitable duty to return such funds to their proper owners.

131.     Defendant Wasendorf Sr. has failed to return to Plaintiffs and members of the proposed Class the cash (and/or assets) that lawfully belong to them. It is against equity and good conscience to permit Defendant Wasendorf Sr. to retain the $215 million in cash (and/or assets) and/or other amounts not yet ascertained that lawfully belongs to Plaintiffs and/or members of the proposed Class.

132.     As a direct and proximate result of the actions of Defendant Wasendorf Sr., PFG and/or one or more of the Defendants to this action or other persons whose identities are presently unknown, Plaintiffs and members of the proposed Class have suffered actual and substantial damages in an amount to be determined at trial.

## JURY DEMAND

133.     Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment:

(a)      Ordering that this action proceed as a class action as to all claims previously alleged;

(b)      awarding money damages, including prejudgment interest, on each claim in an amount to be established at trial;

(c)       awarding statutory attorneys' fees and costs, and other relief;

(d)      imposing a constructive trust on the ill-gotten gains of Defendants in the ultimate res of which each Class member shall have an undivided interest, and disgorging any and all sums by which Defendants have been unjust enriched;

(e)      ordering an accounting of Plaintiffs and the Class' assets;

(f)      directing further proceedings to determine the distribution of the trust among Class members, *inter se*, and awarding attorneys' fees and expenses to Plaintiffs' counsel; and

(g)      granting such other relief as to this Court may seem just and proper.

Dated:   July 30, 2012

SALAS WANG LLC

s/Jeffrey M. Salas
Jeffrey M. Salas
John C. Wang
155 N. Wacker Drive, Suite 4250
Chicago, IL 60606
Tel: 312.803.4963
Fax: 312.244.3151
jsalas@salaswang.com

LAW OFFICE OF
   CHRISTOPHER J. GRAY P.C.
Christopher J. Gray
Alice H. Oshins
460 Park Avenue, 21st Floor
New York, NY 10022

Tel: 212.838.3221
Fax: 212.937.3139
chris@investorlawyers.net

LAW OFFICES OF
  JOSHUA B. KONS, LLC
Joshua B. Kons
27 North Wacker Dr., No. 203
Chicago, IL 60606
 Tel: 773.270.9051
joshuakons@konslaw.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Jeffrey M. Salas, hereby certify that true and correct copies of the foregoing pleadings were served on Defendants Russell Wasendorf Jr., Russell Wasendorf Sr. via U.S. Mail on this 30th day of July, 2012.   Counsel has also served the Service List below via ECF.

*/s/ Jeffrey M.  Salas*
Jeffrey M. Salas

*Service List:*

Jeffry Henderson
Harris Kay
175 West Jackson Boulevard
Suite 240
Chicago, Illinois 60604

*Attorneys for Cuypers and O'Meara*