**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| *In re Peregrine Financial Group Customer Litigation* | Civil Action No: 12-cv-5546 |
| | Judge Sharon Johnson Coleman |
| | Magistrate Judge Morton Denlow |
| | **JURY TRIAL DEMANDED** |

**<u>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   JURISDICTION AND VENUE ........................................................................... 2

III.  THE PARTIES .................................................................................................... 2

      A.   Plaintiffs .................................................................................................... 2

      B.   Defendants ................................................................................................. 5

IV.   PFG'S THEFT OF $200 MILLION IN CUSTOMER FUNDS............................ 7

      A.   PFG and the Governing Regulatory Framework......................................... 7

      B.   PFG's Misuse of Customer Funds.............................................................. 8

      C.   The Regulatory Framework Applicable to the Banks ................................ 12

      D.   Actions of U.S. Bank Leading to the Loss of Customer Funds ................. 14

            1.   U.S. Bank Accounts Maintained by PFG and Its Affiliates ................. 14

                 a.   PFG's Two Primary U.S. Bank Accounts .................................. 15

                 b.   U.S. Bank Accounts of Wasendorf and PFG's Affiliates............ 17

            2.   U.S. Bank Knew PFG Was Holding Out the 1845 Account As Its Segregated
                 Customer Account ............................................................................. 17

            3.   U.S. Bank Also Knew That PFG Was Not Treating the 1845 Account as a
                 Customer Segregated Account............................................................. 19

            4.   U.S. Bank Did Not Act Despite Many Additional Red Flags .............. 24

                 a.   U.S. Bank Did Not Receive Balance Confirmation Requests ..... 24

                 b.   U.S. Bank Knew That PFG Was Not Earning Revenue From the 1845
                      Account and Was Not Profitable ................................................ 26

                 c.   Wasendorf Insisted That U.S. Bank Communicate Only With Him About
                      PFG and Its Accounts ............................................................... 26

            5.   PFG's Record of Regulatory Violations.............................................. 27

i

　　　　6.　U.S. Bank Did Nothing to Prevent the Theft ........................................ 29

　　E.　Actions of JPMorgan Leading to the Loss of Customer Funds ................... 30

V.　TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATION ............................. 32

VI.　CLASS ACTION ALLEGATIONS ................................................................ 33

COUNT 1　　　Fraud by Omission (Against Defendant U.S. Bank) ........................................... 36

COUNT 2　　　Violation of the Illinois Fiduciary Obligations Act, 760 Ill.
　　　　　　　Comp. Stat. § 65/1 et seq., or, alternatively, of various states'
　　　　　　　enactments of the Uniform Fiduciaries Act (Against U.S. Bank) ...................... 38

COUNT 3　　　Breach of Contract (Against JPMorgan) ............................................................ 39

COUNT 4　　　Negligence (Against U.S. Bank) ......................................................................... 41

COUNT 5　　　Negligence (Against JPMorgan) ........................................................................ 43

COUNT 6　　　Breach of Fiduciary Duty (Against U.S. Bank) .................................................. 45

COUNT 7　　　Breach of Fiduciary Duty (Against JPMorgan) .................................................. 47

COUNT 8　　　Aiding and Abetting Fraud (Against U.S. Bank) ................................................ 48

COUNT 9　　　Aiding and Abetting Breach of Fiduciary Duty (Against U.S. Bank) ............... 49

COUNT 10　　　Aiding and Abetting Conversion (Against U.S. Bank) ..................................... 51

COUNT 11　　　Fraud (Against Wasendorf) ............................................................................... 53

COUNT 12　　　Breach of Fiduciary Duty (Against Wasendorf and Wasendorf Jr.) .................. 55

COUNT 13　　　Conversion (Against Wasendorf) ....................................................................... 57

COUNT 14　　　Aiding And Abetting Direct Violations Of The Commodity Exchange Act
　　　　　　　　(Against Wasendorf Jr.) ..................................................................................... 58

COUNT 15　　　Aiding and Abetting Breach of Fiduciary Duty (Against Wasendorf Jr.) ........... 60

COUNT 16　　　Negligence (Against Wasendorf Jr.) ................................................................... 62

COUNT 17　　　Negligent Misrepresentation (Against Wasendorf Jr.) ........................................ 64

COUNT 18　　　(Direct Violations of the Commodity Exchange Act) (Against Wasendorf) ...... 66

COUNT 19      Violations of Section 4b(a)(1)(A) and (C) of the CEA, as amended, (Fraud by Misappropriation) (Against Wasendorf)............................................. 68

COUNT 20      (Violation of Section 4b(a)(2)(A), (B) and (C) of the CEA (Fraud in Connection with Commodity Futures Contracts) (Against Wasendorf)............. 69

PRAYER FOR RELIEF ........................................................................................................ 70

DEMAND FOR JURY TRIAL ............................................................................................. 71

## I.    INTRODUCTION

1.      Plaintiffs are former customers of Peregrine Financial Group, Inc., ("PFG"). They sue on behalf of themselves and approximately 24,000 other similarly situated persons who have lost money as a result of the collapse of PFG in July 2012.

2.      In a letter dated November 1, 2011, shortly after the demise of MF Global Holdings, Ltd., Defendant Russell Wasendorf Jr., the President and Chief Operating Officer of PFG, wrote to PFG's customers to assure them that PFG held all customer funds in segregated accounts "in accordance with all regulations mandated by the CFTC and the rules of the NFA." At the same time that Wasendorf Jr. was assuring PFG's customers that their money was safe, his father, Russell Wasendorf Sr. ("Wasendorf"), was continuing a 20-year scheme to rob more than $200 million from those same customer accounts.

3.      Plaintiffs' money was stolen from purported "customer segregated accounts" maintained by PFG with JPMorgan and U.S. Bank (the "Banks"). The theft from the accounts at JPMorgan and U.S. Bank could not have occurred without the Banks' breaches of their legal duties owed to Plaintiffs.

4.      JPMorgan improperly transferred millions of dollars in PFG customer money from a customer segregated account at JPMorgan to an account at U.S. Bank controlled by Wasendorf, who in turn diverted these funds to his own unauthorized uses.

5.      U.S. Bank maintained various accounts for PFG and the Wasendorfs, including a purported customer segregated account and a "house" account. U.S. Bank allowed PFG to portray an account with U.S. Bank as a customer segregated account, and routinely accepted deposits of customer funds designated for deposit to a "customer segregated account." U.S.

Bank concurrently allowed Wasendorf to use the same account as a personal piggybank and conduit for the diversion of funds transferred from JPMorgan to Wasendorf's personal use.

6.     Plaintiffs' losses are a direct and proximate consequence of Defendants' conduct. Plaintiffs sue under the Commodities Exchange Act, as intended beneficiaries of contracts made by PFG with JPMorgan, and under principles of common law. They bring this action in an individual and representative capacity under Federal Rule of Civil Procedure 23.

## II.     JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367(a) and 7 U.S.C. § 1 et seq. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d), since there are at least 100 people in the proposed class, the combined claims of proposed class members exceed $5,000,000 exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one Defendant.

8.     Venue in this District is proper under 28 U.S.C. § 1391(b), 18 U.S.C. § 1965, 7 U.S.C. § 1, *et seq.*, and 7 U.S.C. § 25(c) because Defendants' unlawful course of conduct occurred in large part in this District and because the alleged conduct included violations of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*, and the Commodity Futures Trading Commission's regulations promulgated thereunder, 17 C.F.R. §§ 1.1, *et seq.*.

## III.     THE PARTIES

### A.     Plaintiffs

9.     Brian Pannkuk resides in Las Vegas, Nevada. Mr. Pannkuk was one of PFG's commodities customers. Pannkuk mailed a check to PFG in Iowa, drawn on his U.S. Bank account, the proceeds of which the company was required to segregate or secure under the CEA

and CFTC regulations.  He has suffered an injury in fact resulting from Defendants' unlawful conduct.

10.     Jordan Robinson resides in Miami, Florida.  Mr. Robinson was one of PFG's commodities customers.  Robinson mailed numerous checks to PFG which were deposited with JPMorgan, the proceeds of which the company was required to segregate or secure under the CEA and CFTC regulations.  He has suffered an injury in fact resulting from Defendants' unlawful conduct.

11.     Courtney May resides in Eagleville, Pennsylvania.  Mr. May was one of PFG's commodities customers.  May's money was transferred to PFG from the funds that remaining in his account at MF Global, following the collapse of that company.  Once PFG assumed control over his account, it was required to segregate or secure the funds therein under the CEA and CFTC regulations.  He has suffered an injury in fact resulting from Defendants' unlawful conduct.

12.     Werner Stapelfeldt resides in Rodenbach, Germany.  Mr. Stapelfeldt was one of PFG's commodities customers.  Stapelfeldt's money was deposited with JPMorgan, the proceeds of which the company was required to segregate or secure the funds therein under the CEA and CFTC regulations.  He has suffered an injury in fact resulting from Defendants' unlawful conduct.

13.     J.D. Sailer resides in Las Vegas, Nevada.  Mr. Sailer was one of PFG's commodities customers.  Sailer wired money to PFG's account at JPMorgan pursuant to PFG's instructions, the proceeds of which the company was required to segregate or secure under the CEA and CFTC regulations.  He has suffered an injury in fact resulting from Defendants' unlawful conduct.

14.     Joe Martano resides in Staten Island, New York.  Mr. Martano was one of PFG's commodities customers.  Martano wired money to PFG's account at JPMorgan pursuant to PFG's instructions, the proceeds of which the company was required to segregate or secure under the CEA and CFTC regulations.  He has suffered an injury in fact resulting from Defendants' unlawful conduct.

15.     Marcus Ibrahim resides in Naperville, Illinois.  Mr. Ibrahim was one of PFG's commodities customers.  Ibrahim wired money to PFG's account at JPMorgan pursuant to PFG's instructions, the proceeds of which the company was required to segregate or secure under the CEA and CFTC regulations.  He has suffered an injury in fact resulting from Defendants' unlawful conduct.

16.     Mark Alexander resides in Niles, Illinois.  Mr. Alexander was one of PFG's commodities customers.  Alexander deposited money with PFG via wire transfers, the proceeds of which the company was required to segregate or secure under the CEA and CFTC regulations.  He has suffered an injury in fact resulting from Defendants' unlawful conduct.

17.     William Robert Evans, III, resides in Dallas, Texas.  Mr. Evans was one of PFG's commodities customers.  Evans wired money to PFG's account at JPMorgan pursuant to PFG's instructions, the proceeds of which the company was required to segregate or secure under the CEA and CFTC regulations.  He has suffered an injury in fact resulting from Defendants' unlawful conduct.

18.     Kirk Houghton is a citizen of the United Kingdom residing in Spain.  Mr. Houghton was one of PFG's commodities customers.  Houghton wired money to PFG's account at JPMorgan pursuant to PFG's instructions, the proceeds of which the company was required to

segregate or secure under the CEA and CFTC regulations and has suffered an injury in fact resulting from Defendants' unlawful conduct.

19.     Kasra Amirhajed resides in Bowling Green, Ohio.  Mr. Amirhajed was one of PFG's commodities customers.  Amirhajed wired money to PFG's account at JPMorgan pursuant to PFG's instructions, the proceeds of which the company was required to segregate or secure under the CEA and CFTC regulations.  He has suffered an injury in fact resulting from Defendants' unlawful conduct.

20.     Guravaneet Randhawa resides in Falls Church, Virginia.  Mr. Randhawa was one of PFG's commodities customers.  Randhawa wired money to PFG's account at JPMorgan pursuant to PFG's instructions, the proceeds of which the company was required to segregate or secure under the CEA and CFTC regulations.  He has suffered an injury in fact resulting from Defendants' unlawful conduct.

21.     Patricia Benvenuto resides in Phoenixville, Pennsylvania.  Ms. Benvenuto was one of PFG's commodities customers.  Benvenuto deposited funds with PFG into a JPMorgan account, the proceeds of which the company was required to segregate or secure the proceeds of the check under the CEA and CFTC regulations.  She has suffered an injury in fact resulting from Defendants' unlawful conduct.

**B.     Defendants**

22.     Russell R. Wasendorf was the CEO and owner of PFG since he first created the company.  He has been registered with the National Futures Association (NFA) as a principal and an associated person of PFG since 1992 under NFA IDs 0049753 and 0089948.  Wasendorf is named in this action solely to toll the statute of limitations pursuant the Court's Order of July 10, 2102 (Dkt. 11), in *CFTC v. Peregrine Financial Group, Inc. et al*, 1:12-cv-05383 (N.D. Ill.).

5

The claims against Wasendorf are stayed and he is not required to answer this complaint until that Order is modified or revoked.

23.     Wasendorf's son, Russell R. Wasendorf Jr., was the President and Chief Operating Officer of PFG. Wasendorf Jr.'s duties and responsibilities as an officer of PFG included monitoring and safeguarding customer segregated funds. Wasendorf Jr. was registered with the NFA as a principal and an associated person of PFG from 1993 to July 13, 2012, under NFA ID 0213806.

24.     U.S. Bank, N.A., is a nationally chartered bank organized under the laws of Delaware with its principal place of business in Minneapolis, Minnesota. U.S. Bank maintains several branches in this District. The "U.S. Bank" name has been used since 1891 and, since that time, as a result of a series of mergers and acquisitions, has covered an increasingly large number of banking institutions. U.S. Bank's parent company, U.S. Bancorp, was formed on or about February 27, 2001, when Firstar Corporation purchased U.S. Bancorp. Although Firstar was the surviving company, the combined entity changed its name to U.S. Bancorp. Defendant U.S. Bank is liable as a successor in interest for the conduct of Firstar.

25.     JPMorgan Chase Bank, N.A. ("JPMorgan"), is a nationally chartered bank that is organized under the laws of Delaware with its principal place of business in New York, New York. JPMorgan maintains several branches in this district. PFG maintained at least 36 accounts at JPMorgan, including at least one customer segregated funds account. JPMorgan's parent company, JPMorgan Chase & Co., is an amalgamation of over 1200 predecessor entities, including the Chase Manhattan Corporation and J.P. Morgan & Co., which merged in December 2000. On or about July 1, 2004, JPMorgan Chase & Co. acquired the Bank One Corporation,

including Bank One's subsidiary, Bank One, N.A., which combined with JPMorgan. Defendant

JPMorgan is liable as a successor in interest for the relevant conduct of Chase and Bank One.

## IV.     PFG'S THEFT OF $200 MILLION IN CUSTOMER FUNDS

### A.     PFG and the Governing Regulatory Framework

26.     Wasendorf established PFG in 1990. During the relevant time period, PFG

maintained its offices in Chicago and in Cedar Falls, Iowa. PFG is not named as a defendant

because the company has filed for bankruptcy and naming the company would violate the

automatic stay. 11 U.S.C. § 362.

27.     From its inception until its bankruptcy, PFG was a registered futures commission

merchant, or FCM. At the time of its failure, PFG was the nation's second largest non-bank,

non-clearing FCM. An FCM is an individual or organization that, among other things, solicits or

accepts orders to buy or sell futures contracts or options on futures contracts, and accepts money

or other assets from customers to support those orders. FCMs receive money, securities, and

other property from their customers to margin, guarantee, or secure the customers' futures and

options trades.

28.     FCMs like PFG are regulated by the Commodity Futures Trading Commission

(CFTC), a federal agency, and the National Futures Association (NFA), a not-for-profit industry

membership corporation that operates under the supervision of the CFTC. The CFTC regulates

trading on the eleven United States futures exchanges, as well as commodity exchange members

and FCMs. The NFA is responsible for overseeing the qualifications, proficiency, financial

condition, retail sales practices, and business conduct of FCMs.

29.     The Commodity Exchange Act (CEA) and CFTC regulations require FCMs to

maintain segregated and secure accounts for their customers' funds. 17 C.F.R. § 1.20(a).

Customer funds may not be commingled with the firm's operational funds and may not be used

to margin or guarantee the trades or contracts, or to secure or extend the credit of, any other person or entity. *See id.*; *see also* 7 U.S.C. § 6d(a)(2).

30.     FCMs must file monthly financial reports with the CFTC known as "1-FR" reports. These reports require FCMs to provide financial statements that show, among other things, the amount of customer funds the FCM has in segregated bank accounts.

31.     The financial statements filed with the 1-FR at the end of the year must be audited. Since 2001, PFG always used the same accountant to perform its audits—The Veraja-Snelling Company—a one-person firm run out of the owner's home in Glendale Heights, Illinois.

### B.     PFG's Misuse of Customer Funds

32.     Over the years, PFG received more than $200 million from customers and deposited the funds in accounts at JPMorgan, U.S. Bank, and several other banks. But instead of keeping its customers' funds segregated as required by CFTC regulations, PFG withdrew money from the customer funds account at U.S. Bank and converted the money for the use of PFG, its affiliates, and Wasendorf personally. Many of the transfers were made to the bank accounts of PFG-related entities, including other corporations Wasendorf owned or controlled.

33.     To conceal and continue its misuse of customer funds, Wasendorf established a post office box in Cedar Falls to intercept mail directed to U.S. Bank, including mail sent by the NFA and PFG's auditor. By forging bank statements and other documents that reported the balance in its U.S. Bank accounts, PFG was able to represent to the NFA and its auditor that it maintained a customer segregated account that eventually contained over two hundred million dollars, when in fact the balance was typically under $10 million. PFG was able to continue representing itself as operating in compliance with governing regulations to its regulators, its customers, and the general public while it pilfered its customers' money.

8

34.     A comparison of PFG's forged documents and actual U.S. Bank records shows the dramatic discrepancy between the two:

| Date | Actual Balance | Forged Balance |
|---|---|---|
| January 31, 2010 | $ 12,343,042.12 | $ 206,970,409.43 |
| February 28, 2010 | $ 9,171,177.08 | $ 207,260,962.28 |
| March 31, 2010 | $ 8,950,909.85 | $ 207,621,195.05 |
| April 30, 2010 | $ 9,097,907.19 | N/A |
| May 31, 2010 | $ 9,243,039.04 | $ 210,917,824.24 |
| June 30, 2010 | $ 9,407,939.62 | $ 211,225,225,02 |
| July 31, 2010 | $ 9,332,609.45 | $ 211,548,540.35 |
| August 31, 2010 | $ 8,769,360.42 | $ 212,896,441.32 |
| September 30, 2010 | $ 8,813,190.42 | $ 213,677,471.33 |
| October 31, 2010 | $ 9,339,665.02 | $ 213,969,645.92 |
| November 30, 2010 | $ 8,690,771.41 | $ 214,373,752.30 |
| December 31, 2010 | $ 8,491,098.93 | $ 217,119,771.83 |
| January 31, 2011 | $ 7,492,296.05 | $ 217,693,761.83 |
| February 28, 2011 | $ 7,125,845.59 | $ 218,182,964.80 |
| March 31, 2011 | $ 7,181,336.36 | $ 218,650,550.96 |
| April 30, 2011 | $ 7,208,261.40 | $ 218,934,764.12 |
| May 31, 2011 | $ 7,314,155.64 | $ 219,964,112.09 |
| June 30, 2011 | $ 7,338,678.89 | $ 220,199,957.73 |
| July 31, 2011 | $ 7,274,234.65 | $ 220,409,844.73 |
| August 31, 2011 | $ 7,593,727.39 | $ 221,335,297.68 |
| September 30, 2011 | $ 7,484,463.40 | $ 221,586,486.68 |
| October 31, 2011 | $ 7,381,972.80 | $ 221,717,072.94 |
| November 30, 2011 | $ 6,963,726.87 | $ 221,770,946.18 |
| December 31, 2011 | $ 6,337,628.14 | $ 221,770,946.18 |
| January 31, 2012 | $ 6,127,735.73 | $ 221,799,196.18 |
| February 29, 2012 | $ 6,010,257.03 | $ 221,849,196.18 |
| March 31, 2012 | $ 5,826,485.54 | $ 221,869,196.18 |
| April 30, 2012 | $ 5,629,593.10 | $ 223,811,055.39 |

| Date | Actual Balance | Forged Balance |
|------|----------------|----------------|
| May 31, 2012 | $ 5,446,891.86 | $ 224,830,835.85 |

35.     PFG represented to its customers that it held their money in segregated accounts as required by the law.  For example, a July 7, 2011, memo from PFG to its customers said that "[c]ustomer funds are maintained at banks in clearly identified 'segregated funds' accounts separate and apart from any other funds of PFGBEST"  and that "[s]egregated assets are only invested through, or deposited in, customer segregated funds accounts."  The memo also said that "[e]ach bank signs a written acknowledgment that (i) the segregated funds are held in the account in accordance with the Commodity Exchange Act and CFTC regulations, and (ii) the bank will not hold, dispose of, or use any of the segregated assets for anyone including PFGBEST, other than the PFGBEST customers."

36.     On or about November 1, 2011, following the collapse of MF Global, which resulted in the loss of over $1.6 billion in purportedly segregated customer funds, PFG sent a letter to its customers reassuring them of PFG's "absolute dedication" to protecting their accounts.  The letter said:

> PFGBEST is not only customer-centric, but compliance-focused.  We consider it a privilege to conduct business with you and to be an advocate for you.  We abide by all regulations mandated by the CFTC and the rules of NFA to hold customer funds in segregated accounts that are always separate from operational funds.  PFGBEST reports daily and monthly to the regulators concerning customer segregated funds.
>
> It is our policy to keep extra funds on deposit in our customer segregation accounts to protect you.

37.     Under CFTC regulations, PFG owes fiduciary duties to its customers with respect to their funds.  76 Fed. Reg. 78776-01, 78777 (Dec. 19, 2011) (FCMs are "bound by their fiduciary obligations to customers and the requirement that the secured amount required to be set

aside be at all times liquid and sufficient to cover all obligations to such customers."). PFG's misuse of its customers' funds violated its fiduciary duties.

38.     On July 9, 2012, Wasendorf attempted suicide. He was found in his car with an apparent suicide note addressed to his wife and a signed statement detailing PFG's theft of its customers' funds and forgery of bank statements and related documents. It said, in part:

> I have committed fraud. For this I feel constant and intense guilt. I am very remorseful that my greatest transgressions have been to my fellow man. Through a scheme of using false bank statements I have been able to embezzle millions of dollars from customer accounts at Peregrine Financial Group, Inc. The forgeries started nearly twenty years ago and have gone undetected until now. I was able to conceal my crime of forgery by being the sole individual with access to the US Bank accounts held by PFG. No one else in the company ever saw an actual US Bank statement. The Bank statements were always delivered directly to me when they arrived in the mail. I made counterfeit statements within a few hours of receiving the actual statements and gave the forgeries to the accounting department.

> ***

> I had no access to additional capital and I was forced into a difficult decision: Should I go out of business or cheat? I guess my ego was too big to admit failure. So I cheated, I falsified the very core of the financial documents of PFG, the Bank Statements. At first I had to make forgeries of both the Firstar Bank Statements and the Harris Bank Statements. When I choose [sic] to close the Harris Account I only had to falsify the Firstar statements. I also made forgeries of official letters and correspondence from the bank, as well as transaction confirmation statements.

> Using a combination of Photo Shop, Excel, scanners, and both laser and ink jet printers I was able to make very convincing forgeries of nearing [sic] every document that came from the Bank. I could create forgeries very quickly so no one suspected that my forgeries were not the real thing that had just arrived in the mail.

> With careful concealment and blunt authority I was able to hide my fraud from others at PFG. PFG grew out of a one man shop, a business I started in the basement of my home. As I added people to the company everyone knew I was the guy in charge. If anyone questioned my authority I would simply point out that I was the sole shareholder. I established rules and procedures as each new situation arose. I ordered that US Bank statements were to be delivered directly to me unopened, to make sure no one was able to examine an actual US Bank Statement. I was also the only person with online access to PFG's account using US Bank's online portal. On US Bank side, I told representatives at the Bank that I was the only person they should interface with at PFG.

When it became a common practice for Certified Auditors and the Field Auditors of the Regulators to mail Balance Confirmation Forms to Banks and other entities holding customer funds I opened a post office box. The box was originally in the name of Firstar Bank but was eventually changed to US Bank. I put the address "PO Box 706, Cedar Falls, IA 50613-0030" on the counterfeit Bank Statements. When the auditors mailed Confirmation Forms to the Bank's false address, I would intercept the Form, type in the amount I needed to show, forge a Bank Officer's signature and mail it back to the Regulator or Certified Auditor.

When online Banking became prevalent I learned how to falsify online Bank Statements and the Regulators accepted them without question.

39.     On July 10, 2012, the CFTC instituted a civil action against Wasendorf and PFG. PFG immediately filed for Chapter 7 liquidation in the United States Bankruptcy Court for the Northern District of Illinois.

### C.     The Regulatory Framework Applicable to the Banks

40.     Under relevant banking regulations, a bank is required to collect and maintain certain information concerning their customers.  The bank must maintain procedures that allowed it to "form a reasonable belief that it knows the true identity of each customer."  31 C.F.R. § 1020.220(a)(1), (2).  To accomplish this, the bank is required to collect information about the holder of each account.  31 C.F.R. § 1020.220(a)(2).  When an account is opened by an entity rather than an individual, the bank must obtain information about the individuals with authority or control over the account.  31 C.F.R. § 1020.220(a)(2)(ii)(C).

41.     Pursuant to federal regulations, the bank must develop, administer, and maintain a program that ensures and monitors the bank's compliance with the Bank Secrecy Act (BSA). 12 C.F.R. § 21.21.  The plan must be approved by the board of directors and noted in the board meeting minutes.  The program must include a system of internal controls designed to ensure ongoing compliance, independent testing of the bank's compliance, daily coordination and monitoring of compliance by a designated person, and training of appropriate personnel.

12

42.     A bank must also develop a Customer Due Diligence (CDD) program that assists in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, and which provides the bank with a way to identify unusual or suspicious transactions for each customer.  The CDD program allows the bank to maintain an awareness of the unique financial details of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

43.     The bank must ensure compliance as a condition of employment and incorporate compliance with the BSA and its implementing regulations into job descriptions and performance evaluations for its employees.  The bank must also train all operational personnel whose duties may require knowledge of the BSA, including tellers and wire room personnel, on the BSA, including identification of various "red flags" discussed below.

44.     The bank must identify a BSA Compliance Officer who is a senior bank official and who is responsible for coordinating and monitoring complete compliance with the BSA.  FDIC Rules & Regulations § 326.8.  The BSA Compliance Officer is required to designate an individual at each office or branch to monitor the bank's day-to-day compliance with the BSA.

45.     Because the Banks provided services to PFG, a high-risk account/customer, the Banks were required to enhance their procedures, including applying a risk rating to PFG.  To determine PFG's risk rating, the Banks were required to obtain customer information to develop a "customer transaction profile" that incorporated an understanding of normal and expected activity for PFG's business operations.

46.     Since March 2002, the CFTC has posted on its website a monthly report providing information about each registered FCM, including (i) the FCM's adjusted net capital; (ii) the FCM's net capital requirement; (iii) the FCM's excess net capital; (iv) the amount of

customer funds required to be segregated; and (v) the amount of funds required to be held in a foreign futures and foreign options secured account.

47.     The Banks knew that FCMs are highly regulated by the CFTC and NFA, and that they are required to maintain customer funds in segregated and secured accounts that are separate from the firm's funds.  *See* 17 C.F.R. § 1.20(a).  The customer funds are required to be segregated, held for the exclusive benefit of the customer, and otherwise protected from misappropriation or unauthorized use.  *See id.*; *see also* 7 U.S.C. § 6d(a)(2).  These requirements ensure that customer funds are protected if an FCM attempts to divert or otherwise mishandle customer funds, or declares bankruptcy.

48.     The Banks knew that when customer funds are deposited in a bank, they are to be deposited under an account name that clearly shows they are customer funds, segregated as required by the CEA.  *See* 17 C.F.R. § 1.20.  The Banks knew that any account held out as or named a customer segregated account would reasonably lead others to conclude the account maintained customer funds that were being segregated and protected consistent with the CEA rules and regulations.  The Banks also knew that customer funds maintained in a segregated account could not lawfully be transferred to a personal account of the Wasendorfs or a "house" account maintained by PFG.

49.     The Banks knew that PFG was a fiduciary to its customers with respect to the money they entrusted to PFG.

**D.      Actions of U.S. Bank Leading to the Loss of Customer Funds**

**1.      U.S. Bank Accounts Maintained by PFG and Its Affiliates**

50.     PFG was based in Cedar Falls, Iowa.  With a population of fewer than 50,000 people, Cedar Falls is not a major business center.  Wasendorf was well known around town as a successful businessman.  He was believed to have amassed substantial personal wealth from

successful investments in Romanian real estate.  He operated a charitable foundation, owned "My Verona," a popular Cedar Falls restaurant, and presented a façade of prosperity to the public.

51.     U.S. Bank entrusted primary responsibility for managing its relationship with PFG to Hope Timmerman, an "Assistant Relationship Manager" who worked at the bank's Cedar Falls branch.

52.     Ms. Timmerman and other U.S. Bank personnel perceived Wasendorf as a successful, desirable bank client with the potential to be a profitable, high-growth client.

53.     Ms. Timmerman and U.S. Bank believed it was important to maintain Wasendorf's and PFG's goodwill in order to protect U.S. Bank's relationship with them.

### a.     PFG's Two Primary U.S. Bank Accounts

54.     PFG opened two of its accounts with Firstar, U.S. Bank's predecessor, between 1992 and 1994.  The first of these accounts was established as a customer segregated funds account.  It had an account number ending with the digits 1845 and is referred to as the "1845 Account."

55.     The second account was designated by both PFG and Firstar as PFG's "house" account.  Firstar documents expressly labeled the account as PFG's house account, as reflected by an April 2002 letter addressed to PFG's "house account."  A house account, sometimes referred to as a "proprietary account," is an account maintained by an FCM for itself and for its own funds and those of its affiliates.  An FCM typically designates an account as a "house" account because it has other accounts at the same banking institution that hold customer segregated funds, which cannot be intermingled with the house account funds.

15

56. The 1845 Account was designated by both PFG and Firstar as a customer segregated funds account. The designation appeared on official Firstar documents, including a letter sent by Firstar to PFG acknowledging that the account held customer segregated funds.

57. In December 1994, PFG entered into a "Master Repurchase Agreement (Public Securities Association Prototype)" with Firstar. The agreement governed the investment of the customer segregated funds held in the 1845 Account and expressly recognized that the 1845 Account was a customer segregated account. Firstar engaged in repurchase transactions with PFG using the customer segregated funds in the 1845 Account for years after the execution of the 1994 agreement.

58. Sometime around April 2002, PFG's accounts with Firstar began to be referred to as U.S. Bank accounts. The 1845 Account maintained the same account number through and following the transition.

59. PFG's records contain a July 5, 2001, letter from U.S. Bank to PFG stating that the 1845 Account was titled "Peregrine Financial Group, Inc., Customer Segregated Account." The letter is signed "Hope Timmerman."

60. While the 1845 Account was a Firstar account, and continuing into 2004 after the account became a U.S. Bank account, PFG wrote checks out of the 1845 Account using checks that identified the 1845 Account as a customer segregated account. Firstar and U.S. Bank received copies of these checks identifying the 1845 Account as a customer segregated account once they were deposited or cashed by the payees.

61. PFG also wrote checks drawn on the house account that identified the account as PFG's house account, and Firstar and U.S. Bank received copies of the checks once they were deposited or cashed by the payees.

16

      **b.**      **U.S. Bank Accounts of Wasendorf and PFG's Affiliates**

62.      U.S. Bank maintained several additional accounts for entities and individuals affiliated with Wasendorf and PFG, including personal accounts of Wasendorf and his family members and accounts for his other companies.

63.      On or about September 10, 2008, U.S. Bank lent Wasendorf and/or his affiliated company, Wasendorf Construction, more than $6,000,000 to build a new headquarters building for PFG in Cedar Falls. As security for the loan, U.S. Bank relied on the funds on deposit in the 1845 Account, even though the 1845 Account was a purported customer segregated account.

64.      U.S. Bank maintained accounts for Wasendorf & Associates, a publishing business, Wasendorf's restaurant, My Verona, and Wasendorf Air, the company created by Wasendorf to hold title to his private airplane.

65.      Peregrine Charities, an Illinois 501(c)(3) corporation founded by Wasendorf, also maintained an account at U.S. Bank.

      **2.**      **U.S. Bank Knew PFG Was Holding Out the 1845 Account As Its Segregated Customer Account**

66.      U.S. Bank knew that most or all of the funds in the 1845 Account were customer deposits that came from one of two sources: (i) deposits of checks at the Cedar Falls branch, or (ii) wire transfers from a PFG JPMorgan customer segregated account into the 1845 Account.

67.      At varying times, PFG told its customers to send their checks to an Iowa or an Illinois address. As a result, PFG customers including Plaintiff Pannkuk routinely sent their checks to PFG's Iowa offices. Typically, checks sent to PFG in Iowa were deposited in the Cedar Falls branch. The proceeds from checks mailed to PFG in Illinois, and from wire transfers, were typically deposited in the PFG JPMorgan customer segregated account.

68.     PFG deposited checks on a daily or near daily basis into the 1845 Account.  The amounts typically ranged from $500 to more than $25,000.  The checks were drawn on accounts that belonged to many different individuals and entities across the country and were clearly identifiable as customer funds directed to an FCM.

69.     PFG told its customers to make their checks payable to "Peregrine Financial Group, Inc.," or "PFGBEST Cust. Seg. Acct."  A significant number of the checks PFG deposited in the 1845 Account were drawn to the "PFGBEST Cust. Seg. Acct." designation, and many others had memo notations or other written statements stating they were customer funds.

70.     PFG stamped the checks deposited into the 1845 Account with "PAY TO THE ORDER OF US BANK FOR DEPOSIT ONLY PEREGRINE FINANCIAL GROUP, INC., CUSTOMER SEGREGATED ACCOUNT 621011845," or words to that effect, as seen in the image below:



71.     When PFG deposited the checks into the 1845 Account, PFG also submitted U.S. Bank deposit slips that stated "Customer Segregated Account" or some variation thereof.  PFG bundled the checks and deposited them in person at either the walk-up or drive-up counter at the Cedar Falls branch.  An example of the deposit slip used by PFG for the 1845 Account appears below:



### 3. U.S. Bank Also Knew That PFG Was Not Treating the 1845 Account as a Customer Segregated Account

72.     PFG's deposits to the 1845 Account were customer funds subject to the segregated and/or secured account requirements, but PFG's frequent and substantial withdrawals were inconsistent with the types of transactions typical for a customer segregated account.  This chart show a listing of deposits and withdrawals from January 2010 to June 2012:

| Month | Deposits | Withdrawals |
|---|---|---|
| January 2010 | $ 155,383.75 | $ 454,878.19 |
| February 2010 | $ 292,552.85 | $ 3,464,417.89 |
| March 2010 | $ 360,232.77 | $ 580,500.00 |
| April 2010 | $ 310,497.34 | $ 163,500.00 |
| May 2010 | $ 241,588.17 | $ 96,456.32 |
| June 2010 | $ 142,500.00 | $ 142,500.00 |
| July 2010 | $ 323,515.33 | $ 398,845.70 |
| August 2010 | $ 401,750.97 | $ 965,000.00 |
| September 2010 | $ 477,480.00 | $ 433,650.00 |
| October 2010 | $ 892,174.60 | $ 365,700.00 |
| November 2010 | $ 404,110.00 | $ 1,053,003.62 |
| December 2010 | $ 696,135.97 | $ 2,945,692.00 |
| January 2011 | $ 573,990.00 | $ 1,572,792.88 |

| Month | Deposits | Withdrawals |
|---|---|---|
| February 2011 | $ 189,192.97 | $ 555,643.43 |
| March 2011 | $ 520,296.16 | $ 464,805.39 |
| April 2011 | $ 284,233.16 | $ 254,308.12 |
| May 2011 | $ 529,347.97 | $ 423,453.73 |
| June 2011 | $ 235,846.64 | $ 211,322.39 |
| July 2011 | $ 209,887.00 | $ 274,331.24 |
| August 2011 | $ 604,271.29 | $ 302,778.55 |
| September 2011 | $ 254,370.65 | $ 363,634.65 |
| October 2011 | $ 130,566.26 | $ 233,076.86 |
| November 2011 | $ 54,075.00 | $ 472,320.93 |
| December 2011 | no entry | $ 626,098.73 |
| January 2012 | $ 26,250.00 | $ 238,142.41 |
| February 2012 | $ 50,000.00 | $ 167,478.70 |
| March 2012 | $ 20,000.00 | $ 203,771.49 |
| April 2012 | $ 12,832.00 | $ 209,724.44 |
| May 2012 | $ 20,800.00 | $ 203,501.24 |
| June 2012 | $ 18,800.00 | $ 371,582.34 |

73.     During the above time period, PFG made hundreds of withdrawals from the 1845 Account, most ranging from tens of thousands of dollars up to several millions of dollars.

74.     On many occasions, PFG made sizeable deposits into the 1845 Account only to follow up with a similarly sized withdrawal shortly thereafter.  For example:

(a)     On January 11, 2010, PFG made two deposits totaling $35,500 and withdrew $33,200;

(b)     On February 11, 2010, PFG deposited $85,200 and withdrew $85,296.04;

(c)     On May 5, 2010, PFG deposited $46,953.17 and withdrew $45,000 the next day;

(d)     On September 13, 2010, PFG deposited $47,500 and withdrew $50,000; and

(e)     On March 3, 2011, PFG deposited $52,000 and withdrew $50,000.

75.     PFG also made frequent electronic fund transfers and telephone transfers from the 1845 Account.  Between January 1, 2010, and December 31, 2011, PFG made approximately 150 electronic transfers, over 95% of which were made into four of Wasendorf's other U.S. Bank accounts:  the Wasendorf Construction, Wasendorf & Associates, My Verona, and Wasendorf Air accounts.  Between the same two dates, PFG also made 25 telephone transfers, all of which transferred funds into the same four Wasendorf accounts.  On their face, these transfers were unlikely to constitute legitimate business transactions for PFG, such as a transfer of $135,000 in February 2011 to Wasendorf's restaurant, My Verona.

76.     U.S. Bank received wire transfers from JPMorgan customer segregated accounts into the 1845 Account.  These transfers showed that the money being transferred into the account consisted of customer segregated funds.  U.S. Bank statements described the source of the transfers as "JPMCHASE*PFG CUST SEG ACCT" and "BANKONENA*CHI IL*PFGCUSTSEG."  U.S. Bank nevertheless allowed Wasendorf unfettered access to the money transferred by JPMorgan, despite the fact that the wires received from JPMorgan made it clear the money was being transferred from a customer segregated account.

77.     PFG consistently withdrew substantial sums from the 1845 Account in single transactions, including:

        a.     A $3,005,150 electronic funds transfer to Wasendorf Construction on February 18, 2010;

        b.     A wire debit of $200,000 on March 1, 2010;

        c.     A $175,000 electronic funds transfer to Wasendorf Construction on July 15, 2010;

     d.      A $715,000 wire debit on August 18, 2010;

     e.      A $164,000 electronic funds transfer to Wasendorf & Associates on
September 13, 2010;

     f.      A $177,700 electronic funds transfer on October 21, 2010;

     g.      A $600,000 customer withdrawal on November 15, 2010;

     h.      A "miscellaneous" withdrawal of $2,489,692 on December 31, 2010;

     i.      A $1,225,292.88 wire debit on January 12, 2011;

     j.      A $135,000 electronic funds transfer to My Verona on February 23, 2011;

     k.      A $173,000 electronic funds transfer on May 19, 2011;

     l.      A $172,500 electronic funds transfer to Wasendorf & Associates on
September 15, 2011;

     m.      A $187,060 customer withdrawal on November 30, 2011;

     n.      A $500,000 customer withdrawal on December 13, 2011;

     o.      A $125,000 electronic funds transfer to Wasendorf & Associates on April
28, 2012; and

     p.      A $250,000 wire debit on June 5, 2012.

78.     U.S. Bank knows that FCMs rarely, if ever, make withdrawals and transfers of this type size and frequency from their customer segregated accounts.  CFTC regulations allow FCMs to deposit their own funds into their customer segregated accounts, since any excess funds will further protect customers in a volatile market.  These excess funds are the only funds the FCM is permitted to withdraw for its own use.  17 C.F.R. § 1.23.  U.S. Bank had no basis for believing that the transfers into and out of the 1845 Account involved PFG excess funds.

79.     Since a number of sizeable transfers from the 1845 Account were made to Wasendorf Construction, to which U.S. Bank had recently extended a mortgage loan exceeding $6 million, by allowing these transfers, U.S. Bank facilitated the prospects for repayment of its loan to Wasendorf Construction, thus directly benefiting from the transfers.

80.     U.S. Bank also allowed Wasendorf to pledge funds in the 1845 Account to guarantee loans for his own benefit or the benefit of his business entities, including Wasendorf Construction's mortgage on the building PFG used for its offices.

81.     The Federal Financial Institutions Examination Counsel (FFIEC) has identified "red flags" that should cause a bank or its employees to inquire further and potentially file a suspicious activity report.  PFG's 1845 Account triggered at least the following "red flags":

a.      Inconsistent deposit and withdrawal activity;

b.      Frequent deposits or withdrawals with no apparent business source;

c.      Transactions that are not consistent with the customer's business;

d.      Intrabank transfers between accounts owned or controlled by common individuals;

e.      Large balances in non-interest bearing accounts;

f.      Appearance of using account as a temporary repository for funds;

g.      Deposits and immediate requests for wire transfers or cash shipments; and

h.      Large deposits and balances.

82.     The FFIEC also recommends that banks perform enhanced due diligence of certain accounts and customers that present a greater potential for violations of the BSA, including FCMs like PFG.  U.S. Bank allowed money to be transferred out of the 1845 Account and into Wasendorf's accounts despite these red flags.

23

### 4.     U.S. Bank Did Not Act Despite Many Additional Red Flags

#### a.     U.S. Bank Did Not Receive Balance Confirmation Requests.

83.     U.S. Bank knows that the CFTC and the NFA require FCMs to maintain a minimum amount of "adjusted net capital." Adjusted net capital is a critical measure for FCMs. If it falls below proscribed limits, the FCM must "transfer all customer accounts and immediately cease doing business as a futures commission merchant" until it can reestablish the minimum threshold. *See* 17 C.F.R. § 1.17(a)(4).

84.     To track net capital, the CFTC and the NFA require FCMs to submit monthly unaudited financial statements and annual audited financial statements. *See* 17 C.F.R. § 1.10. FCMs file 1-FR forms on a monthly and yearly basis. The forms state the FCM's net capital requirement and actual net capital.

85.     U.S. Bank also knows that the NFA sends balance confirmation requests to banks that hold a material portion of an FCM's net capital to monitor the FCM's compliance. The NFA also sends balance confirmation requests if there are suspicious circumstances, suspected fraud, or past improper behavior by the FCM.

86.     FCMs' auditors also routinely send balance confirmation requests to banks as part of the certified auditing process. U.S. Bank is familiar with the auditing process performed according to AICPA or PCAOB standards, including the need for balance confirmations as part of that process.

87.     U.S. Bank personnel are trained and tasked to intake, evaluate, and respond to balance confirmation requests from the NFA and from FCMs' auditors.

88.     Because documents relating to U.S. Bank and PFG's accounts were diverted to the post office box Wasendorf set up, U.S. Bank did not did not routinely receive balance confirmation requests for PFG's accounts from the NFA or PFG's auditor.

24

89.     In May 2011, however, U.S. Bank received a balance confirmation request from the NFA for the 1845 Account.  PFG's chief compliance officer emailed the form to Hope Timmerman at U.S. Bank's Cedar Falls branch.  The email said:

> Dear Hope, Our Regulator the National Futures Association is currently conducting their annual audit of PFGBEST. Attached is the confirmation that needs to be completed. If you would be so kind to get these processed and emailed back to me and Lauren Boehm I would appreciate it. Lauren Boehm from the NFA will also be sending them via US Mail. NFA would appreciate an original hardcopy mailed back to them also. Thank you and have a nice week.

90.     The balance confirmation form bore the post office box address established by Wasendorf, rather than U.S. Bank's actual address, and identified the 1845 Account as "Peregrine Financial Group, Inc. Customer Segregated Account."

91.     U.S. Bank filled out the form, stating that the account balance was $7,181,336.36, did not change the address or the name of the account, and forwarded the form to both PFG and the NFA.

92.     Since the blank copy of the balance confirmation form that was mailed to U.S. Bank, and referenced in the email to Hope Timmerman, was sent to the post office box address established by Wasendorf, U.S. Bank never received it.

93.     When Wasendorf learned that the form had been emailed to U.S. Bank he forged a new form that showed a balance of $220 million to be faxed to the NFA to replace the one U.S. Bank had completed.

94.     In the months that followed, U.S. Bank received no further balance confirmation requests from PFG, the NFA, or PFG's auditor.  U.S. Bank did not follow up to determine why it had received the confirmation form or why no further forms were ever sent to it.

        **b.**        **U.S. Bank Knew That PFG Was Not Earning Revenue From the 1845 Account and Was Not Profitable.**

95.     U.S. Bank knows that FCMs ordinarily depend on revenue from customer segregated accounts through interest earnings or repurchase agreements. While PFG executed at least one repurchase agreement with Firstar, in the years leading up to PFG's bankruptcy in 2012, PFG was not earning interest on the 1845 Account and was not engaging in repurchase agreements with the 1845 Account funds.

96.     U.S. Bank knew from PFG's 1-FR forms that PFG was maintaining a material portion of its reported net capital—typically well in excess of 10% of its total reported net capital—in the 1845 Account.

97.     U.S. Bank also knew that PFG was not profitable from its inception through at least 2005 and that, during the few years that PFG accrued profits, those profits were only about $1-2 million annually.

98.     Wasendorf represented to U.S. Bank that PFG was able to stay in operation despite many years of losses because he was supporting PFG with money he had earned through his successful investments in Romanian real estate.

        **c.**        **Wasendorf Insisted That U.S. Bank Communicate Only With Him About PFG and Its Accounts**

99.     Wasendorf told U.S. Bank that all communications, including written and telephonic communications, regarding the 1845 Account should be directed to and made exclusively with him. He further mandated that no one at U.S. Bank should speak with any PFG personnel, including the other senior officers of the company, regarding the 1845 Account. Wasendorf also imposed similar restrictions on PFG personnel not to contact U.S. Bank, and allowed them to do so only periodically and at his direction.

100.     U.S. Bank personnel knew they were not to deal with anyone other than Wasendorf and knew it was rare for anyone else from PFG to contact U.S. Bank about PFG's accounts.  U.S. Bank knew that Wasendorf's demand that he be the only interface with the bank was highly unusual, particularly since PFG had many employees and Wasendorf was the owner of the company, and because there were other signatories to the 1845 Account.  U.S. Bank also knew that by drastically limiting communications between itself and all other PFG personnel including the two other signatories on the 1845 Account, it would be easier for fraud to occur relating to PFG and its accounts with U.S. Bank.

### 5.     PFG's Record of Regulatory Violations

101.     PFG's history of regulatory violations was available from the NFA's publicly-available database of its members' disciplinary history.  Some of these violations related to PFG's segregation of customer funds and reporting of net capital.

102.     In December 1996, the NFA's Business Conduct Committee ("BCC") issued a disciplinary complaint against PFG and a number of its associated persons alleging that they made misleading sales solicitations.  The complaint also charged PFG with using misleading promotional material and failing to maintain copies of promotional material.  In addition, the complaint alleged that PFG failed to correctly perform segregated funds computations, maintain adequate segregated funds, and report to NFA that the firm was undersegregated.  The complaint also charged PFG with supervisory failures.  PFG settled, agreeing to pay a $75,000 fine, tape record all of its associated persons' conversations for two years, create the position of Director of Compliance, and submit all promotional material to NFA prior to first use.

103.     In connection with the 1996 NFA disciplinary complaint, the NFA reportedly cited radio commercials in which PFG brokers claimed that the firm could turn a $10,000 investment into $80,000 in a matter of months.

27

104.    In 2000, PFG agreed to pay a $90,000 fine to settle a CFTC administrative

proceeding alleging that PFG failed to notify the CFTC that its adjusted net capital was below

the minimum required and the CFTC's "early warning threshold." The CFTC also alleged that

PFG failed to keep accurate books and records and filed an inaccurate capital computation with

the CFTC.

105.    In June 2004, the BCC issued a disciplinary complaint alleging that PFG failed to

audit Dominick Concilio, a conditionally registered sole proprietor introducing broker

guaranteed by PFG. PFG agreed to pay a $5,000 fine and adopt new procedures to ensure

compliance with the NFA's order.

106.    In February 2012, the court-appointed receiver for a Ponzi scheme run by Trevor

Cook sued PFG. The receiver alleged that PFG routinely ignored red flags about the operation

of the Ponzi scheme and permitted the fraudster to open, manage and maintain trading accounts

at PFG. Before his scheme was uncovered in 2009, over $190 million was stolen from investors,

including about $30 million through accounts held at PFG. The discovery of the scheme was

widely publicized. CNN, the Minnesota Star Tribune, and The New York Times all ran

stories. PFG's involvement was a matter of public record and discussion as well.

107.    In February 2012, the BCC issued a disciplinary complaint against PFG, its

president, Wasendorf Jr., and its chief compliance officer. The BCC alleged that PFG failed to

supervise four of its guaranteed introducing brokers, or GIBs, who engaged in deceptive sales

practices and made trade recommendations that maximized commissions without regard for the

best interests of their customers. To settle the matter, PFG agreed to pay a $700,000 fine and

refrain from any new guarantee agreements with introducing brokers for two years. PFG also

agreed to hire an independent consultant to review its procedures for supervising its GIBs and

retail customer accounts, and to designate an individual to act as its full-time anti-money-laundering officer. The NFA publicly reported PFG's $700,000 fine and PFG included the fine on its financial statements, including statements it provided to U.S. Bank.

### 6.    U.S. Bank Did Nothing to Prevent the Theft

108.    As part of the mortgage transaction with U.S. Bank for Wasendorf Construction, PFG and Wasendorf provided substantial information to U.S. Bank about PFG's business, including copies of its certified audits, 1-FR reports, and quarterly financial information such as balance sheet and income statement summaries. Many of these documents reported the amount of customer segregated funds held by PFG.

109.    U.S. Bank charged PFG a monthly "Analysis Service Charge" for the 1845 Account, indicating that U.S. Bank performed a series of account analyses on PFG's behalf.

110.    U.S. Bank has provided banking services to other FCMs in addition to PFG. It is familiar with the operating restrictions imposed on FCMs by the governing rules and regulations under the CEA and other relevant legislation.

111.    Despite its knowledge of PFG's conduct and financial position and the numerous red flags known to it, U.S. Bank took no action to prevent PFG's theft of customer money. U.S. Bank allowed PFG to deposit hundreds of checks in to the 1845 Account, processed hundreds of transfers into and out of the 1845 Account, and never declined to authorize a withdrawal from the 1845 Account and never declined to accept the deposit of funds it knew to be customer deposits into the account.

112.    At the time PFG declared bankruptcy, U.S. Bank had over 30,000 pages of records related to accounts held by PFG, Wasendorf, and the other entities owned or controlled by Wasendorf.

### E.   Actions of JPMorgan Leading to the Loss of Customer Funds

113.    JPMorgan operated under the same legal framework and had access to the same publicly available information concerning PFG as U.S. Bank.

114.    From at least 2009 through the date of PFG's collapse, PFG deposited or instructed its customers to deposit customer funds into an account at JPMorgan ending in 5265 by wire transfer or by mailing a check to PFG's office.  (During the same time period, however, checks from PFG customers that were sent to PFG's Iowa headquarters were typically deposited into the U.S. Bank account).  Customer money sent to JPMorgan was deposited into one of four customer segregated accounts, including money sent to JPMorgan by Plaintiffs Robinson, Sailer, Stapelfeldt, Martano, Ibrahim, Evans III, Houghton, Amirhajed, Randhawa and Benvenuto.

115.    JPMorgan had an extensive banking relationship with PFG.  JPMorgan held over 30 other accounts for PFG, including several foreign exchange accounts, accounts for precious metals trading, and "house" accounts.  JPMorgan knew that PFG was an FCM.  Because it provides banking services to PFG and other FCMs, JPMorgan knew that FCMs are highly regulated by the CFTC and NFA, and that they are required to maintain customer funds for the exclusive benefit of their customers in segregated and secured accounts that are separate from the firm's funds.  *See* 17 C.F.R. § 1.20(a); *see also* 7 U.S.C. § 6d(a)(2).

116.    JPMorgan was required to provide NFA regulators with confirmations of the balances of PFG's customer segregated accounts and to otherwise ensure that PFG's customer funds were properly segregated.  In addition, JPMorgan (like U.S. Bank) is required to maintain procedures that allow it to know the true identity of each of its customers, ensure compliance with the BSA and other banking laws and regulations, and monitor accounts that show signs of suspicious activity.

30

117.    JPMorgan expressly undertook to comply with the requirements of the CEA and CFTC regulations applicable to customer segregated fund accounts. JPMorgan was required to provide PFG at the time the accounts were opened with written acknowledgment that the bank had been informed that the four accounts contained funds belonging to commodity or options customers and had to be treated in accordance with the CEA and CFTC regulations. *See* 17 C.F.R §§ 1.20, 1.49. By its own acknowledgement, JPMorgan had a contractual obligation to hold customer money according to the CEA and CFTC regulations, and knew that the money could be lawfully used for the benefit of PFG's customers only.

118.    JPMorgan breached its obligations to customers of PFG by transferring customer funds to the 1845 Account. JPMorgan failed to contact U.S. Bank to verify that the 1845 Account was in fact a customer segregated account. Despite outward appearances, and its own practice of allowing PFG to treat the 1845 Account as a customer segregated funds account, U.S. Bank did not consider the 1845 Account to be a customer segregated account, believed Wasendorf was free to treat the money in the account as his personal property, and disclaimed any obligation associated with a customer segregated account. By transferring money from its segregated accounts to the 1845 Account, JPMorgan made it possible for Wasendorf to divert millions in PFG customer funds to his own benefit.

119.    Bank One, N.A., and later JPMorgan made repeated transfers to the 1845 Account for Wasendorf's personal benefit, in highly suspicious amounts. The wires typically transferred customer funds in multiples of $1,000,000:

        a.      An $8,000,000 transfer on December 13, 2005;

        b.      Transfers of $5,000,000 and $10,000,000 in January and February 2007;

31

        c.      A \$5,000,000 transfer in January 2008; and

        d.      A \$7,000,000 transfer in January 2009.

120.    The size and frequency of these transfers made it obvious the transfers were not being made to PFG customers and were not instances of PFG removing its own excess funds from the customer segregated account. The wire transfers were suspicious for several reasons. They were irregular, for large, round amounts, and transferred to another bank even though JPMorgan held three other customer segregated accounts for PFG. In addition, JPMorgan had a contractual obligation to hold the money according to CEA and CFTC rules, which require it to be held only in proper, customer segregated accounts. But despite these suspicious circumstances and its obligations, JPMorgan transferred millions in PFG customer funds to a non-segregated account under the exclusive control of Wasendorf, in breach of contractual obligations undertaken by JPMorgan for the benefit of Plaintiffs.

## V.     TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATION

121.    Plaintiffs and the proposed Class members did not discover the facts constituting Defendants' violations until after July 9, 2012, when Wasendorf's attempted suicide and admission of fraud triggered a robust investigation of PFG. Plaintiffs learned of the actions of PFG and Wasendorf, and the actions and inaction of the Defendants, through extensive media coverage, personal interviews and their independent investigation. Plaintiffs then retained counsel.

122.    Plaintiffs and Class members could not reasonably have discovered the facts constituting Defendants' violations until after the law enforcement and regulatory investigations began on July 9, 2012. Until then, Plaintiffs and Class members received account information from PFG that did not show a discrepancy or shortfall in their account balances.

123.    Because Plaintiffs and Class members could not have reasonably discovered the facts constituting Defendants' violations until July 9, 2012, their claims accrued on that date and any applicable statutes of limitations were tolled until that date.

## VI.    CLASS ACTION ALLEGATIONS

124.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all PFG futures account holders or customers who held open commodity futures or options positions, swaps, and/or cash collateral or cash deposits for futures collateral in their PFG accounts and have not received a return of 100% of their funds from PFG, its affiliates, or the Defendants.  Excluded from the Class are all Defendants, all members of the immediate families of the Defendants, all other officers, directors, and managing agents of the Defendants including all PFG affiliates and subsidiaries.

125.    The Class satisfies the requirements of Rule 23(a), as well as 23(b)(1)(B) and 23(b)(3).

126.    Numerosity.  The members of the Class are so numerous that joinder of all members is impracticable. The size of the Class, which is estimated to consist of 24,000 individuals and business entities, can only be ascertained through discovery.

127.    Typicality.  Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct.

128.    Adequacy.  Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action litigation, and securities and commodities related litigation.

129.    Commonality and Predominance.   Common questions of law and fact exist as to all members of the proposed class and predominate over any questions solely affecting

33

individual members of the proposed class. The questions of law and fact common to the class include:

a.      whether Defendants Wasendorf and Wasendorf Jr. breached duties to the Plaintiffs and the members of the proposed class;

b.      whether the Wasendorfs are liable to the proposed class;

c.      whether the Wasendorfs' assets are sufficient to compensate the members of the proposed class for their losses, and if not, whether the assets of the Wasendorfs should be equitably divided among all class members according to their respective losses;

d.      whether U.S. Bank knew or should have known that PFG was representing that an account maintained by PFG with U.S. Bank was a customer segregated account;

e.      whether U.S. Bank in fact maintained a customer segregated account for the benefit of PFG's customers;

f.      whether U.S. Bank is estopped from denying that it maintained a customer segregated account for the benefit of PFG's customers;

g.      whether U.S. Bank disregarded "red flags" suggesting that PFG and Wasendorf might be using the services of U.S. Bank to perpetrate a fraud on their customers;

h.      whether U.S. Bank owed a legal duty to customers of PFG;

i.      whether U.S. Bank breached a legal duty to customers of PFG;

j.      whether any breach of duty on the part of U.S. Bank is the legal cause of any damages suffered by customers of PFG;

k.      whether PFG represented to customers of PFG that it maintained a customer segregated account with JPMorgan;

34

l.      whether customers of PFG transferred or deposited funds with JPMorgan, in reliance on PFG's representations that it maintained a customer segregated account with JPMorgan;

m.      whether PFG in fact maintained a customer segregated account with JPMorgan;

n.      whether JPMorgan improperly transferred customer funds from a customer segregated account to a non-segregated account under the personal control of Wasendorf or a non-segregated account of an entity he controlled;

o.      whether JPMorgan knew or should have known of any diversion or misuse of customer funds on deposit with JPMorgan;

p.      whether JPMorgan disregarded "red flags" suggesting that PFG and Wasendorf might be using the services of JPMorgan to perpetrate a fraud on their customers;

q.      whether JPMorgan owed a legal duty to customers of PFG;

r.      whether JPMorgan breached a legal duty to PFG;

s.      whether any breach of duty on the part of JPMorgan is the legal cause of any damages suffered by customers of PFG; and

t.      whether Plaintiffs and Class members are entitled to damages.

130.    The Class may be certified under Rule 23(b)(1)(B).  Unless Defendants' combined unencumbered assets are equal to the shortfall in the segregated customer accounts at PFG, the prosecution of separate actions by individual customers of PFG would create a risk of adjudications with respect to individual class members that, as a practical matter, would be

dispositive of the interests of other customers who are not parties to the individual adjudications, or would substantially impair or impede their ability to protect their interests.

131.    The Class may also be certified under Rule 23(b)(3).  Questions of law or fact common to class members predominate over any questions affecting only individual members. A class action under Rule 23(b)(3) is also superior to all other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no unusual difficulty in the management of this action as a class action.

### COUNT 1
### Fraud by Omission
### (Against Defendant U.S. Bank)

132.    Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

133.    U.S. Bank failed to disclose to Plaintiffs and to other members of the proposed class all of the facts known to U.S. Bank as set forth above, including that (i) PFG was holding the 1845 Account out to be a customer segregated account, (ii) the 1845 Account was not actually designated a customer segregated account, (iii) PFG was using other persons' and entities' mistaken belief that the 1845 Account was a customer segregated account to draw customer funds into the 1845 Account, and (iv) PFG was misappropriating the customer funds in the 1845 Account by failing to segregate them and by spending them or allowing them to be spent for the benefit of PFG, its affiliates, Wasendorf, and other non-PFG customers.

134.    U.S. Bank had a legal duty to disclose its knowledge because it had superior knowledge of the above facts and far more experience dealing with FCMs, segregation

36

requirements, and related requirements than PFG's customers. In addition, Plaintiffs and other members of the proposed class trust and have confidence in banks like U.S. Bank to disclose such knowledge. Further, U.S. Bank is in a position of influence and superiority over and a fiduciary to Plaintiffs and the other members of the proposed class.

135. U.S. Bank's knowledge, had it been disclosed, would have been material to Plaintiffs and the other members of the proposed class. The facts known to U.S. Bank, stated above and throughout the complaint, substantially affected the interests of the Plaintiffs and the other members of the proposed class, and the non-disclosure of that knowledge induced Plaintiffs and other members of the proposed class to act, including by mailing or wiring their money to PFG or continuing to entrust their money to PFG. Plaintiffs and the other members of the proposed class would not have mailed or wired their money to PFG or continued to entrust their money to PFG had U.S. Bank disclosed its knowledge to them.

136. U.S. Bank knew that Plaintiffs and other members of the proposed class did not share U.S. Bank's knowledge of the facts stated above and throughout the complaint and knew that Plaintiffs and other members of the proposed class would not have expected those facts to be true. Alternatively, U.S. Bank acted with reckless disregard for the truth.

137. U.S. Bank acted with intent to deceive and an intent to induce action by Plaintiffs and other members of the proposed Class because, among other things, the necessary and foreseeable consequences of U.S. Bank's failure to disclose its knowledge was that Plaintiffs and other members of the proposed class would mail or wire their money to PFG or continue to entrust their money to PFG.

138. Plaintiffs and other members of the proposed class acted in justifiable reliance on U.S. Bank's failure to disclose its knowledge when they mailed or wired PFG their money or

when they continued to entrust their money to PFG.  Plaintiffs and other members of the proposed class acted in a manner consistent with how a reasonably prudent person in their position would have acted, particularly given (i) their lack of access to the facts U.S. Bank knew, (ii) U.S. Bank's fiduciary status, (iii) U.S. Bank's concealment of the information, (iv) their inability to detect the fraud, and (v) the nature of the omitted information.  Had U.S. Bank disclosed its knowledge to Plaintiffs and the other members of the proposed class, they would not have mailed or wired their money to PFG or would not have continued to entrust their money to PFG.

139.    As a direct and proximate result of U.S. Bank's failure to disclose its knowledge, Plaintiffs and other members of the proposed class suffered and will continue to suffer damages.

## COUNT 2
### Violation of the Illinois Fiduciary Obligations Act, 760 Ill. Comp. Stat. § 65/1 *et seq.*, or, alternatively, of various states' enactments of the Uniform Fiduciaries Act (Against U.S. Bank)

140.    Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

141.    PFG owed a fiduciary duty to its customers, including Plaintiffs and the other members of the proposed class.

142.    U.S. Bank knew that PFG was an FCM in possession of customer funds and that PFG owed a fiduciary duty to its customers.

143.    PFG deposited checks that were made payable to itself as a fiduciary into the 1845 Account.  PFG also deposited checks and other funds that it possessed as a fiduciary into the 1845 Account.  PFG deposited these checks and funds into the 1845 Account even though the 1845 Account was not designated as a fiduciary account or a customer segregated account at the time.

38

144.     PFG breached its fiduciary duty to Plaintiffs and other members of the proposed
class.

145.     U.S. Bank allowed PFG to deposit checks into the 1845 Account and accepted
wire transfers from the JPMorgan customer segregated account into the 1845 Account.  U.S.
Bank further allowed PFG to withdraw funds from the 1845 Account for use other than for the
customers to whom the funds belonged.

146.     U.S. Bank had actual knowledge of PFG's breach of fiduciary duty and knew
PFG was misappropriating its customers' funds.  U.S. Bank had express factual information that
the funds were being used for private purposes in violation of the fiduciary relationship.

147.     Alternatively, U.S. Bank acted in bad faith because it knew of obvious
circumstances indicating that PFG was breaching its fiduciary duty to Plaintiffs and other
members of the proposed class but deliberately refrained from investigating PFG's activities so
as to avoid knowledge that PFG was breaching its fiduciary duty.  In doing so, U.S. Bank acted
in a commercially unjustifiable manner because, among other things, it disregarded and refused
to learn facts readily available to it that indicated PFG was breaching its fiduciary duty and
misappropriating customer funds.  It was bad faith for U.S. Bank to remain passive.

148.     The actual and foreseeable result of U.S. Bank's conduct was the loss of the funds
belonging to Plaintiffs and the other members of the proposed class, who have suffered and will
continue to suffer damages as a result.

**COUNT 3**
**Breach of Contract**
**(Against JPMorgan)**

149.     Plaintiffs incorporate by reference all of the foregoing allegations as if fully set
forth herein.

150.     JPMorgan entered into a contract for banking services with PFG.

151.     The contract obligated JPMorgan to ensure the appropriate segregation and protection of customer segregated funds, including the funds held in the JPMorgan account ending in 5265.

152.     JPMorgan sent a letter to PFG acknowledging that the account ending in 5265 contained customer funds to be segregated and protected.  That letter has been incorporated into the contract between JPMorgan and PFG and further obligated JPMorgan to ensure the appropriate segregation and protection of customer segregated funds.

153.     The purposes of segregating funds include safeguarding the funds deposited by customers in the event an FCM such as PFG attempts to divert or otherwise mishandle customer funds, or declares bankruptcy.

154.     Plaintiffs Robinson, Sailer, Stapelfeldt, Martano, Ibrahim, Evans III, Houghton, Amirhajed, Randhawa and Benvenuto and other members of the proposed class were direct, intended third party beneficiaries of the contract entered into between PFG and JPMorgan. Plaintiffs Robinson, Sailer, Stapelfeldt, Martano, Ibrahim, Evans III, Houghton, Amirhajed, Randhawa and Benvenuto and other members of the proposed class wired funds directly to the PFG customer segregated account at JPMorgan ending in 5265 or mailed checks for deposit into that account.

155.     JPMorgan breached its contractual obligations to PFG and, by extension, Plaintiffs Robinson, Stapelfeldt, Sailer, Martano, Ibrahim, Evans III, Houghton, Amirhajed, Randhawa and Benvenuto and other members of the proposed class.  In addition to the conduct set forth above, JPMorgan breached its contractual obligations by facilitating transfers of millions of dollars in customer funds from the customer segregated account to the 1845 Account

40

even though the 1845 Account was not a customer segregated account at the time of the transfers.

156.     The actual and foreseeable result of JPMorgan's breach of its contractual obligations was the non-segregation and loss of the funds belonging to Plaintiffs Robinson, Sailer, Stapelfeldt, Martano, Ibrahim, Evans III, Houghton, Amirhajed, Randhawa and Benvenuto and other members of the proposed class, who have suffered and will continue to suffer damages as a result.

**COUNT 4**
**Negligence**
**(Against U.S. Bank)**

157.     Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

158.     At all times relevant hereto, PFG deposited customer funds from Plaintiffs and other members of the proposed class into the 1845 Account at U.S. Bank.

159.     U.S. Bank knew the deposits were customer funds, which raised certain regulatory requirements concerning the management of those funds.

160.     U.S. Bank knew that PFG was representing that the 1845 Account was a customer segregated account even though it was not formally designated as such.

161.     U.S. Bank was familiar with FCMs and the regulatory restrictions imposed on FCMs by the CEA, the NFA, and the CFTC.

162.     U.S. Bank knew that it was subject to certain regulatory requirements concerning monitoring accounts on deposit at U.S. Bank, including regulations designed to prevent money laundering and other illicit behavior.

163.    Because U.S. Bank knew that Plaintiffs' and other PFG customers' funds were intended for customer segregated accounts, because U.S. Bank knew PFG was misrepresenting that its 1845 Account was a customer segregated account, because U.S. Bank knew about the regulatory restrictions concerning such accounts, and because U.S. Bank knew that it was subject to certain regulatory requirements concerning account monitoring and compliance, U.S. Bank had a duty to Plaintiffs and other members of the proposed class to monitor and safeguard customer segregated funds deposited with U.S. Bank by PFG.

164.    U.S. Bank breached its duty to Plaintiffs and other members of the proposed class in the manner described above and in the following respects:

(a)    Accepting for deposit funds that were designated for a customer segregated account by Plaintiffs and other members of the proposed class and depositing them instead into a non-customer segregated account (the 1845 Account);

(b)    Failing to identify, monitor, or exercise any due diligence related to discrepancies and inconsistencies concerning PFG's deposits of the funds of Plaintiffs and other members of the proposed class;

(c)    Failing to implement and adhere to compliance and monitoring protocols concerning PFG's use of the funds of Plaintiffs and other members of the proposed class;

(d)    Failing to identify, monitor, or exercise any due diligence related to the regulatory and compliance "red flags" identified herein;

(e)    Failing to identify, monitor, or exercise any due diligence related to PFG not treating the 1845 Account as a customer segregated account;

(f)    Failing to prevent PFG and Wasendorf from using funds designated for customer segregated accounts for the operational expenses of PFG;

(g)     Failing to prevent PFG and Wasendorf from using funds designated for customer segregated accounts for non-PFG entities;

(h)     Failing to notify Plaintiffs, other members of the proposed class, PFG management, PFG's auditor, or any governmental entity or regulator about PFG's and Wasendorf's misappropriation of funds designated for customer segregated accounts;

(i)     Causing and allowing customer assets to be misappropriated for the use of PFG, its affiliates, Wasendorf, and other non-PFG customers.

165.     As a direct and proximate consequence of U.S. Bank's conduct as described in the foregoing and throughout this complaint, Plaintiffs and other members of the proposed class have lost a significant portion of the money, securities, and property they paid and delivered to PFG, have been denied the use of their assets since no later than July 9, 2012, and have been damaged thereby at an amount to be determined at trial.  The harm suffered by Plaintiffs and members of the proposed class was the foreseeable result of U.S. Bank's conduct.

**COUNT 5**
**Negligence**
**(Against JPMorgan)**

166.     Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

167.     PFG instructed customers that they could transmit their funds to PFG by wire transferring those funds to a customer segregated account at JPMorgan ending with the digits 5265.  PFG also instructed customers that they could mail checks to PFG in Illinois for deposit As a result, Plaintiffs Robinson, Sailer, Stapelfeldt, Martano, Ibrahim, Evans III, Houghton, Amirhajed, Randhawa and Benvenuto and other members of the proposed class sent funds to be held in a customer segregated account at JPMorgan.

168.     JPMorgan knew the wire and check deposits were intended for customer segregated accounts, which raised certain regulatory requirements concerning the management of those funds.

169.     JPMorgan was familiar with FCMs and the regulatory restrictions imposed on FCMs by the CEA, the NFA and the CFTC.

170.     JPMorgan knew that it was subject to certain regulatory requirements concerning customer segregated accounts, including regulations designed to prevent money laundering and other illicit behavior.

171.     JPMorgan had a duty to Plaintiffs and other members of the proposed class to monitor and safeguard customer segregated funds deposited with JPMorgan by PFG customers because (1) JPMorgan had a direct relationship with PFG customers; (2) JPMorgan knew that funds of Plaintiffs and other members of the proposed class were intended for customer segregated accounts; (3) JPMorgan knew about the regulatory restrictions concerning such accounts; and (4) JPMorgan knew that it was subject to certain regulatory requirements concerning customer segregated accounts,.

172.     JPMorgan breached its duty to Plaintiffs and other members of the proposed class as set out above and in the following respects:

       (a)     Accepting for deposit funds that were designated for a customer segregated account by Plaintiffs and other members of the proposed class, and then wiring them into PFG's non-customer segregated account at U.S. Bank (the 1845 Account);

(b)     Failing to investigate or undertake any effort to independently verify that PFG's account at U.S. Bank (the 1845 Account) was an appropriate recipient of the funds held by JPMorgan; and

(c)     Failing to implement and/or adhere to compliance and monitoring protocols concerning the transfer of customer segregated funds.

173.     As a direct and proximate consequence of JPMorgan's conduct as described in the foregoing and throughout this complaint, Plaintiffs and other members of the proposed class have lost a significant portion of the money, securities, and property they paid and delivered to PFG, have been denied the use of their assets since no later than July 9, 2012, and have been damaged thereby in an amount to be determined at trial.  The harm suffered by Plaintiffs and members of the proposed class was the foreseeable result of JPMorgan's conduct.

## COUNT 6
## Breach of Fiduciary Duty
### (Against U.S. Bank)

174.     Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

175.     U.S. Bank was on actual or inquiry notice that a diversion of fiduciary funds by Wasendorf and PFG would occur or was ongoing.

176.     U.S. Bank knowingly breached its fiduciary duties to PFG's commodity customers by, among other things:

(a)     Accepting for deposit funds that were designated for a customer segregated account by Plaintiffs and proposed class members and depositing them instead in to PFG's non-customer segregated account (the 1845 Account);

45

(b)     Failing to identify, monitor, or exercise due diligence related to discrepancies and inconsistencies concerning PFG's deposits of Plaintiffs' and other proposed class members' funds;

(c)     Failing to implement and adhere to compliance and monitoring protocols concerning PFG's use of Plaintiffs' and proposed class members' funds;

(d)     Failing to identify, monitor, or exercise due diligence related to the regulatory and compliance "red flags" identified herein;

(e)     Failing to identify, monitor, or exercise due diligence related to PFG not treating the 1845 Account as a customer segregated account;

(f)     Failing to prevent PFG and Wasendorf from using funds designated for customer segregated accounts for the operational expenses of PFG;

(g)     Failing to prevent PFG and Wasendorf from using funds designated for customer segregated accounts for PFG, its affiliates, Wasendorf, and other non-PFG customers;

(h)     Failing to notify Plaintiffs, other members of the proposed class, PFG management, PFG's auditor, or any governmental entity or regulator about PFG and Wasendorf's misappropriation of funds designated for customer segregated accounts; and

(i)     Causing and allowing customer assets to be misappropriated for the use of PFG, its affiliates, Wasendorf, and other non-PFG customers.

177.     As a direct and proximate consequence of the conduct of U.S. Bank, as described in this complaint, Plaintiffs and other members of the proposed class have lost a significant portion of the money, securities, and property they paid and delivered to PFG to margin, guarantee, or secure their commodity or options trading or to support securities transactions,

46

have been denied the use of their customer funds and property since no later than July 9, 2011, and have been damaged thereby at an amount to be determined at trial.

## COUNT 7
### Breach of Fiduciary Duty
### (Against JPMorgan)

178.    Plaintiffs incorporate and re-allege each of their previous allegations as though fully set forth herein.

179.    JPMorgan was on actual or inquiry notice that a diversion of fiduciary funds by Wasendorf and PFG would occur or was ongoing.

180.    JPMorgan knowingly breached its fiduciary duties to PFG's commodity customers by, among other things:

(a)    Allowing PFG and Wasendorf to transfer funds that were designated and held by JPMorgan in a customer segregated account on behalf of Plaintiffs and proposed class members, into PFG's non-customer segregated account (the 1845 Account);

(b)    Failing to identify, monitor, or exercise due diligence related to discrepancies and inconsistencies concerning PFG's deposits of Plaintiffs' and proposed class members' funds;

(c)    Failing to implement and adhere to compliance and monitoring protocols concerning PFG's use of Plaintiffs' and proposed class members' funds; and

(d)    Failing to notify Plaintiffs, other members of the proposed class, PFG management, PFG's auditor, or any governmental entity or regulator about Wasendorf 's and PFG's misappropriation of funds designated for customer segregated accounts.

181.    As a direct and proximate consequence of the conduct of JPMorgan, as described in this complaint, Plaintiffs and the members of the proposed class have lost a significant portion

of the money, securities, and property they paid and delivered to PFG to margin, guarantee, or secure their commodity or options trading or to support securities transactions, have been denied the use of their customer funds and property since no later than July 9, 2011, and have been damaged thereby at an amount to be determined at trial.

## COUNT 8
## Aiding and Abetting Fraud
### (Against U.S. Bank)

182.   Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

183.   As set forth herein, by misappropriating the funds that Plaintiffs and proposed class members deposited with PFG, Wasendorf committed fraud.

184.   U.S. Bank substantially and materially assisted Wasendorf in the commission of his fraudulent conduct in the following respects:

(a)   Accepting for deposit funds that were designated for a customer segregated account by Plaintiffs and other members of the proposed class and depositing them instead into PFG's non-customer segregated account (the 1845 Account);

(b)   Failing to identify, monitor, or exercise any due diligence related to discrepancies and inconsistencies concerning PFG's deposits of Plaintiffs' and proposed class members' funds;

(c)   Failing to implement and adhere to compliance and monitoring protocols concerning PFG's use of Plaintiffs' and proposed class members' funds;

(d)   Failing to identify, monitor, or exercise any due diligence related to the regulatory and compliance "red flags" identified herein;

(e)     Failing to identify, monitor or exercise any due diligence related to PFG not treating the 1845 Account as a customer segregated account;

(f)     Failing to prevent PFG and Wasendorf from using funds designated for customer segregated accounts for the operational expenses of PFG;

(g)     Failing to prevent PFG and Wasendorf from using funds designated for customer segregated accounts for non-PFG entities;

(h)     Failing to notify Plaintiffs, other members of the proposed class, PFG management, PFG's auditor, or any governmental entity or regulator about PFG's and Wasendorf's misappropriation of funds designated for customer segregated accounts; and

(i)     Causing and/or allowing customer assets to be misappropriated for the use of PFG, its affiliates, Wasendorf, and other non-PFG customers.

185.    By virtue of its substantial and material assistance to Wasendorf, U.S. Bank was aware of its role in Wasendorf's tortious activity and it acted knowingly in assisting Wasendorf.

186.    As a direct and proximate consequence of U.S. Bank's conduct as described in the foregoing and throughout this complaint, Plaintiffs and other members of the proposed class have lost a significant portion of the money, securities, and property they paid and delivered to PFG, have been denied the use of their assets since no later than July 9, 2012, and have been damaged thereby at an amount to be determined at trial.

## **COUNT 9**
### **Aiding and Abetting Breach of Fiduciary Duty**
### **(Against U.S. Bank)**

187.    Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

188.    As set forth herein, by misappropriating the funds that Plaintiffs and other members of the proposed class deposited with PFG, Wasendorf breached his fiduciary duty to Plaintiffs and other members of the proposed class.

189.    U.S. Bank substantially and materially assisted Wasendorf in breaching his fiduciary duty to Plaintiffs and other members of the proposed class in the following respects:

(a)    Accepting for deposit funds that were designated for a customer segregated account by Plaintiffs and other members of the proposed class and depositing them instead in to PFG's non-customer segregated account (the 1845 Account);

(b)    Failing to identify, monitor, or exercise any due diligence related to discrepancies and inconsistencies concerning PFG's deposits of Plaintiffs' and other proposed class members' funds;

(c)    Failing to implement and adhere to compliance and monitoring protocols concerning PFG's use of Plaintiffs' and other proposed class members' funds;

(d)    Failing to identify, monitor, or exercise any due diligence related to the regulatory and compliance "red flags" identified herein;

(e)    Failing to identify, monitor, or exercise any due diligence related to PFG not treating the 1845 Account as a customer segregated account;

(f)    Failing to prevent PFG and Wasendorf from using funds designated for customer segregated accounts for the operational expenses of PFG;

(g)    Failing to prevent PFG and Wasendorf from using funds designated for customer segregated accounts for non-PFG entities;

50

(h)     Failing to notify Plaintiffs, other members of the proposed class, PFG management, PFG's auditor, or any governmental entity or regulator about PFG's and Wasendorf's misappropriation of funds designated for customer segregated accounts; and

(i)     Causing and allowing customer assets to be misappropriated for the use of PFG, its affiliates, Wasendorf, and other non-PFG customers;

190.    By virtue of its substantial and material assistance to Wasendorf, upon information and belief, U.S. Bank was aware of its role in Wasendorf's breach of fiduciary duty and it acted knowingly in assisting Wasendorf.

191.    As a direct and proximate consequence of U.S. Bank's conduct as described in the foregoing and throughout this complaint, Plaintiffs and other members of the proposed class have lost a significant portion of the money, securities, and property they paid and delivered to PFG, have been denied the use of their assets since no later than July 9, 2012, and have been damaged thereby at an amount to be determined at trial.

**COUNT 10**
**Aiding and Abetting Conversion**
**(Against U.S. Bank)**

192.    Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

193.    As set forth herein, by misappropriating the funds that Plaintiffs and class Members deposited with PFG, Wasendorf unlawfully converted the funds.

194.    U.S. Bank substantially and materially assisted Wasendorf in the commission of his conversion in the following respects:

51

(a)     Accepting for deposit funds that were designated for a customer segregated account by Plaintiffs and other members of the proposed class and depositing them instead into PFG's non-customer segregated account (the 1845 Account);

(b)     Failing to identify, monitor, or exercise any due diligence related to discrepancies and inconsistencies concerning PFG's deposits of Plaintiffs' and other proposed class members funds;

(c)     Failing to implement and adhere to compliance and monitoring protocols concerning PFG's use of Plaintiffs' and proposed class members' funds;

(d)     Failing to identify, monitor, or exercise any due diligence related to the regulatory and compliance "red flags" identified herein;

(e)     Failing to identify, monitor, or exercise any due diligence related to PFG not treating the 1845 Account as a customer segregated account;

(f)     Failing to prevent PFG and Wasendorf from using funds designated for customer segregated accounts for the operational expenses of PFG;

(g)     Failing to prevent Wasendorf and PFG from using funds designated for customer segregated accounts for non-PFG entities;

(h)     Failing to notify Plaintiffs, other members of the proposed class, PFG management, PFG's auditor, or any governmental entity or regulator about PFG's and Wasendorf's misappropriation of funds designated for customer segregated accounts; and

(i)     Causing and allowing customer assets to be misappropriated for the use of PFG, Wasendorf, and other entities owned or controlled by Wasendorf unrelated to PFG's customers.

195.    By virtue of its substantial and material assistance to Wasendorf, upon information and belief, U.S. Bank was aware of its role in Wasendorf's conversion and it acted knowingly in assisting Wasendorf.

196.    As a direct and proximate consequence of U.S. Bank's conduct as described in the foregoing and throughout this Complaint, Plaintiffs and other members of the proposed class have lost a significant portion of the money, securities, and property they paid and delivered to PFG, have been denied the use of their assets since no later than July 9, 2012, and have been damaged thereby at an amount to be determined at trial.

**COUNT 11**
**Fraud**
**(Against Wasendorf)**

197.    Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

198.    Wasendorf made or caused PFG to make false and misleading representations to Plaintiffs and members of the proposed class concerning customer funds.  Wasendorf represented or caused PFG to represent that customer funds would be kept in customer segregated accounts and would only be used for the benefit of customers.  This representation was false when made because PFG and Wasendorf were not properly segregating customer money but instead using the funds for the benefit of PFG, its affiliates, Wasendorf, and other non-PFG customer entities.  The misrepresentations were material because they induced Plaintiffs and other members of the proposed class to provide their money to PFG and to continue entrusting PFG with their money.

199.    Wasendorf failed to disclose that he was misappropriating customer funds from the 1845 Account and using those funds for the benefit of himself and other non-PFG customer

entities. This information was material because Plaintiffs and other members of the proposed class would not have deposited their money with PFG or continued to entrust their money with had they known these facts.

200. Wasendorf had a legal duty to disclose his knowledge because he owed a fiduciary duty to Plaintiffs and members of the proposed class. In addition, he had superior knowledge of the above facts and was in a position of influence and superiority over Plaintiffs and the other members of the proposed class.

201. Wasendorf admitted that he acted with fraudulent intent and intent to deceive Plaintiffs and other members of the proposed class. Wasendorf knew that Plaintiffs and members of the proposed class did not know that he was misappropriating money from their accounts and knew that Plaintiffs and other members of the proposed class would not have expected those facts to be true.

202. Plaintiffs and other members of the proposed class acted in justifiable reliance on Wasendorf's misrepresentations and omissions when they mailed or wired PFG their money or when they continued to entrust their money to PFG. Plaintiffs and other members of the proposed class acted in a manner consistent with how a reasonably prudent person in their position would have acted, particularly given (i) their lack of access to the facts Wasendorf knew, (ii) Wasendorf's fiduciary status, (iii) Wasendorf's concealment, (iv) their inability to detect the fraud, and (v) the nature of the omitted information. Had Plaintiffs and the other members of the proposed class known that Wasendorf's misrepresentations were false or had he disclosed his knowledge to them, they would not have mailed or wired their money to PFG or would not have continued to entrust their money to PFG.

203.     As a direct and proximate result of Wasendorf's fraudulent misrepresentations and failures to disclose his knowledge, Plaintiffs and other members of the proposed class suffered and will continue to suffer damages.

**COUNT 12**
**Breach of Fiduciary Duty**
**(Against Wasendorf and Wasendorf Jr.)**

204.     Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

205.     As senior officers and/or directors of PFG, Wasendorf and Wasendorf Jr. were responsible for preserving the safety and security of monies, securities, and property that Plaintiffs and the members of the proposed class paid, delivered, and entrusted to them and to PFG to allow such customers to trade commodity futures and options contracts through PFG.

206.     Wasendorf and Wasendorf Jr. exercised dominion and control over PFG's commodity customers' funds and property and were charged with the duty and responsibility to adopt, implement, and enforce stringent rules and procedures to segregate and separately maintain such property and to ensure that those assets were not used or applied for any improper purpose, including to fulfill or satisfy the financial obligations and liabilities of PFG or its affiliates.

207.     As such, Wasendorf and Wasendorf Jr. owed PFG's commodity customers, including Plaintiffs and the members of the proposed class, a fiduciary duty to preserve and protect their customer funds and property, to segregate and separately maintain these assets (including 4d and 30.7 funds), to act solely in the customer's best interests in connection with its custody and control of their assets, and to avoid any self-dealing or conduct on behalf of PFG to the detriment of customers.

208.     Further, as the sole shareholder of PFG, Wasendorf owed PFG and its customer and creditors additional fiduciary duties arising from his effective control of PFG and from the insolvency of PFG.

209.     Wasendorf and Wasendorf Jr. breached their fiduciary duties to Plaintiffs and the other members of the proposed class by, among other things, intentionally, knowingly, recklessly, willfully or negligently:

(a)     Using or directing, authorizing, or causing the use of, the funds of PFG's commodity customers for the benefit of PFG, its affiliates, Wasendorf, and other non-PFG customers;

(b)     Using, or directing, authorizing, or causing the use of, the commodity customers' funds to margin or guarantee the trades or contracts or to secure or extend the credit of PFG, its affiliates, Wasendorf, and other non-PFG customers;

(c)     Commingling the funds of PFG's commodity customers with the funds of PFG and its affiliates and/or third-parties;

(d)     Employing procedures at PFG that did not ensure that customer funds, deposited for commodity futures trading, including 4d and 30.7 funds, would be treated as belonging exclusively to customers;

(e)     Obligating PFG customer funds for purposes other than to purchase, margin, guarantee, secure, transfer, adjust or settle trades, contracts or commodity option transactions of such customers;

(f)     Maintaining in a separate account or accounts money, securities and property in an amount not sufficient to cover or satisfy all of PFG's current obligations to its foreign futures or foreign options customers; and

(g)     Commingling foreign futures or foreign options customer funds with the money, securities or property of PFG, with proprietary accounts of PFG and its affiliates, and using such funds to secure or guarantee the obligations of, or extend credit to, PFG or its affiliates or the proprietary accounts of PFG or its affiliates.

210.    As a direct and proximate consequence of the conduct of Wasendorf and Wasendorf Jr. as described in this complaint, Plaintiffs and the other members of the proposed class have lost a significant portion of the money, securities, and property they paid and delivered to PFG to margin, guarantee, or secure their commodity or options trading or to support securities transactions, have been denied the use of their customer funds and property since no later than July 9, 2011, and have been damaged thereby at an amount to be determined at trial.

**COUNT 13**
**Conversion**
**(Against Wasendorf)**

211.    Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

212.    The funds Plaintiffs and members of the proposed class deposited with PFG were intended solely for the benefit of Plaintiffs and members of the proposed class.

213.    The funds belonging to Plaintiffs and members of the proposed class were specific and identifiable.  Each Plaintiff and member of the proposed class deposited a determinable amount of funds with PFG.

214.    Wasendorf wrongfully assumed control, dominion or ownership over funds belonging to Plaintiffs and members of the proposed class.  Plaintiffs and members of the proposed class never authorized Wasendorf to use their funds for his benefit or the benefit of

PFG, its affiliates, or other non-PFG customer entities. In fact, Wasendorf admitted that he stole millions of dollars from Plaintiffs and members of the proposed class.

215.    Plaintiffs and members of the proposed class have an absolute and unconditional right to immediate possession of the property.

216.    Plaintiffs and members of the proposed class have suffered and will continue to suffer damages as a direct and proximate result of Wasendorf's unlawful conversion of their funds.

**COUNT 14**
**Aiding And Abetting Direct Violations Of The Commodity Exchange Act**
**(Against Wasendorf Jr.)**

217.    Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

218.    Plaintiffs bring this Count against Wasendorf Jr. under Sections 13 and 25(a) of the CEA (7 U.S.C. §§ 13c, 25(a)) for aiding and abetting direct violations of the CEA and applicable CFTC regulations by PFG and Wasendorf.

219.    Wasendorf Jr. willfully aided, abetted, counseled, induced, and/or procured violations by PFG and Wasendorf of Section 4d of the CEA (7 U.S.C. § 6d) and Sections 1.20(a), 1.20(c), and 30.7(a) of the CFTC Regulations regarding the segregation and maintenance of customer funds, and acted in concert and combination with PFG and each other in such violations by, among other things, intentionally, knowingly, recklessly, or willfully:

> (a)    Using, or directing, authorizing, or causing the use of, the customer funds of PFG's commodity customers for the benefit of PFG, its affiliates, Wasendorf, and other non-PFG customers;

(b)      Using, or directing, authorizing, or causing the use of, the customer funds of PFG's commodity customers to margin or guarantee the trades or contracts, or to secure or extend the credit, of PFG or its affiliates, and/or any other customer or person other than the PFG customer for whom the property was held;

(c)      Commingling the funds of PFG's commodity customers with the funds of PFG, its affiliates, Wasendorf, and other non-PFG customers;

(d)      Employing procedures at PFG that did not ensure that customer funds, deposited for commodity futures trading, including 4d and 30.7 funds, would be treated as belonging exclusively to commodity customers; and

(e)      Obligating PFG customer funds for purposes other than to purchase, margin, guarantee, secure, transfer, adjust or settle trades, contracts or commodity option transactions of such customers.

220.    Wasendorf Jr. participated directly or indirectly through PFG in commodities transactions by receiving deposits, money, securities, or property from the Plaintiffs and the members of the proposed class in connection with or with the expectation of a contract of sale of commodities for future delivery and otherwise participated in the transactions set forth in Section 25 of the CEA (7 U.S.C. § 25(a)(1)(A)-(D)).

221.    PFG was capable of operating and meeting its obligations under the CEA and CFTC regulations only through its senior management, including Wasendorf Jr. who had control over PFG and direct supervisory responsibility and authority to ensure that PFG properly implemented and carried out the customer segregation requirements imposed under the CEA and CFTC regulations.

222.     As a direct and proximate consequence of Wasendorf Jr. conduct as described in this complaint, Plaintiffs and the members of the proposed class have lost a significant portion of the money, securities, and property they paid and delivered to PFG to margin, guarantee, or secure their commodity or options trading, have been denied the use of their customer funds since no later than July 9, 2012, and have been damaged thereby at an amount to be determined at trial.

## COUNT 15
### Aiding and Abetting Breach of Fiduciary Duty
### (Against Wasendorf Jr.)

223.     Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

224.     As set forth herein, by misappropriating the funds that Plaintiffs and other members of the proposed class deposited with PFG, Wasendorf breached his fiduciary duty to Plaintiffs and other members of the proposed class.

225.     In his capacity as President and Chief Operating Officer of PFG, Wasendorf Jr. substantially and materially assisted Wasendorf in breaching his fiduciary duty to Plaintiffs and other members of the proposed class in the following respects:

(a)     Wasendorf Jr. falsely reassured PFG clients in a communication dated November 1, 2011 that "We abide by all regulations mandated by the CFTC and the rules of NFA to hold customer funds in segregated accounts that are always separate from operational funds.  PFGBEST reports daily and monthly to the regulators concerning customer segregated funds."

(b)     Wasendorf Jr. did not monitor, safeguard, or exercise any due diligence related to customer segregated funds deposited with PFG;

60

(c)     Wasendorf Jr. did not monitor, safeguard, or exercise any due diligence related to operating funds deposited with non-PFG entities with which Wasendorf was affiliated;

(d)     Wasendorf Jr. did not implement any procedural or internal safeguards or protocol to prevent the misuse or misappropriation of customer segregated funds;

(e)     Wasendorf Jr. caused and allowed customer assets to be misappropriated for the use of PFG, its affiliates, Wasendorf, and other non-PFG customers;

(f)     Wasendorf Jr. caused and allowed the funds of PFG's customers to margin or guarantee the trades or contracts, or to secure or extend the credit, of PFG or its affiliates, and/or any other customer or person other than the PFG customer for whom the property was held;

(g)     Wasendorf Jr. caused and allowed the commingling the funds of PFG's customers with the funds of PFG and its affiliates and/or third-parties;

(h)     Wasendorf Jr. caused and allowed unlawful transfers of customer funds and property;

(i)     Wasendorf Jr. caused PFG to operate without appropriate liquidity and risk infrastructure to protect customer funds and property;

226.     By virtue of his substantial and material assistance to Wasendorf, upon information and belief Wasendorf Jr. was aware of his role in Wasendorf's breach of fiduciary duty and he acted knowingly in assisting Wasendorf.

227.     As a direct and proximate consequence of Wasendorf Jr.'s conduct as described in the foregoing and throughout this complaint, Plaintiffs and other members of the proposed class have lost a significant portion of the money, securities, and property they paid and delivered to

PFG, have been denied the use of their assets since no later than July 9, 2012, and have been

damaged thereby at an amount to be determined at trial.

## COUNT 16
### Negligence
### (Against Wasendorf Jr.)

228.    Plaintiffs incorporate by reference all of the foregoing allegations as if fully set

forth herein.

229.    At all times relevant hereto, Defendant Wasendorf Jr. was the President and Chief

Operating Officer of PFG.  In his capacity as a corporate officer of PFG, Wasendorf Jr. had a

duty to Plaintiffs and other members of the proposed class to monitor and safeguard customer

funds deposited with PFG.

230.    Wasendorf Jr. was aware that Plaintiffs and other members of the proposed class

relied on the proper handling of segregated accounts to preserve customer funds and property.

231.    Indeed, Wasendorf Jr. induced this reliance by Plaintiffs and other members of the

proposed class.  Following the collapse of MF Global, Wasendorf Jr. reassured PFG clients in a

communication dated November 1, 2011 that "We abide by all regulations mandated by the

CFTC and the rules of NFA to hold customer funds in segregated accounts that are always

separate from operational funds.  PFG BEST reports daily and monthly to the regulators

concerning customer segregated funds."

232.    Wasendorf Jr.'s November 1, 2011 letter was intended to ease customer concerns

and cause continued reliance by them on him and PFG.

233.    Concurrent with his role at PFG, Wasendorf Jr. also was an officer in non-PFG-

related entities, including November 1, 2011.  These entities wrongfully and unlawfully received

funds for their operating expenses from PFG – funds that belonged to Plaintiffs and other

members of the proposed class and that were supposed to be held in customer segregated funds accounts.

234.    Despite his duty to Plaintiffs and other members of the proposed class and despite his inducement of continued reliance by them, Wasendorf Jr. breached his duty to Plaintiffs and other members of the proposed class in one or more of the following respects:

(a)    Failing to monitor, safeguard, or exercise any due diligence related to customer funds deposited with PFG;

(b)    Failing to monitor, safeguard, or exercise any due diligence related to operating funds deposited with non-PFG entities with which Wasendorf Jr. was affiliated;

(c)    Failing to implement any procedural or internal safeguards or protocol to prevent the misuse or misappropriation of customer funds;

(d)    Causing and allowing customer assets to be misappropriated for the use of PFG, its affiliates, Wasendorf, and other non-PFG customers;

(e)    Causing and allowing the funds of PFG's customers to margin or guarantee the trades or contracts, or to secure or extend the credit, of PFG or its affiliates, and/or any other customer or person other than the PFG customer for whom the property was held;

(f)    Causing and allowing the commingling of customer funds with the funds of PFG and its affiliates and/or third-parties;

(g)    Causing and allowing unlawful transfers of customer funds and property;

(h)    Causing PFG to operate without appropriate liquidity and risk infrastructure to protect customer funds and property;

(i)     Maintaining in a separate account or accounts money, securities, and property in an amount not sufficient to cover or satisfy all of PFG's obligations to its foreign futures or foreign options customers; and

(j)     Commingling foreign futures or foreign options customer funds with the money, securities, or property of PFG, with proprietary accounts of PFG and its affiliates, and/or using such funds to secure or guarantee the obligations of, or extend credit to, PFG or its affiliates or the proprietary accounts of PFG or its affiliates.

235.     As a direct and proximate consequence of Wasendorf Jr.'s conduct as described in the foregoing and throughout this complaint, Plaintiffs and other members of the proposed class have lost a significant portion of the money, securities, and property they paid and delivered to PFG, have been denied the use of their assets since no later than July 9, 2012, and have been damaged thereby at an amount to be determined at trial.  The harm suffered by Plaintiffs and members of the proposed class was the foreseeable result of U.S. Bank's conduct.

## COUNT 17
### Negligent Misrepresentation
### (Against Wasendorf Jr.)

236.     Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

237.     On or about November 1, 2011, after the collapse of MF Global, Wasendorf Jr. sent a letter to PFG customers.  The letter was intended to reassure PFG customers that PFG was stable and their money was safe.  The letter assured PFG customers of the following:

(a)     "We abide by all regulations mandated by the CFTC and the rules of the NFA to hold customer funds in segregated accounts that are always separate from operational funds."

(b)      "PFGBEST reports daily and monthly to the regulators concerning customer segregated funds."

(c)      "It is our policy to keep extra funds on deposit in our customer segregation accounts to protect you."

(d)      "PFGBEST has significant excess capital."

238.    The information supplied by Wasendorf Jr. was incorrect.

239.    Before communicating this information, Wasendorf Jr. had a duty to make an investigation that would be made by a reasonable person in the same business or profession.

240.    Wasendorf Jr. breached his duty, and negligently supplied this information in that he failed to exercise the reasonable care or skill of a person in the same business or profession in obtaining the information and communicating it.  Specifically, Wasendorf Jr. did not undertake an adequate investigation to verify the information before sending his letter; had he done so, he would have learned that the information was incorrect.

241.    As the President and Chief Operating Officer of PFG, as well as the son of PFG's sole owner, Wasendorf Jr. had a financial interest in supplying the information.  Wasendorf Jr. supplied the information within the scope of his employment at PFG.

242.    Wasendorf Jr. intended to supply the information for the benefit and guidance of Plaintiffs and other members of the proposed class in their capacity as PFG customers.

243.    Wasendorf Jr. intended for the information to influence PFG customers to maintain their accounts with PFG.

244.    Plaintiffs and other members of the proposed class acted in reliance on the truth of the information supplied and were justified in relying on the information.

245.    Plaintiffs and other members of the proposed class suffered damages because of Wasendorf Jr.'s negligence.

**COUNT 18**
**(Direct Violations of the Commodity Exchange Act)**
**(Against Wasendorf)**

246.    Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

247.    Plaintiffs bring this Count against Wasendorf for direct violations of Section 4d of the CEA (7 U.S.C. § 6d) and Sections 1.20(a), 1.20(c) and 30.7(a) of CFTC regulations regarding the segregation and maintenance of customer funds and CFTC Regulation 166.3 for failure to properly supervise persons or entities under their direction and control by PFG, by and through Wasendorf.[1]

248.    Defendant Wasendorf directly violated Section 4d of the Commodity Exchange Act and applicable CFTC regulations by, among other things, expressly directing the transfer of commodity customer funds for an unlawful purpose in direct violation of the CEA's prohibition against utilizing customer funds other than for the benefit of customers.

249.    At the time that Wasendorf specifically directed the transfers of customer funds, he had complete control and dominion over such funds and was acting on behalf of PFG's FCM unit, which was engaged in transactions with commodities customers as set forth in Section 22 of

---

[1] 17 C.F.R. § 166.3 provides that:

> Each Commission registrant, except an associated person who has no supervisory duties, must diligently supervise the handling by its partners, officers, employees and agents (or persons occupying a similar status or performing a similar function) of all commodity interest accounts carried, operated, advised or introduced by the registrant and all other activities of its partners, officers, employees and agents (or persons occupying a similar status or performing a similar function) relating to its business as a Commission registrant.

the CEA (7 U.S.C. § 25). Wasendorf, while acting on behalf of and directing the actions of PFG

with respect to commodity customers' funds, directed the transfer of such funds in a manner that

caused the use of the funds of PFG's customers to margin or guarantee the trades or contracts, or

to secure or extend the credit, of PFG or its affiliates, and/or any other customer or person other

than the PFG customer for whom the property was held.

250.    Section 22 of the CEA (7 U.S.C. § 25 ("Section 25")) expressly provides private

rights of action for violations of the CEA, including violations of Section 4d (7 U.S.C. § 6d) of

the act and Sections 1.20(a), 1.20(c) and 30.7(a) of CFTC regulations regarding the segregation

and maintenance of customer funds.

251.    Wasendorf was acting on behalf of and directing the actions of PFG with respect

to customers' commodities transactions by receiving deposits, money, securities, or property

from the Plaintiffs and the proposed class members' in connection with or with the expectation

of a contract of sale of commodities for future delivery and otherwise participated in the

transactions set forth in Section 25 of the Commodity Exchange Act (7 U.S.C. § 25(a)(1)(A)-

(D)).

252.    PFG was capable of operating and meeting its obligations under the CEA and

CFTC regulations only through its senior management, including Wasendorf, who had dominion

over PFG and direct supervisory responsibility and authority to ensure that PFG properly

implemented and carried out the customer segregation requirements and related obligations

imposed under the CEA and CFTC regulations.

253.    As a direct and proximate consequence of Wasendorf's misconduct as admitted

by Wasendorf and described in this complaint, Plaintiffs and the members of the proposed class

have lost a significant portion of the money, securities, and property they paid and delivered to

PFG to margin, guarantee, or secure their commodity or options trading, have been denied the use of their assets since no later than July 9, 2012, and have been damaged thereby at an amount to be determined at trial.

## COUNT 19
### Violations of Section 4b(a)(1)(A) and (C) of the CEA, as amended, (Fraud by Misappropriation) (Against Wasendorf)

254.     Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

255.     Section 4b(a)(1)(A), (C) of the CEA, as amended, 7 U.S.C. §6b(a)(1)(A), (C), makes it unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person: (A) to cheat or defraud or attempt to cheat or defraud such other person; or (C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for such other person.

256.     By misappropriating customer funds for purposes other than those intended by its customers, PFG, by and through Wasendorf, violated Section 4b(a)(1)(A), (C) of the CEA, as amended, 7 U.S.C. § 6b(a)(1)(A), (C).

257.     Wasendorf controlled PFG and willfully aided, abetted, counseled, commanded, induced, and procured the acts constituting the violations by PFG alleged in this count. Wasendorf is therefore additionally liable for PFG's violations of Section 4b(a)(1)(A), (C) of the

CEA, as amended, 7 U.S.C. § 6b(a)(1)(A), (C) and pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b).

258. Each and every day that PFG and/or Wasendorf misappropriated customer funds for purposes other than those intended by its customers constitutes a separate and distinct violation of Section 4b(a)(1)(A), (C) of the CEA, as amended, 7 U.S.C. § 6b(a)(1)(A), (C).

259. As a direct and proximate result of the wrongful conduct of the Defendants named in this Count, Plaintiffs and the other proposed class members suffered substantial damages. Plaintiffs and the proposed class members who deposited with or paid to PFG money, securities, or property in order to engage in commodity futures or options contract trading on or subject to the rules of a designated contract market in the United States are each entitled to actual damages for the violations of the CEA alleged herein.

**COUNT 20**
**(Violation of Section 4b(a)(2)(A), (B) and (C) of the CEA**
**(Fraud in Connection with Commodity Futures Contracts)**
**(Against Wasendorf)**

260. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

261. Section 4b(2)(A), (B) and (C) of the CEA, 7 U.S.C. § 6b(a)(2) makes it unlawful:

[F]or any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or other agreement, contract, or transaction subject to paragraphs (1) and (2) of section 7a (g) of this title, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market -- (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person....

69

262.     Wasendorf and PFG, individually or in concert, in or in connection with commodity futures contracts made for or on behalf of other persons, cheated or defrauded, or attempted to cheat or defraud, customers and willfully deceived or attempted to deceive customers by, among other things, knowingly making transfers of customer segregated funds in a manner designed to avoid detection, improperly diverting customers' cash and commingling it with PFG own funds, willfully making or causing to be made false reports or statements or willfully entering or causing to be entered false records, and converting customers funds for its own use in violation of 7 U.S.C. § 6b(a)(2)(A), (B), and (C).

263.     As a direct and proximate result of the wrongful conduct of Wasendorf, Plaintiffs and the other proposed class members suffered and will continue to suffer damages.

264.     Plaintiffs and the members of the proposed class who deposited with or paid to PFG money, securities, or property in order to engage in commodity futures or options contract trading other than on or subject to the rules of a designated contract market in the United States are each entitled to actual damages for the violations of the CEA alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment:

(a)     certifying the class, appointing Plaintiffs as representatives of the class, and appointing Plaintiffs' counsel as class counsel;

(b)     awarding damages, including pre-judgment interest, on each claim in an amount to be established at trial;

(c)     awarding punitive damages in an amount to be established at trial;

(d)     impressing a constructive trust on the ill-gotten gains of Defendants in the ultimate res of which each proposed class member shall have an undivided interest;

(e)    for reasonable attorneys' fees and costs of investigation and litigation; and

(f)    granting such other relief as to this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of

Civil Procedure, of all issues so triable.

Dated:  December 21, 2012                    /s/  *Daniel C. Girard*

                                                                    Daniel C. Girard, *pro hac vice*
                                                                    Amanda M. Steiner, *pro hac vice* forthcoming
                                                                    David Stein, *pro hac vice* forthcoming
                                                                    **GIRARD GIBBS LLP**
                                                                    601 California Street, Suite 1400
                                                                    San Francisco, CA 94104
                                                                    Telephone: (415) 981-4800
                                                                    Facsimile: (415) 981-4846
                                                                    dcg@girardgibbs.com
                                                                    as@girardgibbs.com
                                                                    ds@girardgibbs.com

                                                                    Merrill G. Davidoff
                                                                    Michael C. Dell'Angelo (PA80910)
                                                                    **BERGER & MONTAGUE, P.C.**
                                                                    1622 Locust Street
                                                                    Philadelphia, PA  19103
                                                                    Telephone:  (215) 875-3000
                                                                    Fax:  (215) 875-4604
                                                                    mdavidoff@bm.net
                                                                    mdellangelo@bm.net

                                                                    *Co-Lead Counsel for Plaintiffs and the
                                                                    proposed Class*

71

Norman E. Siegel, *pro hac vice*
Matthew L. Dameron, *pro hac vice*
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (866) 714-7112
Facsimile: (816) 714-7101
siegel@stuevesiegel.com
dameron@stuevesiegel.com
Douglas G. Thompson
Michael G. McLellan
Robert O. Wilson
**FINKELSTEIN THOMPSON LLP**
1077 30th Street NW, Suite 150
Washington, District of Columbia
20007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090
dthompson@finkelsteinthompson.com
mmclellan@finkelsteinthompson.com
rwilson@finkelsteinthompson.com


Adam J. Levitt
Edmund Aronowitz
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLC**
55 West Monroe Street, Suite 1111
Chicago, Illinois 60603
Telephone: (312) 984-0000
Facsimile: (312) 984-0001
levitt@whafh.com

*Plaintiffs' Executive Committee*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 21, 2012, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ *Daniel C. Girard*
*Daniel C. Girard*