# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| | ) | No. 12 C 5546 |
| In re Peregrine Financial Group | ) | |
| Customer Litigation | ) | |
| | ) | Judge Sara L. Ellis |
| | ) | |

## OPINION AND ORDER

This is one of two actions pending before this Court arising from the collapse of

Peregrine Financial Group ("Peregrine") in July 2012.[1]  In this case, Plaintiffs bring a putative

class action against Defendants Russell R. Wasendorf, Sr., U.S. Bank, N.A. ("U.S. Bank"), and

JPMorgan Chase Bank, N.A. ("JPMorgan") on behalf of Peregrine's futures account holders and

customers who have not received the entirety of their funds invested with Peregrine.[2]  U.S. Bank

seeks to dismiss the claims brought against it in the Second Consolidated Amended Class Action

Complaint (the "Complaint"): fraud by omission (Count I); violation of the Illinois Fiduciary

Obligations Act ("FOA"), 760 Ill. Comp. Stat. § 65/1 *et seq.* (Count II); negligence (Count III);

breach of fiduciary duty (Count IV); aiding and abetting Wasendorf's fraud (Count V); aiding

and abetting Peregrine's and Wasendorf's breaches of fiduciary duties (Count VI); and aiding

and abetting Wasendorf's conversion of funds (Count VII).  U.S. Bank's motion [182] is granted

in part and denied in part.  Although the Court finds that Plaintiffs have sufficiently alleged U.S.

Bank's bad faith to overcome U.S. Bank's FOA defense and pursue their affirmative FOA claim,

their aiding and abetting claims must be dismissed because the allegations do not allow the Court

---

[1] A related class action on behalf of introducing brokers, *Fintec Group, Inc. v. U.S. Bank, N.A.*, No. 13 C 8076, is also pending before this Court.  The Court is issuing an Opinion on U.S. Bank's motion to dismiss the claims against it in that case concurrent with the issuance of this Opinion.

[2] The claims against Wasendorf are stayed.  Plaintiffs, JPMorgan, and the Trustee for the Peregrine bankruptcy estate have reached a settlement, which is awaiting Court approval.

to infer that U.S. Bank had actual knowledge of Wasendorf's fraud. Because Plaintiffs were non-customers of U.S. Bank and thus were owed no duty of care, Plaintiffs' negligence claim is dismissed. But because Plaintiffs have alleged that a fiduciary relationship arose on account of the deposit of their funds in a customer segregated account at U.S. Bank, their fraud by omission and breach of fiduciary duty claims may proceed to discovery.

**BACKGROUND**[3]

## I. Peregrine and Its Relationship with U.S. Bank

Russell Wasendorf, Sr. [4] established Peregrine in 1990 and served as its CEO. Peregrine was a futures commission merchant ("FCM") regulated by the Commodity Futures Trading Commission ("CFTC") and the National Futures Association ("NFA"). An FCM is an entity "engaged in soliciting or in accepting orders for . . . the purchase or sale of a commodity for future delivery," which, "in connection with [such activities], accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom." 7 U.S.C. § 1a(28). As an FCM, Peregrine's operations were governed by the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*, and CFTC regulations. Pursuant to these rules, Peregrine was required to keep its customers' money in a separate account maintained solely for the customers' benefit. 7 U.S.C. § 6d(a)(2); 17 C.F.R. § 1.20(a). The account was to bear a name identifying it as a customer segregated account. 17 C.F.R. § 1.20(a). Although Peregrine was allowed to commingle one customer's funds with

---

[3] The facts in the background section are taken from Plaintiffs' Second Consolidated Amended Class Action Complaint and the exhibits attached thereto and are presumed true for the purpose of resolving U.S. Bank's motion to dismiss. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 782 (7th Cir. 2007). The Court may also take judicial notice of matters of public record. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080–81 (7th Cir. 1997).

[4] The Court will refer to Russell Wasendorf, Sr. as "Wasendorf." It will retain the full names of other members of Wasendorf's family.

another's in a single account, it could not commingle customer funds with its operational funds or use customer funds to guarantee trades or contracts, or secure or extend the credit of anyone other than the customer. 17 C.F.R. § 1.20(c). Peregrine could hold excess funds in its customer segregated funds accounts and withdraw those excess funds for its own use, however. 17 C.F.R. § 1.23. Similar to the restrictions on an FCM's use of money in a customer segregated account, the bank where the account is held cannot use money in the account for any purpose "except to purchase, margin, guarantee, secure, transfer, adjust or settle trades, contracts, or commodity option transactions of futures customers." 17 C.F.R. § 1.20(a). The bank must sign a written acknowledgment that futures customers' funds are deposited in the account and are being held in accordance with the CEA. *Id.*

Headquartered in Cedar Falls, Iowa, Peregrine established a primary banking relationship there with U.S. Bank.[5] Peregrine maintained at least two accounts at U.S. Bank continuously from the early 1990s through July 2012 and had at least four other accounts there over that time period. Among the accounts at U.S. Bank was a customer segregated account—the 1845 Account—which is the focus of this case.[6] Wasendorf provided US Bank with business beyond the Peregrine's accounts. U.S. Bank also maintained approximately ten accounts for other companies run by Wasendorf and at least six personal bank accounts for Wasendorf and his family. Additionally, U.S. Bank extended various loans to Wasendorf and his companies between 1993 and 2012.

---

[5] Initially, Peregrine's accounts were opened with Firstar Corporation. Firstar merged with U.S. Bancorp, U.S. Bank's parent company, in 2001. The Court will refer to Firstar and U.S. Bank interchangeably as U.S. Bank for purposes of this Opinion.

[6] From 1992 to 1996, the account holding Peregrine customers' money was designated with a number ending in 9434.

Indeed, because of Wasendorf's presence in Cedar Falls and the perception that he was a successful businessman, U.S. Bank sought out additional business from him and provided him with personalized service. In July 2007, Timothy Raymer, a U.S. Bank vice president, met with Wasendorf to discuss moving more of Wasendorf's business to U.S. Bank, with Raymer estimating that the potential relationship would be worth between $13 and $40 million. From 2009 to 2011, U.S. Bank sought to convince Wasendorf to open a trust and custody account to hold $100 million in U.S. Treasury bills. Two U.S. Bank employees, Hope Timmerman and Douglas Boe, were assigned to Wasendorf and his accounts as relationship managers. Timmerman, an assistant relationship manager, worked in the Cedar Falls branch office, while Boe, a senior vice president, worked in U.S. Bank's Cedar Rapids branch. Both Timmerman and Boe socialized with Wasendorf and were invited to Wasendorf's birthday golfing trip to Orlando, Florida and his wedding. They worked to cultivate the relationship, holding at least quarterly conference calls or meetings with Wasendorf. The meetings often took place at Wasendorf's restaurant in Cedar Falls, My Verona, or at Wasendorf's office, and at least on one occasion, Timmerman and Boe traveled to Chicago to meet Wasendorf.

U.S. Bank also accepted the controls Wasendorf placed on account access and gave him preferential treatment. U.S. Bank followed Wasendorf's direction that all communications regarding Wasendorf's accounts, including those of Peregrine, were to be made exclusively with him. All account inquiries and balance confirmations were to be directed to Timmerman or Boe, regardless of whether the inquiry was made by an authorized signatory on one of the accounts. Even Peregrine's CFO did not have access to Peregrine's accounts at U.S. Bank. On the other hand, Timmerman performed major transactions for Wasendorf at his request without requiring him to fill out required paperwork for the transactions. For example, in June 2002, she

transferred over $1 million out of the 1845 Account to a third party, did not require Wasendorf to sign the standard form used to initiate such transfers, and instead wrote "Known Customer" on the signature line. Timmerman also monitored Wasendorf's banking activity, contacting him if she noticed a pending charge that would result in an overdraft, at which time Wasendorf would often instruct her to transfer funds out of a Peregrine account, including the 1845 Account, to cover the shortfall. Finally, Timmerman provided reference letters and creditworthiness letters for Wasendorf, including whatever language was needed to meet compliance standards.

Because Timmerman was assigned to Wasendorf's accounts, she was intimately aware of their status and the overall financial picture of Wasendorf and his companies, including Peregrine. She reviewed Peregrine's statements of financial condition, income statements, 1-FR-FCMs (a form required by the CFTC), audited financial statements, and performance projections. She also reviewed CFTC monthly reports on Peregrine's adjusted net capital, net capital requirement, excess net capital, and the amount of customer funds that Peregrine had to keep in segregated accounts. Based on Timmerman's review of these documents, U.S. Bank knew Peregrine did not turn a profit in most of its years of existence, with losses in some years totaling over $4 million. Timmerman also reviewed Wasendorf's personal tax returns, financial statements, and insurance policies.

## II. The 1845 Account

In June 1996, U.S. Bank executed a letter to Peregrine acknowledging that the 1845 Account was a customer segregated account governed by the CEA. U.S. Bank employees also reassured Wasendorf that they would be able to comply with the CEA with respect to Peregrine's customer funds. Bank records and other documents referred to the 1845 Account inconsistently, however. Up until around April 2001, most of the monthly statements for the 1845 Account

identified it as "Peregrine Financial Group Inc. Segregated Funds Acct." Compl. ¶ 96. Around 2002, however, the name shown on the 1845 Account's monthly statements was merely "Peregrine Financial Group Inc." *Id.* ¶ 153. Checks for the account always identified the payor as "Peregrine Financial Group, Inc. CEA Customer Segregated Accounts," *id.* ¶ 97, and deposit record booklets and deposit tickets used similar names. Peregrine and U.S. Bank's Master Repurchase Agreement, which governed the investment of Peregrine's customers' funds, identified "Peregrine Financial Group, Inc. CEA Customer Segregated Accounts" as the party to the agreement. *Id.* ¶ 102. Some, but not all, computer programs at U.S. Bank identified the 1845 Account as a customer segregated account. Since 2006, screenshots showing outgoing wire transfers and the online banking profile for the 1845 Account listed the name of the account merely as "Peregrine Financial Group" or "Peregrine Financial Group Inc." *Id.* ¶ 154. Peregrine also recognized that the 1845 Account was a customer segregated account at least in name. Checks drawn on Peregrine's house or proprietary account and deposited into the 1845 Account listed "Peregrine Financial Group Customer Seg" or Peregrine Financial Group Seg" as the payee. *Id.* ¶ 130. In sum, most incoming documents indicated the 1845 Account was a customer segregated account while most outgoing documents suggested it had no such restrictions.

Plaintiffs' funds were either initially deposited in the 1845 Account or deposited in a customer segregated account at JPMorgan and then transferred to the 1845 Account. Between November 2005 and March 2009, approximately $289 million was transferred from Peregrine's customer segregated accounts at JPMorgan into the 1845 Account. Peregrine also deposited checks from individual customers directly into the 1845 Account. These checks bore notations that indicated they were customer funds.

### III.    Transfers from the 1845 Account

Despite the fact that the 1845 Account was a customer segregated account, U.S. Bank employees performed numerous transactions that transferred money out of the 1845 Account for non-customer purposes. These transfers included large withdrawals—often exceeding $50,000—made personally by Wasendorf, in addition to transfers to other accounts Wasendorf held at U.S. Bank in his name or those of his family members or businesses. For example, on November 15, 2005, Wasendorf withdrew $70,000 from the 1845 Account at the counter of the Cedar Falls branch and then immediately deposited $70,000 in a joint checking account he held at U.S. Bank with his wife. In April 2008, U.S. Bank processed a transfer of $468,809 from the 1845 Account to fund the purchase of Wasendorf's home in Orlando, Florida. In December 2008, Wasendorf transferred $1,660,000 from the 1845 Account to his restaurant, My Verona. In December 2010, a U.S. Bank employee at the Cedar Falls branch processed a $2,469,692 transfer from the 1845 Account to Connie Wasendorf's savings account at U.S. Bank as part of a divorce settlement.

In sum, from 2008 to 2010, Wasendorf transferred over $24,000,000 directly from the 1845 Account to one of his other companies' accounts at U.S. Bank. Although many transfers were made from the 1845 Account into other Wasendorf accounts, money was rarely transferred from these other accounts into the 1845 Account. The frequency and nature of withdrawals and transfers even led Timmerman to refer to the 1845 Account as Peregrine's checking account. And while standard U.S. Bank procedures required customer signatures for the type of transfers Wasendorf was requesting, because of her relationship with Wasendorf, Timmerman often processed transfers out of the 1845 Account at Wasendorf's email, telephone, or fax request

without a signature, noting instead "known customer" or taking some other action to allow the transfers to go forward without the signature. *Id.* ¶ 283.

## IV.    Loans to Wasendorf Construction and the Wasendorfs

In September 2008, U.S. Bank lent Wasendorf Construction $6.4 million and Wasendorf and his then-wife Connie $3 million to build a new headquarters building for Peregrine in Cedar Falls. The Wasendorf Construction loan was guaranteed by Wasendorf, Connie Wasendorf, and Russell Wasendorf, Jr., while the loan to Wasendorf and Connie Wasendorf was guaranteed by Peregrine, Wasendorf Construction, and Russell Wasendorf, Jr. Connie Wasendorf was removed as a guarantor on the loan to Wasendorf Construction in May 2011, and Peregrine was added as a guarantor on that loan on August 2011. The guaranties provided U.S. Bank with a security interest in all property in which the guarantors had an ownership interest and granted U.S. Bank a contractual right to set off amounts due against all depository account balances in its possession. U.S. Bank, along with the other parties to the loans, believed the 1845 Account to be included as security for the loans. The 1845 Account had the largest balance among Peregrine's accounts at U.S. Bank during the life of the loans. From March 2009 to June 2012, U.S. Bank collected nearly $4 million in loan repayments, with the majority of the money coming from the 1845 Account.

In connection with the loans, U.S. Bank employees again reviewed Peregrine's and Wasendorf's finances. In reviewing Wasendorf Construction's documents, they found its 2010 financials incomplete and suspect. In January 2011, Timmerman found Wasendorf Construction's internal financial reporting to have questionable expense levels. U.S. Bank employees also questioned Wasendorf's sources of cash, not giving credence to his explanation that Peregrine remained in operation through cash infusions from Wasendorf's successful

Romanian real estate investments. Thus, they expressed their belief that the loans to the Wasendorfs and Wasendorf Construction would likely end up on the watchlist and not be repaid. Nonetheless, no further action was taken.

## V.    Analysis Service Charges

U.S. Bank collected analysis service charges for services on various Wasendorf accounts it held. These charges totaled nearly $30,000 between May 2005 and December 2012. Even though the charges were attributable to individual Wasendorf accounts, U.S. Bank often collected them all directly from the 1845 Account. This was in spite of its agreement not to use funds in that account for non-futures customer purposes.

## VI.   Wasendorf's Fraud Comes to Light

By mid-2012, Wasendorf had taken over $200 million from the 1845 Account for non-customer use. To conceal his conduct, Wasendorf had set up a post office box in Cedar Falls to appear as a U.S. Bank address so as to intercept mail intended for U.S. Bank, including balance confirmation requests that were sent by the NFA and Peregrine's auditor. This meant U.S. Bank never received the typical balance confirmation requests a bank with a customer segregated account would receive from the NFA and an FCM's auditor. As a result, Wasendorf was able to represent to the NFA, Peregrine's auditor, and its customers that Peregrine maintained a customer segregated account at U.S. Bank that had over $200 million in 2012 when the balance was actually closer to $6 million.[7] The one time U.S. Bank did receive an NFA balance confirmation request, in May 2011, Wasendorf was still able to conceal his fraud. Timmerman filled out the forms, did not notice the incorrect address for U.S. Bank, and sent the completed forms (with the proper balance for the 1845 Account) to Peregrine and the NFA. After

---

[7] As another example, Peregrine's August 2004 financial statement listed a balance for the customer segregated account at U.S. Bank of over $90 million when the 1845 Account only had a balance of around $1 million during the relevant time period. Timmerman reviewed this financial statement.

Wasendorf received the form, he showed Timmerman the wrong address, convinced her to provide him with another confirmation form, altered the form, and sent the NFA the altered form (reflecting an inflated balance for the 1845 Account) as a correction from Timmerman. U.S. Bank did not receive any subsequent balance confirmation requests.

In mid-2012, however, the NFA was moving to a system that would allow it direct online access to the balance in customer segregated accounts. Wasendorf, realizing his actions would be exposed, attempted suicide, leaving a confession and suicide note admitting to fraud. Peregrine subsequently declared bankruptcy. Wasendorf pleaded guilty to fraud and embezzlement and is currently serving a fifty year sentence.

After Peregrine's collapse, U.S. Bank claimed the 1845 Account was an ordinary business checking account. But this position was belied by U.S. Bank documents and behavior after Peregrine declared bankruptcy, including U.S. Bank employees providing the CFTC with statements for the 1845 Account that identified it as a customer account in July 2012 and U.S. Bank delivering the funds in the 1845 Account to the trustee for Peregrine's bankruptcy estate in May 2013 in response to the trustee's assertion that the account was a customer segregated account.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a

claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank*, 649 F.3d at 615 (citation omitted). Rule 9(b) applies to "all averments of fraud, not claims of fraud." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). "A claim that 'sounds in fraud'— in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements." *Id.*

## ANALYSIS

## I. Illinois Fiduciary Obligations Act

Initially, U.S. Bank argues that all claims against it are barred by the FOA.[8] The FOA governs a bank's liability in its dealings with a fiduciary and is "meant to shift the burden of employing honest fiduciaries to the principal instead of the banking institution." *Time Savers, Inc. v. LaSalle Bank, N.A.*, 863 N.E.2d 1156, 1165, 371 Ill. App. 3d 759, 309 Ill. Dec. 259 (2007). Section 9 of the FOA provides:

---

[8] The parties both proceed under Illinois law, with Plaintiffs asserting a claim under the FOA and U.S. Bank arguing that the FOA precludes all of Plaintiffs' claims. Because the parties do not dispute the application of Illinois law, the Court does not engage in a choice of law analysis but instead applies Illinois substantive law to the state law claims at issue. *See TKK USA, Inc. v. Safety Nat'l Cas. Corp.*, 727 F.3d 782, 786 (7th Cir. 2013).

> Notwithstanding any other law, if a fiduciary makes a deposit in a bank to his personal credit of checks drawn by him upon an account in his own name as fiduciary, or of checks payable to him as fiduciary, or of checks drawn by him upon an account in the name of his principal if he is empowered to draw checks thereon, or of checks payable to his principal and indorsed by him, if he is empowered to indorse such checks, or if he otherwise makes a deposit of funds held by him as fiduciary, the bank receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of his obligation as fiduciary; and the bank is authorized to pay the amount of the deposit or any part thereof upon the personal check of the fiduciary without being liable to the principal, unless the bank receives the deposit or pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in making such deposit or in drawing such check, or with knowledge of such facts that its action in receiving the deposit or paying the check amounts to bad faith.

760 Ill. Comp. Stat. 65/9. The FOA provides a "total defense to banks for all claims arising from a bank's honest interactions with fiduciaries." *Crawford Supply Grp., Inc. v. LaSalle Bank, N.A.* (*Crawford Supply I*), No. 09 C 2513, 2010 WL 320299, at *9 (N.D. Ill. Jan. 21, 2010); *Johnson v. Citizens Nat'l Bank of Decatur*, 334 N.E.2d 295, 299, 300 Ill. App. 3d 1066 (1975).

But Plaintiffs' claims may proceed at this stage if they have adequately alleged either (1) that U.S. Bank had actual knowledge of Peregrine's and Wasendorf's misappropriation of customer funds or (2) that U.S. Bank had knowledge of sufficient facts regarding Peregrine's and Wasendorf's wrongdoing that U.S. Bank's actions amounted to bad faith. *Time Savers, Inc.*, 863 N.E.2d at 1165. Plaintiffs need not plead evidentiary facts to avoid the FOA bar, but they must do more than merely use "the words 'actual knowledge' and 'bad faith.'" *Id.*

Plaintiffs argue that they have adequately alleged both actual knowledge and bad faith. "Actual knowledge" has been defined as "the awareness at the moment of the transaction that the fiduciary is defrauding the principal or having express factual information that funds are being used for private purposes that violate the fiduciary relationship." *Id.* (internal quotation marks omitted) (quoting *Cont'l Cas. Co. v. Am. Nat'l Bank & Trust Co. of Chicago*, 768 N.E.2d 352,

365, 329 Ill. App. 3d 686, 263 Ill. Dec. 592 (2002)). Illinois courts have defined "bad faith" to include situations "where the bank suspects that the fiduciary is acting improperly and deliberately refrains from investigating in order that it may avoid knowledge that the fiduciary is acting improperly." *Mikrut v. First Bank of Oak Park*, 832 N.E.2d 376, 385, 359 Ill. App. 3d 37, 295 Ill. Dec. 225 (2005) (internal quotation marks omitted) (citation omitted)); *see also Time Savers, Inc.*, 863 N.E.2d at 1165 ("In determining whether a bank has acted in bad faith, courts will consider whether it was commercially unjustifiable for the payee to disregard and refuse to learn readily available facts such that it was bad faith to remain passive."). The Court need not address whether U.S. Bank had actual knowledge that Peregrine and Wasendorf were using customer funds in violation of their fiduciary duties because the Complaint sufficiently alleges that U.S. Bank acted in bad faith.

Plaintiffs allege that Peregrine and Wasendorf breached at least two fiduciary duties: (1) the duty to use customers' money for the customers' benefit only, and (2) the duty to maintain customer funds in a properly named and segregated account.[9] Plaintiffs contend that the circumstances surrounding Wasendorf's use of the 1845 Account were such that it was commercially unjustifiable for U.S. Bank not to investigate further to determine whether Wasendorf and Peregrine were improperly using customer funds. These circumstances include: (1) the withdrawal of millions of dollars from the 1845 Account, with a large portion of these funds being transferred to other accounts controlled by Wasendorf at U.S. Bank; (2) only a small minority of the checks deposited in the 1845 Account being from sources other than Peregrine

---

[9] U.S. Bank appears to suggest that, as currently pleaded, the Complaint does not set forth that Peregrine breached the second duty because, at the time, Peregrine was not required to deposit customer funds directly into a customer segregated account as long as equivalent funds were segregated on the same day. *See* Reply at 4–5 (citing CFTC Interpretative Letter No. 90-7 (May 1, 1990); Administrative Determination No. 203 (Dec. 1, 1966)). The Complaint fails to allege that this did not occur but the Court need not decide whether this duty was breached at this time.

customers; (3) the use of the 1845 Account as security for loans issued by U.S. Bank to

Wasendorf, his then-wife, and Wasendorf Construction; (4) the use of funds from the 1845

Account to make payments to U.S. Bank on those loans; (5) the close supervision that

Timmerman maintained over Wasendorf's accounts over the years; (6) U.S. Bank's review and

knowledge of Peregrine's finances, including Peregrine's general unprofitability over the years;

(7) U.S. Bank employees' concerns that Wasendorf did not have sufficient funds to pay off his

loans and their failure to give credence to Wasendorf's explanation regarding from where he

obtained his money; (8) U.S. Bank's complicity in the inconsistent naming and presentation of

the 1845 Account; (9) the restrictions on access to the 1845 Account; (10) U.S. Bank providing

Wasendorf and Peregrine with preferential treatment; and (11) U.S. Bank's desire to retain and

grow Wasendorf's business.

      Defendants argue that none of these circumstances, or the other instances Plaintiffs have

alleged, suggest that U.S. Bank suspected Peregrine and Wasendorf were acting improperly but

deliberately refrained from investigating. Although taken individually, they are not sufficient to

establish bad faith, when considered together, they suffice at this stage to allow Plaintiffs to

move forward with their claims. It is true that "the deposit or transfer of money by a fiduciary

into his personal accounts does not, without more, give rise to the inference that a bank had

actual knowledge of wrongdoing or bad faith." *Crawford Supply I*, 2010 WL 320299, at *7

(collecting cases); *see also Johnson*, 334 N.E.2d at 300 ("Mere suspicious circumstances are not

enough to require the Bank to inquire."). But here, the 1845 Account was not an ordinary

account, but a customer segregated account where it would be unlikely for such large numbers of

transfers to be directed to non-Peregrine accounts controlled by Wasendorf at U.S. Bank.

Moreover, despite the inconsistent treatment of the 1845 Account, the Complaint alleges that

U.S. Bank was aware that it was a customer segregated account but referred to it nonetheless as Peregrine's "checking" account. *See, e.g.*, Compl. ¶ 167. And although an FCM like Peregrine could deposit excess funds in a customer segregated account and withdraw such funds for its own use, the Complaint suggests that it would have been impossible for the withdrawals to be solely excess Peregrine funds where only a small number of deposits came from non-customer sources. Plaintiffs also allege that U.S. Bank employees reviewed Peregrine's financials and were aware that Peregrine was not turning a profit most years and thus could not have the type of excess funds on hand to justify the withdrawals being made. Indeed, the Complaint includes allegations that U.S. Bank employees were suspicious of how Peregrine remained in operation, as they gave "no credence" to Wasendorf's explanations. Compl. ¶ 216. Combined with the allegations of large withdrawals and transfers from the 1845 Account to non-Peregrine accounts at U.S. Bank controlled by Wasendorf, U.S. Bank's alleged knowledge that Peregrine did not have enough excess funds to cover the transfers gives rise to an inference of bad faith. *See U.S. C.F.T.C. v. U.S. Bank, N.A.*, No. 13-CV-2041-LRR, 2013 WL 5944179, at \*14 (N.D. Iowa Nov. 5, 2013) (court could draw inference that U.S. Bank was liable for CEA violation for improper transfers out of 1845 Account based on allegations that U.S. Bank knew Peregrine did not have enough excess funds to cover transfers and that U.S. Bank knew Wasendorf was not transferring funds to benefit Peregrine customers); *Falk v. N. Trust Co.*, 763 N.E.2d 380, 387–88, 327 Ill. App. 3d 101, 261 Ill. Dec. 410 (2001) (finding plaintiff had sufficiently alleged a bank's bad faith by alleging that fiduciary had transferred principal's funds into own account, fiduciary used funds to pay personal loan owed to the bank, and the bank had reviewed the fiduciary's tax returns and other financial statements and was aware she had insufficient income to support the account and loan activity she was generating); *cf. Paloian v. F.D.I.C.*, No. 11 C 50017, 2011 WL

5325562, at *8 (N.D. Ill. Nov. 2, 2011) (finding allegations did not support bad faith where, among other things, plaintiff did not allege bank had any knowledge of fiduciaries' "personal finances or any reason to believe they were living a lifestyle unsupported by their legitimate income").

And these are not the only allegations that support a bad faith finding. The fact that U.S. Bank relied on the 1845 Account as security for the loans to Wasendorf, his then-wife, and Wasendorf Construction, all while being aware that the 1845 Account comprised almost the entirety of the balances of Peregrine's accounts at U.S. Bank, suggests that U.S. Bank at least had facts before it that should have caused it to inquire as to whether the use of the 1845 Account as security was proper or instead violated the CEA.[10] *See U.S. C.F.T.C.*, 2013 WL 5944179, at *12 (finding CFTC adequately alleged CEA violation based on U.S. Bank's use of 1845 Account to secure the Wasendorf loans where the CFTC alleged "that U.S. Bank 'used,' or availed itself, of the 1845 Account when it entered into the 2008 and 2011 guaranties with Peregrine, which enabled U.S. Bank to collect interest on the associated loans"). Plaintiffs also allege that U.S. Bank gave Peregrine and Wasendorf preferential treatment, by, for example, Timmerman executing certain transfers without the required signatures or paperwork. *Cf. Crawford Supply I*, 2010 WL 320299, at *9 (finding no basis for an inference of bad faith where, among other things, there was no allegation that the bank gave the fiduciary "preferential treatment or assistance"). Finally, Plaintiffs allege that U.S. Bank had an incentive not to investigate, i.e. that it refrained from delving deeper into Peregrine's and Wasendorf's transactions because

---

[10] Plaintiffs also allege that U.S. Bank accepted money from the 1845 Account as repayments on the loans. They acknowledge, however, that the money was first transferred to a different Wasendorf-related account, which undercuts their argument that U.S. Bank should have been suspicious for this reason, as banks do not have a duty to "cross-referenc[e] the accounts of all those who had dealings with the bank and acted as fiduciaries with their personal incomes and other assets." *Crawford Supply Grp., Inc. v. Bank of Am., N.A.* (*Crawford Supply II*), No. 09 C 2513, 2011 WL 1131292, at *8 (N.D. Ill Mar. 28, 2011).

Wasendorf was a valuable and important customer to whom they could sell additional services. More importantly, Plaintiffs allege U.S. Bank benefited from the transfers out of the 1845 Account because "they facilitated the prospects for repayment of U.S. Bank's loan to Wasendorf Construction." Compl. ¶ 236. These allegations suggest a motive for U.S. Bank avoiding deeper knowledge of Wasendorf's actions with respect to the 1845 Account. *See U.S. C.F.T.C.*, 2013 WL 5944179, at *12 ("[T]he Commission points out that Wasendorf and his businesses had many other accounts at U.S. Bank and, presumably, if U.S. Bank had not issued the Wasendorfs' loan or extended the Construction loan—of which the 1845 Account allegedly was the primary security—Wasendorf plausibly could have closed these other accounts, which could have been financially detrimental to U.S. Bank."); *Crawford Supply II*, 2011 WL 1131292, at *6 (bank chose "to ignore [fiduciary's] breaches rather than lose his business"); *Ohio Cas. Ins. Co. v. Bank One*, No. 95 C 6613, 1996 WL 507292, at *1, *4 (N.D. Ill. Sept. 5, 1996) (plaintiff sufficiently alleged bad faith where, among other things, bank executives socialized with the fiduciary, who was the township supervisor, and the bank had a strong financial interest in keeping the township's accounts with the bank). Because the allegations here, when taken together, amount to more than just "mere suspicious circumstances," Plaintiffs' claims are not barred by the FOA.[11] *See Ohio Cas. Ins. Co.*, 1996 WL 507292, at *4 ("While probably none of the matters alleged, standing alone, would be sufficient to demonstrate bad faith, their totality raises enough of an inference of bad faith for pleading purposes.").

---

[11] Because the Court concludes that the FOA does not bar Plaintiffs' claims, it will not dismiss Count II, which is Plaintiffs' affirmative claim under the FOA. Although the FOA generally provides a defense to liability, some Illinois courts have suggested that the FOA also provides an affirmative cause of action. *See Crawford Supply Grp. II*, 2011 WL 1131292, at *10 (collecting cases). Because U.S. Bank does not argue that Plaintiffs cannot recover affirmatively on the FOA for this reason, the Court follows those Illinois courts that have recognized the FOA as providing a cause of action. *See, e.g.*, *Cont'l Cas. Co.*, 896 N.E.2d at 348 (discussing the trial court's grant of summary judgment on a claim for the violation of FOA § 9).

## II.  Existence of a Legal Duty

To state claims for negligence, fraud by omission, and breach of fiduciary duty, Plaintiffs must allege, respectively, that U.S. Bank owed them a duty of care, a duty to speak, or a fiduciary duty.  *See Setera v. Nat'l City Bank*, No. 07 C 2978, 2008 WL 4425446, at *4 (N.D. Ill. Sept. 26, 2008) ("A claim for negligence requires that the defendant breach a duty of care owed to the plaintiff."); *Weidner v. Karlin*, 932 N.E.2d 602, 605, 402 Ill. App. 3d 1084, 342 Ill. Dec. 475 (2010) (claim for fraud by omission requires a special or fiduciary relationship, which gives rise to a duty to speak); *Paloian*, 2011 WL 5325562, at *4 (plaintiff must allege existence of fiduciary relationship in order to state claim for breach of fiduciary duty).  Plaintiffs allege that U.S. Bank had a duty to disclose its knowledge to Plaintiffs because they placed trust and confidence in banks like U.S. Bank and because U.S. Bank was in a position of influence and superiority over Plaintiffs.  Plaintiffs also claim that U.S. Bank created the mistaken impression that Peregrine customer money was being held properly in customer segregated accounts and thus had the duty to correct that misimpression.  Finally, Plaintiffs contend that U.S. Bank owed them a fiduciary duty because the funds in the 1845 Account constituted a special deposit, as the 1845 Account was opened specifically to hold customer funds segregated pursuant to the CEA.  U.S. Bank, however, argues that it owed Plaintiffs no such duties and thus that these claims must be dismissed.

U.S. Bank is correct with respect to Plaintiffs' negligence claim.  Plaintiffs were not U.S. Bank customers, and banks do not owe a duty of care to non-customers.  *See Setera*, 2008 WL 4425446, at *4 (collecting cases); *Thompson v. Capital One Bank, Inc.*, 375 F. Supp. 2d 681, 683–84 (N.D. Ill. 2005).  Plaintiffs do not offer a meaningful response, and thus their negligence claim will be dismissed.

As for the other two claims, which depend on the existence of a fiduciary or special relationship, a bank generally does not owe a fiduciary duty to its depositors, let alone to its non-customers. *See Geimer v. Bank of Am., N.A.*, 784 F. Supp. 2d 926, 932 (N.D. Ill. 2011) (the relationship between a bank and a depositor is "no more than 'an arms-length transaction between debtor and creditor'" (quoting *Miller v. Am. Nat'l Bank & Trust Co.*, 4 F.3d 518, 520 (7th Cir. 1993)). A fiduciary relationship may arise, however, where a plaintiff places trust and confidence in the defendant so that the defendant attains a position of influence and superiority over the plaintiff. *Kurtz v. Solomon*, 656 N.E.2d 184, 190, 275 Ill. App. 3d 643, 212 Ill. Dec. 31 (1995). Here, Plaintiffs have only provided conclusory allegations that they placed trust and confidence in U.S. Bank, generically alleging that they "trust and have confidence in banks like U.S. Bank," Compl. ¶ 328, without suggesting that they ever had any dealings specifically with U.S. Bank or even were aware that their money was deposited with U.S. Bank until after Peregrine's collapse.[12] Similarly, the allegation that U.S. Bank was in a position of influence and superiority over Plaintiffs cannot be credited, as there are no factual allegations that support this conclusion. Without more, the Court finds that Plaintiffs have failed to adequately allege the existence of a fiduciary duty arising from a relationship of trust and confidence.

But Plaintiffs have also alleged that a fiduciary duty arose because the deposit of their funds into the 1845 Account constituted a special deposit. "A special deposit is the delivery of either money or chattel to a bank under a special agreement, or under circumstances sufficient to create a trust." *Mid-City Nat'l Bank of Chicago v. Mar Bldg. Corp.*, 339 N.E.2d 497, 503, 33 Ill. App. 3d 1083 (1975). A special deposit is found where the bank has a duty "to hold a sum to be kept separate from the bank's other funds." *Seaway Nat'l Bank v. Cain*, 629 N.E.2d 660, 665,

---

[12] Not one of the Plaintiffs alleges that he or she wired money to Peregrine's account at U.S. Bank, while some Plaintiffs allege that they wired money to Peregrine's account at JPMorgan.

257 Ill. App. 3d 856, 196 Ill. Dec. 115 (1994). "The deposit is for some specific purpose not contemplating a credit or a general account." *Mid-City*, 339 N.E.2d at 503. Here, Plaintiffs allege that the deposits in the 1845 Account were special deposits governed by the CEA. The CEA required Peregrine "to hold customers' property in trust and to treat it as belonging to those customers rather than to" Peregrine. *Grede v. FCStone, LLC*, 746 F.3d 244, 247 (7th Cir. 2014) (citing 7 U.S.C. § 6d(a)-(b)). The Complaint includes allegations that U.S. Bank acknowledged that the 1845 Account was a customer segregated account governed by the CEA and thus the Court can infer that U.S. Bank and Peregrine had an agreement to treat the 1845 Account as a special deposit on behalf of the customers whose funds were deposited in that account. Discovery may not bear that out, but at this stage, the Court will allow Plaintiffs to proceed on their breach of fiduciary duty and fraud by omission claims based on the 1845 Account being a special deposit held on behalf of Peregrine's customers.

## III.    Aiding and Abetting Claims

Plaintiffs bring three claims against U.S. Bank based on aiding and abetting liability, alleging that U.S. Bank aided and abetted Wasendorf's fraud, Peregrine's and Wasendorf's breach of fiduciary duties, and Wasendorf's conversion of the funds in the 1845 Account. To state an aiding and abetting claim, Plaintiffs must allege that (1) Peregrine or Wasendorf performed a wrongful act that caused injury, (2) U.S. Bank was aware of its role when it provided assistance, and (3) U.S. Bank knowingly and substantially assisted the violation. *Time Savers, Inc.*, 863 N.E.2d at 1168. Although Rule 9(b) applies to the circumstances surrounding the alleged fraud involved, U.S. Bank's knowledge may be alleged generally. *Heffernan v. Bass*, 467 F.3d 596, 601–02 (7th Cir. 2006); *Prestwick Capital Mgmt. Ltd. v. Peregrine Fin. Grp., Inc.*,

No. 10 C 23, 2010 WL 4684038, at *4 (N.D. Ill. Nov. 12, 2010). U.S. Bank claims that Plaintiffs have failed to sufficiently allege the second and third elements.

The Court agrees with U.S. Bank that Plaintiffs have not alleged that U.S. Bank was aware of its role in Wasendorf's fraud. Plaintiffs have alleged that U.S. Bank employees, including Timmerman and others, knew the 1845 Account was a customer segregated account but processed transfers of funds from that account to Wasendorf personally or to accounts that he controlled. Plaintiffs also point to Timmerman's awareness of Peregrine's and Wasendorf's finances, the use of the 1845 Account as security for loans to Wasendorf, his then-wife, and Wasendorf Construction, and the inconsistent naming of the 1845 Account in U.S. Bank's systems. According to Plaintiffs, these allegations establish that Timmerman, and by imputation U.S. Bank, knew "every salient fact about Peregrine's and Wasendorf's improper deposits into and use of the 1845 Account." Resp. at 17. They further contend that U.S. Bank's knowledge can be inferred from the fact that U.S. Bank benefited from Wasendorf's misuse of the 1845 Account. *See U.S. S.E.C. v. Benger*, 697 F. Supp. 2d 932, 939–40 (N.D. Ill. 2010) (in securities fraud context, scienter for aiding and abetting violation may be inferred where "the aider and abettor is alleged to have had something to gain from the fraud"). But although these allegations are indicative of bad faith as discussed above, they are not sufficient to create the inference that U.S. Bank had actual knowledge of Wasendorf's fraud. *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292–94 (2d Cir. 2006) (red flags "may have put the banks on notice that some impropriety may have been taking place" but they "do not create a strong inference of Schick's outright theft of client funds"); *cf. Benger*, 697 F. Supp. 2d at 940–41 (primary violation was failure to disclose that commissions exceeded 60%, and complaint included allegations that defendant knew that more than 60% of investor funds were being distributed as commission as he allocated these

commissions repeatedly and knew that the investor agreements did not disclose the commission rate but stated only a nominal transactional fee would be charged). Without more, Plaintiffs' aiding and abetting claims must be dismissed.

## CONCLUSION

For the foregoing reasons, U.S. Bank's motion to dismiss [182] is granted in part and denied in part. Plaintiffs' claims for aiding and abetting fraud (Count V), aiding and abetting breach of fiduciary duty (Count VI), and aiding and abetting conversion (Count VII) are dismissed without prejudice. Plaintiffs' claim for negligence (Count III) is dismissed with prejudice. U.S. Bank is ordered to answer the remaining counts of the Second Consolidated Amended Class Action Complaint by October 9, 2014.


Dated: September 25, 2014

_____
SARA L. ELLIS
United States District Judge