IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| *In re Peregrine Financial Group Customer Litigation* | Civil Action No: 12-cv-5546<br><br>Judge Sara L. Ellis<br><br>Magistrate Judge Daniel G. Martin |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND FOR CLASS CERTIFICATION FOR SETTLEMENT PURPOSES**

The Customer Representative Plaintiffs,[1] individually and on behalf of all others similarly situated, respectfully submit this memorandum in support of their motion for preliminary approval of a proposed class action settlement with defendant U.S. Bank, N.A. and Ira Bodenstein (the "Trustee"), not individually, but solely as Chapter 7 Trustee for the estate of Peregrine Financial Group, Inc. ("PFG").[2] U.S. Bank has agreed to pay $44.5 million to former PFG customers in settlement of Plaintiffs' claims and the potential claims of the PFG Estate. The proposed settlement reflects a recovery of more than 20% of the $215 million of diverted class members' funds before accounting for an award of attorneys' fees, the reimbursement of litigation expenses, and service awards as discussed in Section II.D.

Plaintiffs respectfully request that the Court enter an order (1) preliminarily approving the settlement, (2) certifying the settlement class for settlement purposes, (3) approving the proposed form and manner of notice, and (4) setting a date for the fairness hearing. A proposed order is attached as Exhibit E to the Declaration of Daniel C. Girard, filed in support of Plaintiffs' motion for preliminary approval.

I.    THE LITIGATION AND NEGOTIATION OF THE PROPOSED SETTLEMENT

    A.    **Plaintiffs' Claims**

This case arises from the diversion of $215 million of customer funds by PFG's founder and principal, Russell Wasendorf, Sr., from PFG's accounts, including an account at U.S. Bank. PFG was required to hold its customers' money in special statutorily designated "customer

---

[1] The Customer Representative Plaintiffs are defined in the Settlement Agreement as Brian Pannkuk, Jordan Robinson, Joe Martano, Marcus Ibrahim, William Robert Evans, III, Gurvaneet Randhawa, and Patricia Benvenuto. Mark Alexander and J.D. Sailer were also named as class representatives in the Third Amended Complaint. Concurrently with this motion, Plaintiffs filed a motion to drop Mr. Alexander and Mr. Sailer as parties from this action for the reasons stated therein.

[2] Ira Bodenstein is Trustee in *In re Peregrine Financial Group, Inc.*, No. 12-B-27488, which is currently pending in the United States Bankruptcy Court for the Northern District of Illinois.

1

segregated accounts" to be used exclusively for the benefit of its customers. These accounts are the chief protection for customer funds under the Commodity Exchange Act (CEA).

Over the course of about twenty years, Wasendorf misappropriated PFG's customers' funds from an account at U.S. Bank (the "1845 Account"). U.S. Bank signed formal letters of acknowledgment undertaking to hold the 1845 Account in accordance with the CEA. Wasendorf and PFG held out the 1845 Account to PFG's customers, regulators, and PFG's employees as a customer segregated account. Plaintiffs allege that, in reality, U.S. Bank allowed Wasendorf to use the 1845 Account as a personal checking account. It is estimated that approximately $215 million was missing from PFG's customer segregated accounts at the time PFG filed for bankruptcy.

In their Third Amended Complaint ("TAC"), plaintiffs assert four claims against U.S. Bank: (1) fraud by omission (Dkt. 398 at ¶¶ 325-32); (2) violation of the Illinois Fiduciary Obligations Act (IFOA), 760 Ill. Comp. Stat. § 65/1 *et seq.* (¶¶ 333-40); (3) breach of fiduciary duty (¶¶ 341-45); and (4) violation of the CEA, 7 U.S.C. § 25, by aiding and abetting PFG's and Wasendorf's violations of provisions of the CEA (¶¶ 384-91).

### B. Procedural History

#### 1. Plaintiffs' Complaints and U.S. Bank's Motions to Dismiss

After the news broke about Wasendorf's theft of customer funds, a number of PFG's commodities customers filed lawsuits. The Court consolidated the cases in October 2012 and appointed Girard Gibbs LLP and Berger & Montague, P.C. to serve as interim co-lead class counsel. Dkt. 50. Plaintiffs filed a Consolidated Amended Class Action Complaint on December 21, 2012. Dkt. 66. U.S. Bank and J.P. Morgan moved to dismiss on February 5, 2013, and both of those motions were fully briefed. *See* Dkt. 80, 82, 87-88, 103, 106-07.

Before the Court ruled on the motions, plaintiffs filed a Second Consolidated Amended Class Action Complaint. Dkt. 169. U.S. Bank moved to dismiss, and the parties briefed the motion.

*See* Dkt. 182-83, 193, 197. The Court granted in part and denied in part the motion. Dkt. 255. On May 5, 2015, Plaintiffs filed a Third Amended Complaint, asserting their surviving claims, and adding a claim for aiding and abetting violations of the CEA. Dkt. 398. U.S. Bank answered on May 6. Dkt. 399.

### 2. Discovery

The parties engaged in substantial discovery throughout the course of the litigation. Plaintiffs deposed twelve U.S. Bank employees on a number of topics, including U.S. Bank's policies and procedures related to FCMs, CEA customer segregated accounts, fiduciary accounts, fraud detection and prevention, account opening, closing and designations, processing of transfers, withdrawals and deposits, U.S. Bank's job descriptions and training, U.S. Bank's communications with the NFA and external auditors, and the loans, extensions of credit and other services U.S. Bank provided to PFG, Wasendorf, and Wasendorf's affiliated enterprises.

Plaintiffs deposed four PFG employees. Plaintiffs conducted a video deposition of Wasendorf at the federal penitentiary in Terre Haute, Indiana. Plaintiffs also deposed his son, Russell Wasendorf Jr., PFG Chief Compliance Officer Susan O'Meara and CFO Brenda Cuypers. Plaintiffs deposed Heather McCallum, the CFO of Wasendorf's non-PFG companies, and also deposed NFA auditor Regina Thoele about audit policies and procedures related to PFG.

All of the plaintiffs were deposed. Plaintiffs have responded to three sets of interrogatories and two sets of requests for production and produced approximately 1,600 documents.

Plaintiffs obtained and searched over 4 million pages of documents in the course of discovery. U.S. Bank produced more than 94,000 pages of documents in response to plaintiffs' requests for production. Plaintiffs also served multiple sets of interrogatories and requests for production on U.S. Bank. To obtain this discovery, plaintiffs met and conferred with U.S. Bank on

numerous occasions, and filed four discovery motions. Dkt. 218, 311, 314, 323. U.S. Bank also filed three motions to compel. Dkt. 212, 293, 306.

Plaintiffs also obtained documents from defendant J.P. Morgan, Wasendorf Jr., and PFG accountant Veraja-Snelling. The Trustee produced several hundred thousand documents, and allowed plaintiffs to search documents selected from the Trustee's data map, a compendium of electronic and hard-copy evidence that was collected after PFG's collapse. Plaintiffs obtained large productions from the CFTC and the NFA, and also reviewed and analyzed documents and transcripts of depositions conducted in the CFTC's case against PFG, *CFTC v. Peregrine Financial Group, Inc.*, No. 1:12-cv-05383 (N.D. Ill.).

Plaintiffs conferred with potential expert witnesses on a variety of topics related to Futures Commission Merchants (FCMs), including policies and procedures typically used by banks when maintaining an FCM's customer segregated account, training related to such accounts, FCMs' expected use of such accounts, red flags warranting investigation, anti-money laundering controls, fraud and banking risks unique to such accounts, NFA/CFTC relationship with FCMs, financial, margin and recordkeeping requirements of FCMs and financial reports of FCMs.

### 3. Settlement With J.P. Morgan

In March 2014, plaintiffs entered into a settlement with defendant J.P. Morgan and the Trustee. The J.P. Morgan settlement will return approximately $12 million to settlement class members. The Bankruptcy Court approved the settlement on April 16 and, following notice to the class and a fairness hearing, this Court granted final approval of the settlement on January 27, 2015. *See* Dkt. 302-305. U.S. Bank, which had objected to the settlement, timely appealed from this Court's settlement approval order and U.S. Bank's appeal is pending.

4. **Settlement Negotiations With U.S. Bank**

On November 17 and 18, 2014, plaintiffs, representatives of the Trustee and U.S. Bank participated in two full days of mediation with the Hon. Vaughn Walker, retired United States District Court judge for the Northern District of California. Although the parties engaged in good faith negotiations and exchanged numerous offers and counteroffers, the parties were unable to reach an agreement. On May 15, 2015, plaintiffs, representatives of the Trustee, and U.S. Bank mediated the case for a second time with Judge Walker and, after a full day of negotiations, reached an agreement.

## II.    TERMS OF THE PROPOSED SETTLEMENT

The terms of the settlement are summarized in the parties' Settlement Agreement, which is attached as Exhibit 1 to the Declaration of Daniel C. Girard.

### A.    The Settlement Class

The proposed settlement class includes all persons or entities who held money, property, and/or securities pursuant to 7 U.S.C. § 6d(a)(2) at PFG as of July 10, 2012.[3] Girard Decl., Ex. 1 at ¶ 2.hh.

### B.    The Settlement Benefits

Upon preliminary approval of the settlement, U.S. Bank will pay $44.5 million in cash into an escrow account. Settlement class members who have an allowed claim in the PFG bankruptcy case will automatically receive a payment unless they exclude themselves. Other settlement class members will be required to submit a claim form to participate. The parties propose to distribute

---

[3] Excluded from the class are all of PFG's 30.7 customers, the defendants, the immediate family members of the defendants, any parent, subsidiary or affiliate of any defendant, and any person who excludes himself from the class by filing a request for exclusion that is accepted by the Court. While the TAC did not exclude 30.7 customers from the proposed class, they are excluded under the Settlement Agreement because the 30.7 customers with Allowed Claims received a distribution of 100% of their Allowed Claims from the Trustee. *See In re Peregrine Financial Group, Inc., Debtor.,* No. 12-27488 (Bankr. N.D. Ill.) at Dkt. 3256.

the funds according to the proposed plan of allocation attached as Exhibit D to the Declaration of Daniel C. Girard. Upon final approval of the settlement, U.S. Bank will dismiss with prejudice its appeal of the J.P. Morgan settlement thereby making those settlement funds available for distribution.

        **C.**        **Proposed Release of Claims**

In exchange for the settlement benefits, settlement class members will release all claims that were or could have been asserted against U.S. Bank in this matter. The full text of the releases is set forth in paragraph 2.bb and 2.ee of the Settlement Agreement, attached as Ex. 1 to the Girard Declaration. The PFG bankruptcy Trustee and U.S. Bank will also exchange mutual releases.

        **D.**        **Attorneys' Fees, Costs, and Service Awards**

Plaintiffs will move for court approval of an award of attorneys' fees in an amount not to exceed 31% of the settlement fund, as well as reimbursement of litigation expenses, and service awards to the named plaintiffs (including Alexander and Sailer) of $5,000 each. Plaintiffs have agreed with the PFG bankruptcy Trustee that if the total of all expense reimbursements and service awards sought in connection with this settlement exceeds, $500,000, the excess will be deducted from the fee award.

**III.**        **THE PROPOSED SETTLEMENT SHOULD BE PRELIMINARILY APPROVED**

        **A.**        **The Proposed Settlement Is Favorable to the Settlement Class**

Federal Rule of Civil Procedure 23(e) requires judicial approval of class action settlements. This process involves two steps. First, the court conducts a preliminary review of the settlement terms. *Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982). Then, after notice to the class and a fairness hearing, the court decides whether to grant final approval of the proposed settlement. *Id.*; *see generally* Manual for Complex Litigation § 21.6 (4th ed. 2004).

Preliminary approval does not require a searching inquiry into the adequacy or merits of the settlement. *American International Group, Inc. v. ACE INA Holdings, Inc.*, Nos. 07 C 2898, 09 C 2026, 2011 WL 3290302, at *6 (N.D. Ill. July 26, 2011). The question at this preliminary stage is whether the settlement is "within the range of possible approval." *Gautreaux*, 690 F.2d at 621 n.3. In determining whether it should exercise its discretion to approve a class settlement as fair, a district court should "consider the facts in the light most favorable to the settlement," and evaluate the settlement's fairness based on:

> the strength of plaintiffs' case compared to the amount of defendants' settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of settlement.

*Isby v. Bayh*, 75 F.3d 1191, 1198 (7th Cir. 1996). Courts also consider whether the settlement was the result of arm's-length negotiation and not the product of collusion. *See In re AT&T Mobility Wireless Data Services Sales Litig.*, 270 F.R.D. 330, 345 (N.D. Ill. 2010).

### 1. The Settlement Is an Excellent Recovery Given the Risk of Continuing to Litigate Against U.S. Bank

The "most important" factor is "the relative strength of plaintiffs' case on the merits as compared to what the defendants offer by way of settlement." *Isby*, 75 F.3d at 1199. In evaluating this factor, courts "compare the benefits to the class under the proposed settlement with the likely rewards the class would have received following a successful trial of the case." *Mangone v. First USA Bank*, 206 F.R.D. 222, 225 (S.D. Ill. 2001). U.S. Bank raises numerous factual and legal arguments that plaintiffs have considered in negotiating the settlement.

U.S. Bank argues that plaintiffs will face serious obstacles to proving damages at trial. U.S. Bank asserts that plaintiffs must prove the bank's liability on a transaction-by-transaction basis and that plaintiffs will be unable to hold U.S. Bank liable for the loss of any money that was initially

7

deposited with J.P. Morgan and then transferred to PFG's U.S. Bank account. U.S. Bank also asserted that, at most, only transfers from the 1845 Account to another Wasendorf-controlled account at U.S. Bank could support liability. From mid-2005 to PFG's collapse, the period for which plaintiffs have undisputed transactional data, those transfers add up to only about $33 million. Plaintiffs acknowledge they face substantive risks in proving liability and procedural challenges in obtaining and maintaining class certification through trial and on appeal. Wasendorf is in prison and does not have the means to compensate class members, and PFG is bankrupt and did not maintain insurance that covers plaintiffs' losses.

The settlement will provide roughly $44.5 million to the class or, as noted above, more than 20% of the $215 million diverted from customer accounts, before attorneys' fees, expenses and service awards. This recovery, when coupled with that portion of the J.P. Morgan settlement payable to 4d claimants with Allowed Claims, amounts to over 25% of the original shortfall at the commencement of the bankruptcy case, before attorneys' fees, expenses and service awards. This is an outstanding recovery for the class. *See, e.g., Mars Steel Corp. v. Continental Illinois National Bank & Trust*, 834 F.2d 677, 682 (7th Cir. 1897) (finding a settlement to be fair, reasonable and adequate when it would pay class members ten percent of their total damages due to the risks and costs of trial); *see also Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 583-84 (N.D. Ill. 2011) (same). "Continued litigation carries with it a decrease in the time value of money, for '[t]o most people, a dollar today is worth a great deal more than a dollar ten years from now.'" *AT&T Mobility*, 270 F.R.D. at 347 (citation omitted). This factor favors approval of the settlement.

### 2. The Complexity, Length, and Expense of Continued Litigation Weigh in Favor of the Settlement

Continuing to litigate their claims against U.S. Bank would require the parties to invest significant time and money in developing expert opinions and completing expert discovery, and

8

preparing for trial. There is also the cost of the trial itself and appeals. This process would likely take years. The settlement provides a reasonably prompt resolution with meaningful relief to all settlement class members without these major expenditures of time and money. This factor supports preliminary approval. *See Isby*, 75 F.3d at 1199-1200 (affirming the district court's finding that continuing to litigate would require the resolution of complex issues and entail considerable time and expense, and that the settlement was comparable, if not superior, to what the plaintiffs could have achieved at trial).

### 3. No Significant Opposition to the Settlement

Based on their communications with the class representatives, class counsel believe the settlement will enjoy broad support. If the Court grants preliminary approval, class members will be notified and have an opportunity to voice their opinions about the settlement.

### 4. Competent and Experienced Class Counsel Are of the Opinion That the Settlement Is an Excellent Result for the Class

The court is "entitled to give consideration to the opinion of competent counsel that the settlement [is] fair, reasonable and adequate." *Isby*, 75 F.3d at 1200. Class counsel believe the settlement is an excellent result because it recovers a significant portion of class members' losses and without the risk, expense and delay of further litigation. Based on their decades of experience in class actions and more particularly in representing victims of financial fraud, class counsel endorse the proposed settlement.

### 5. Plaintiffs Have Sufficient Information to Make a Reasonable Assessment of the Claims Against U.S. Bank

"The stage of the proceedings at which settlement is reached is important because it indicates how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *AIG*, 2011 WL 3290302, at *8 (citation omitted). Plaintiffs and their counsel have lived with this case for several years and engaged in substantial discovery. They have a thorough

understanding of the strengths and weaknesses of their claims against U.S. Bank and the procedural and substantive obstacles they would face at trial and on appeal. *See id.* (finding that where "extensive discovery has undisputedly been completed, and the court has been presented with volumes of argument, declarations, and exhibits … it is impossible to say that the court and the parties are unable to evaluate the merits of this case." *Id.*

### 6. The Settlement Is the Product of Zealous Arm's-Length Negotiation

The settlement was reached only after vigorous, arm's-length negotiations among experienced counsel and with the assistance of an experienced mediator. *See McKinnie v. JP Morgan Chase Bank,* 678 F. Supp. 2d 806, 812 (E.D. Wis. 2009) (mediator's participation in negotiations supports finding that settlement was fairly bargained for). The settlement does not unfairly favor the plaintiffs, who will ask the Court to approve a modest service award of $5,000 for their contributions, or class counsel, whose request for an award of attorneys' fees and costs must also be approved by the Court. Preliminary approval is therefore warranted.

### B. The Settlement Class Should Be Conditionally Certified for Settlement Purposes

Certification of a settlement class "has been recognized throughout the country as the best, most practical way to effectuate settlements involving large numbers of claims by relatively small claimants." *In re IMAX Securities Litig.*, 283 F.R.D. 178, 186 (S.D.N.Y. 2012) (citation omitted). A class may be certified if it satisfies all of the Rule 23(a) prerequisites (numerosity, commonality, typicality, and adequacy of representation) and one of the three subparagraphs of Rule 23(b). *See Messner v. Northshore University HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012). The proposed settlement class satisfies the requirements of Rule 23(a) and Rule 23(b)(3).

### 1. The Class Is So Numerous That Joinder Would Be Impracticable

Under Rule 23(a)(1), a class must be "so numerous that joinder of all members is impracticable." *See Chandler v. Southwest Jeep-Eagle, Inc.*, 162 F.R.D. 302, 307 (N.D. Ill. 1995) (holding that there is no "magic number" but that it is usually "impracticable" to join forty or more persons). Geographic dispersion of the class also weighs against voluntary joinder. *Herkert v. MRC Receivables Corp.*, 254 F.R.D. 344, 348 (N.D. Ill. 2008). PFG had 13,586 4d accounts, and as of January 23, 2013, the Trustee received 8,596 individual proofs of claim.[4] It would be impracticable for all of these customers to litigate their claims through voluntary joinder.

### 2. There Are Common Issues of Law and Fact

Rule 23(a)(2) requires that there be at least one issue of law or fact common to the class. *Spano v. Boeing Co.*, 633 F.3d 574, 585 (7th Cir. 2011). It is not necessary that "every member of the class have an identical claim." *Id.* A "'common nucleus of operative fact is usually enough to satisfy' this requirement." *AT&T Mobility*, 270 F.R.D. at 341 (citation omitted). There is a common nucleus of operative fact in this case because all of the proposed class members' claims arise out of the same alleged course of conduct by U.S. Bank. The commonality requirement is satisfied.

### 3. The Proposed Class Representatives Are Typical of the Class

Rule 23(a)(3) requires that the representative plaintiffs' claims be typical of those of the other class members. "'A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are

---

[4]http://www.omnimgt.com/sblite/templates/a/peregrineorder.aspx?clientId=CsgAAncz%2b6Y6BvbWWv8%2bb36Dj%2fDJZopCTH%2fUoH71miODakPIzfeAY2Jz9cbvsKRVwkWisq%2b56Os%3d ("certain of the Debtor's approximately 13,586 accounts").
http://omnimgt.com/CMSVol/CMSDocs/pub_46535/391885_claims%20update%20031913.pdf ("As of January 23, 2013, the Trustee has received the following number of filed proofs of claim in the following categories: i) 8,596 futures claims; ii) 3,064 forex claims; iii) 200 metals claims; and iv) 2,034 general creditor claims.")
Both the 13,586 accounts and the 8,596 proofs of claim include a relatively small percentage of 30.7 customers, who are not included in the class.

based on the same legal theory.'" *Herkert*, 254 F.R.D. at 350 (citation omitted). "Even if there are factual distinctions between the representative parties and other class members, the typicality requirement can be satisfied." *Kohen v. Pacific Investment Management Co., LLC*, 244 F.R.D. 469, 477 (N.D. Ill. 2007), *aff'd*, 571 F.3d 672 (7th Cir. 2009). Plaintiffs' claims satisfy this requirement because they arise from the same course of conduct and are based on the same legal theories.

### 4. Plaintiffs and Their Counsel Will Adequately Represent the Class

Rule 23(a)(4) requires the plaintiffs to "fairly and adequately protect the interests of the class." This requirement "is satisfied where the named representative (1) has retained competent counsel, (2) has a sufficient interest in the outcome of the case to ensure vigorous advocacy, and (3) does not have interests antagonistic to those of the class." *Fournigault v. Independence One Mortgage Corp.*, 234 F.R.D. 641, 646 (N.D. Ill. 2006). Only conflicts of interest that are "real" and manifest, not merely "hypothetical" will impact typicality. *Kohen,* 571 F.3d at 680.

Plaintiffs' interests are aligned with all settlement class members as they were all allegedly injured in the same manner by the same course of conduct, and they all share a common interest in maximizing their recovery from U.S. Bank. Each plaintiff has fulfilled his or her duty to the class by actively participating in the litigation and remaining informed of the negotiations with U.S. Bank. In addition, class counsel are well qualified to represent the class. They have years of specialized experience in class action litigation, and have successfully prosecuted major cases on behalf of victims of investment and commodities fraud. *See* Girard Decl., Exs. 2, 3. Class counsel have diligently prosecuted the case and successfully negotiated the proposed settlement in order to secure a fair recovery for the class.

### 5. Common Issues Predominate Over Any Individual Issues

Rule 23(b)(3) requires plaintiffs to demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members." This

requirement "is satisfied when 'common questions represent a significant aspect of [a] case and … can be resolved for all members of [a] class in a single adjudication.'" *Messner*, 669 F.3d at 815 (citation omitted). "If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question." *Id.* (citation omitted).

All of plaintiffs' claims focus on U.S. Bank's conduct, and not issues that pertain to individual class members. Predominating common questions of law and fact include whether U.S. Bank knew about the conduct of Wasendorf and PFG and was therefore liable under the IFOA and for aiding abetting violations of the CEA, and whether U.S. Bank's breaches of legal duties proximately caused some or all of the loss of PFG customer money. While there could be individualized issues relating to damages, the Seventh Circuit has held that "the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)." *Id.* The predominance requirement is therefore satisfied.

### 6. A Class Settlement Is the Superior Method for Resolving Class Member's Claims

Rule 23(b)(3) requires a finding that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See Amchem Products, Inc., v. Windsor*, 521 U.S. 591, 620 (1997).

The proposed settlement class includes 13,586 4d accounts for which, as of January 23, 2013, the Trustee has received 8,596 separate proofs of claim.[5] The monetary value of many claims is small relative to the cost of litigating these challenging claims against a large company like U.S. Bank. Absent this class proceeding, many if not most class members would likely be forced to abandon their claims. *See AT&T Mobility*, 270 F.R.D. at 345 (finding a class settlement to be superior when the class members "reside throughout the United States and would have a

---

[5] See footnote 4 above.

difficult and costly task in seeking relatively small damages solely on an individual basis"). There is also no indication that a significant number of class members have an interest in controlling the prosecution of individual cases against U.S. Bank. Resolving all class members' claims in this proceeding is therefore superior to a multitude of individual proceedings.

### C. The Proposed Form and Method of Class Notice Should Be Approved

Rule 23(c)(2)(B) states that "[f]or any class certified under Rule 23(b)(3), the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Rule 23(e)(B) similarly directs that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise." Due process requires a good-faith effort to reach the class members, not that every class member actually receives notice of the settlement. *See, e.g., Mangone*, 206 F.R.D. at 231; *see also* Newberg on Class Actions § 11:53 (4th ed.). Ultimately, courts have "virtually complete discretion" in approving an appropriate notice plan. *Eirhart v. Libbey Owens-Ford Co.*, 921 F.2d 278, at *1 (7th Cir. 1990) (unpublished table decision); *see also* Manual for Complex Litigation § 21.311.

The parties propose to send a copy of the long form notice by email to all members of the settlement class whose email addresses are maintained in the claims register in the bankruptcy case or that can be determined through reasonable efforts, and a copy of the summary notice by first class mail to Class members for whom no email address is available. For class members who do not have an allowed claim in the bankruptcy case, the parties propose mailing or emailing a claim form to the addresses listed in the claims register or in the Trustee's records or that can be determined through reasonable efforts. Other courts have found first class mail and email to be adequate means of distributing class notice. *See, e.g., AT&T Mobility*, 270 F.R.D. at 351.

14

Additionally, the proposed form and method of Class notice tracks the Court-approved notice used for the J.P. Morgan settlement, which proved effective in that context. *See* Dkt. 261 at 6-8.

As to the content and form of the notice, under Rule 23(c)(2)(B) the notice must state in plain language: the nature of the action; the class definition; the class claims, issues, or defenses; that a class member may enter an appearance through counsel; when and how class members may elect to be excluded from the class; and the binding effect of a judgment on class members. In addition, the notice should "'inform the class members of the nature of the pending action, the general terms of the settlement, that complete and detailed information is available from the court files, and that any class member may appear and be heard at the hearing.'" *Id.* (quoting Newberg § 8:32). The proposed short form and long form notices convey the necessary information in a user-friendly format. Girard Decl., Exs. B-1 and B-2. The long form notice was based on sample notices developed by the Federal Judicial Center as models of plain language drafting. *See* www.fjc.gov.

## IV. CONCLUSION

Plaintiffs respectfully request that the Court grant preliminary approval of the proposed settlement, certifying the settlement class for settlement purposes, approve the form and manner of notice to class members, and schedule a fairness hearing.

Dated: June 18, 2015        Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　/s/ *Daniel C. Girard*

　　　　　　　　　　　　　　　　　　　Daniel C. Girard
　　　　　　　　　　　　　　　　　　　Amanda M. Steiner
　　　　　　　　　　　　　　　　　　　David Stein
　　　　　　　　　　　　　　　　　　　Elizabeth A. Kramer
　　　　　　　　　　　　　　　　　　　**GIRARD GIBBS LLP**
　　　　　　　　　　　　　　　　　　　601 California Street, Suite 1400
　　　　　　　　　　　　　　　　　　　San Francisco, CA 94104

Telephone: (415) 981-4800
Facsimile: (415) 981-4846

Michael C. Dell'Angelo
Jennifer MacNaughton
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604

Norman E. Siegel
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (866) 714-7112
Facsimile: (816) 714-7101

*Counsel for Plaintiffs
and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2015, a copy of the foregoing document was filed electronically with the United States District Court for the Northern District of Illinois. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

      /s/ *Daniel C. Girard*